IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| **Women's Life Care Center**, on behalf of itself and its patients; **National Institute of Family and Life Advocates (NIFLA)**, on behalf of itself, its member clinics whose interests are violated by Minnesota law, and the patients of such member clinics; **Clara Munger**, on behalf of herself and her child; **Alexandra Johnson**, on behalf of herself and her child; **K.P.S.** (full name under seal), on behalf of herself and her child; **Dakota Hope Clinic**, on behalf of itself and its patients; **David Billings, MD**, on behalf of himself and his patients; and **Dawn Schreifels, MD**, on behalf of herself and her patients; | Case No.    24-4250 |
|  |  |
|  | **COMPLAINT** |
|  | **and** |
|  | **Plaintiffs Munger's, K.P.S.', and Johnson's Request for Jury Trial on Damages Only** |
| Plaintiffs, |  |
| v. |  |
| **Keith Ellison**, Attorney General, in his official capacity; **Tim Walz**, Governor, in his official capacity; **Jodi Harpstead**, Commissioner, Department of Human Services, in her official capacity; **Planned Parenthood Minnesota, North Dakota, South Dakota (PPMNS)**; **Planned Parenthood North Central States (PPNCS)**; **Sarah A. Traxler, MD**, in her capacity as Medical Director/Chief Medical Officer of PPMNS/PPNCS, and individually; **Brooke Cunningham**, Commissioner, Department of Health, in her official capacity; **Cheryl Bailey, MD**, President, Board of Medical Practice, in her official capacity; **Laura Elseth, LPN**, President, Board of Nursing, in her official capacity; **Ronda Chakolis**, President, Board of Pharmacy, in her official capacity; **Access Independent Health Services, Inc. d/b/a Red River Women's Clinic**; and **Kathryn L. Eggleston, MD**, in her capacity as Medical Director of Red River, and individually; |  |
| Defendants. |  |

## COMPLAINT

Plaintiffs, Women's Life Care Center; National Institute of Family and Life Advocates ("NIFLA"); Clara Munger; Alexandra Johnson; K.P.S.; Dakota Hope Clinic; David Billings, MD; and Dawn Schreifels, MD, by and through their undersigned counsel, bring this Complaint against the above-named defendants, their employees, agents, and successors in office, and in support thereof state the following:

## INTRODUCTION

1.      This is a constitutional challenge, brought pursuant to 42 U.S.C. §1983, to Minnesota's abortion laws, which have as their purpose the irreparable termination of the pregnant mother's constitutionally protected relationship with her child by terminating the life of her child without providing any due process protections or the equal protection of the law in violation of the 14th Amendment of the U.S. Constitution. Clara Munger, Alexandra Johnson, and K.P.S. (whose full name is submitted under seal) (together, "the pregnant mother plaintiffs") were all subjected to the termination of their parental rights and relationships with their children by involuntary and unwanted abortions. The pregnant mother plaintiffs also suffered the deprivation of other rights guaranteed by the 14th Amendment. Minnesota's laws violate the fundamental and intrinsic Due Process and Equal Protection rights of the current and future patients of plaintiffs Women's Life Care Center ("WLCC"), Dawn Schreifels, MD, Dakota Hope Clinic, and David Billings, MD ("the PHC plaintiffs"), as well as directly harming the PHC plaintiffs' own interests. Minnesota's abortion laws also

violate the 14th Amendment due process and equal protection rights of the patients of the member pregnancy help centers ("PHCs") of plaintiff National Institute of Family and Life Advocates ("NIFLA"), and directly harm NIFLA's and its member PHCs' own interests. The PHC plaintiffs and NIFLA also raise the Equal Protection rights of the children of these pregnant mother patients who want to keep their protected relationship with their children. Minnesota's abortion laws violate the pregnant mothers' intrinsic right to maintain their constitutionally protected relationship with their children, their right to procreate, their interests in their children's lives and welfare, and their right to the equal protection of the laws. They also violate the equal protection rights of the children of the mothers who want to keep their relationship with their children as guaranteed by the 14th Amendment.

2.    An abortion, as practiced under Minnesota law, is not medical treatment. It is the employment of a medical procedure to achieve a non-medical objective: the termination of a pregnant mother's constitutionally protected relationship with her child. That termination is achieved by the intentional termination of her child's life. If a pregnant mother has an ectopic pregnancy, or some other medical condition that places her at risk of death or the loss of a major bodily function, medical treatment necessary to treat such conditions which may have the unintended or unavoidable consequence of her child's death, is not, by its nature, an abortion. Such a procedure is true medical care, in contrast to an abortion which has as its only purpose the killing of the mother's child as a method of terminating her parental relationship with her child. True medical treatment to preserve the life and health of a

pregnant mother is not performed at an abortion facility. That true medical treatment is provided by the pregnant mother's physician, or physicians providing prenatal care, where there is a true physician-patient relationship. There is no true or traditional physician-patient relationship at an abortion facility.

3.      Under Minnesota law, it is a murder to intentionally kill an unborn child at any age after conception, which is punishable by *mandatory* life imprisonment. M.S.A. §609.2661, M.S.A. §609.266. That murder statute has, as its intended purpose, the protection of both the pregnant mother's right and interest in maintaining her relationship with her child and the protection of her child's life. *State v. Merrill*, 450 N.W. 2d 318, 322 (Minn. 1990).

4.      It has traditionally been the exclusive function of the state to terminate a pregnant mother's parental relationship with her child in both the context of "involuntary" terminations and "voluntary" terminations. "Involuntary" termination of a mother's rights is subject to the strict requirements of the 14th Amendment Due Process Clause which permits such involuntary termination only by a court order following a hearing, which provides extensive due process protections, including that the grounds for termination – the mother's "unfitness" – must be proven by clear and convincing evidence. The central purpose of such an involuntary termination is to advance the best interests of the child.

5.      It has also been the exclusive function of the state to terminate a mother's protected relationship with her child, where such terminations are deemed "voluntary." Those "voluntary" terminations can be effectuated only by a court order entered following a court

hearing in which the court determines that the mother's waiver of her intrinsic rights, resulting in the termination of the mother's relationship with her child, is knowing, truly voluntary, and truly informed. In Minnesota, those statutorily mandated court proceedings are required for voluntary terminations for pregnant mothers in the context of both non-abortion terminations and abortion terminations. The court proceedings required in the abortion context, however, are provided to some pregnant mothers but denied to most of them. The statutorily mandated court proceedings also apply to voluntary terminations for a mother's waiver of her rights to her child already born. Voluntary terminations of a pregnant mother's rights in the context of adoption operate to terminate the mother's legal status of "mother," and permit the state to confer legal status of "mother" of the child upon another woman. In the context of an adoption procedure, in order to ensure that the mother's waiver of such an important intrinsic 14th Amendment right is truly voluntary, the consent for such a termination cannot be taken during the mother's pregnancy, and no less than 72 hours after the birth of her child. That provision is in response to the generally recognized fact that a pregnant mother surrendering her rights prior to the birth of her child is not, in the most important sense, fully informed. In the adoption context, even after relinquishment of her rights, the mother can revoke her consent, for any reason, for up to ten days. Thereafter, a court of law must determine that the mother's waiver of her rights is voluntary and informed. An adoption agency, which has interests in conflict with those of the mother, cannot terminate the mother's right to her relationship. Only a court of law can do so, and

only after finding that termination of the mother's relationship with her child was voluntary and informed, and that the placement with another person is in the child's best interests. A court order terminating the mother's relationship can be vacated if the state fails to provide proper due process protections.

6.      Although the central traditional purpose of both "involuntary" and "voluntary" terminations of a mother's constitutionally protected relationship with her child is to advance and protect the child's best interests, a termination of the pregnant mother's relationship by an abortion destroys the mother's rights and completely defeats the child's interests by killing the child. Such terminations are completely irrevocable.

7.      The State of Minnesota has created an exception to the traditional norms governing termination of the mother's parental rights. Minnesota has a legal and regulatory scheme implemented, administered, and enforced by various state officials, which delegates the state function of terminating a pregnant mother's rights and interests in her relationship with her child to defendants Planned Parenthood Minnesota, North Dakota, South Dakota ("PPMNS"), Planned Parenthood North Central States ("PPNCS"), Red River Women's Clinic ("Red River"), and other abortion businesses, all of which have interests in direct conflict with those of the pregnant mother and the child she wants. The state defendants, elected and appointed state officials, work in collaboration and partnership with PPMNS, PPNCS, Red River, and other abortion businesses to effectuate the termination of the pregnant mother's constitutionally protected relationship with her child whether or not such

termination is voluntary. That termination is often involuntary, resulting from coercion or pressure from others placed upon the pregnant mothers who want to keep their children. Most waivers of the mother's rights and consents to abortions are uninformed. That collaborative effort and partnership between the state officials and the private state actor abortion businesses accomplishes the termination by killing the mother's child in utero. The unconstitutional state laws and regulations extend immunity from prosecution under the state's murder statute (punishable by mandatory life imprisonment) to the abortion doctors, the abortion facilities, their agents and employees, and to all of the public officials collaborating and partnering with the abortion providers whether or not the abortion that kills the mother's child is voluntary, knowing, and informed.

8.     The only asserted justification for the termination of the mother's relationship with her child by the killing of her child is that it is performed under the presumption of a voluntary and informed request and consent of the mother. Yet, unlike all other terminations of a mother's relationship with her child, the state does not impose any safeguards at all to ensure such terminations are voluntary. In fact, most of the abortions are performed on pregnant mothers who want their children. Minnesota and its officials repealed the few inadequate protections for the mothers' rights which previously existed under Minnesota's statutes, including the statute making it illegal to perform an involuntary abortion. The stark reality that – absent the state's grant of immunity – an abortion constitutes a murder is most apparent when the pregnant mother is forced to submit to an abortion against her will. The

collaborative and conspiratorial acts of the defendant officials and the other state actors acting under the color of state law withhold the protections of the murder statute for both the pregnant mother and her child, a statute intended to protect the interests of both. It demonstrates the unconstitutional equal protection violations of the mother's rights when the law sanctions the abortions without the proper procedures to ensure the mother's waiver of her rights is truly voluntary and informed.

9.      Not only are the terminations often involuntary or uninformed (there are no hearings in a court of law), they are final and completely irreversible. Unlike in other contexts in which an improper termination by a court order can be overturned, terminations by an abortion are completely irrevocable.

10.     Thus, under the pretense of being a *voluntary* termination of the mother's constitutionally protected relationship with her child, Minnesota has a legal and regulatory abortion scheme that: (a) makes no provision to ensure that such termination is, in fact, voluntary; (b) fails to prohibit involuntary abortions and authorizes them; (c) makes no provision to ensure that such termination is, in fact, informed; (d) effectuates such terminations by the termination of the life of one member of the relationship which would be a criminal murder punishable by life imprisonment absent a specially created immunity; (e) delegates the termination, which has traditionally been the exclusive function of the State, to private actors whose interests are in direct conflict with the pregnant mother's interest in maintaining her relationship with her child without court supervision or due process

8

protections; (f) institutionalizes the state collaboration and partnership with abortion businesses to achieve that result; and (g) imposes terminations by an abortion, which, unlike *voluntary* termination in an adoption, are totally irrevocable and irreversible.

11.    As a consequence of the implementation of Minnesota's statutory scheme, the acts of the state officials responsible for effectuating that scheme, and the acts of other state actors to whom they delegate such terminations, pregnant mothers in Minnesota, including patients of the PHC plaintiffs and the pregnant mother plaintiffs, have been subjected to coerced, pressured, and uninformed terminations of their constitutionally protected relationships in violation of their substantive due process rights and equal protection rights guaranteed by the 14th Amendment, to their great detriment.

12.    The medical profession recognizes that any physician who has a pregnant mother as a patient, has two separate patients, the mother and the child, and the physician owes a professional and legal duty to both. Defendant PPMNS admitted that fact under oath in prior litigation. Thus, the abortion doctor who proposes an abortion and seeks consent for one is proposing to kill one of his patients. The only thing that immunizes the abortion doctor from prosecution for murder, punishable by life imprisonment, is the signature on a "consent" form solicited by the physician, his agents and employees. PPMNS also admitted that fact in prior litigation. Yet, the abortion businesses all deceive the pregnant mothers by denying that a human being exists.

13.    The PHC plaintiffs, their medical directors, their associated umbrella organizations providing legal, administrative, and educational resources, and their agents and employees, also have two separate patients, the pregnant mothers and their children in utero. Plaintiffs WLCC and Dakota Hope, their medical directors and their agents and employees, have as their central mission the protection of their pregnant patients' constitutionally protected relationship with their children and their interests in the lives and well-being of their children. They are the protectors of the 14th Amendment rights of the pregnant mothers. Their duties also include protecting the lives and health of the pregnant mothers' children and protecting the children's interests. The State of Minnesota, through its officers, agents, and employees, has a duty to protect those very same interests, but instead of discharging its duty to protect those interests, the State, its officers, agents, and employees, working in conjunction with the abortion business defendants, aggressively acts to defeat the rights and interests of the pregnant mothers and the interests of their children, and to defeat the PHC plaintiffs' efforts to protect them. The interests and missions of the PHC plaintiffs and those of the defendants and abortion businesses are diametrically opposed: the PHCs are the defenders of the rights of pregnant mothers; the abortion businesses are the destroyers of their rights.

14.    Numerous former PPMNS and other abortion business workers testify that the abortion industry forbids its employees to tell a pregnant mother the name or contact information of any PHC, even when the pregnant mother indicates she would like help to

keep her child. One PPMNS worker testifies that she was fired for giving pregnant mothers information about where they could get help to keep the babies they wanted. She was told that her giving such information was "not in line" with PPMNS's "values." The former abortion facility workers testify that there was constant pressure to maximize the sale of abortions, and the abortion workers and doctors even pressured ambivalent mothers into an abortion. For that reason, PPMNS and the entire abortion industry has waged war against the PHCs because the PHCs help the mothers keep their babies they want, resulting in lost sales of abortions. The abortion industry attacks the PHCs and tells women not to obtain help from them. The defendant Minnesota Attorney General joined in with PPMNS and issued a "Consumer Alert" telling women never to go to a PHC.

15.     Former PPMNS and other abortion facility workers describe the women's suffering at abortion clinics, the women's despair, grief, and wailing because of the loss of their children. They describe the dark depressing culture that results in the workers' own depression and need to seek therapy for that depression and self-loathing.

16.     The former abortion clinic workers describe how they are required to lie to the pregnant mothers, being required to tell a mother who asks "What's already there?" that it is nothing but tissue. One former worker relates how depressing it was when she went to the Parts Room to reassemble the remains of the babies just aborted to be sure the abortion was complete. She would be required to find the baby's head and other body parts, and could only think about how a couple of hours earlier they lied to the mother that there was "just some

tissue." She testifies that if those mothers first went to the Parts Room, every pregnant mother would run out of the abortion facility. The sadness and depression of former abortion facility workers is so common, that an organization was founded in 2010 to help get such workers the therapy they need.

17.    The implementation of Minnesota abortion laws causes irreparable harm of the greatest magnitude on a daily basis and must be enjoined. Many thousands of pregnant mothers in Minnesota lose their children each year in terminations by abortions they do not want, a majority of which are performed by defendant PPMNS/PPNCS in partnership with the State. Minnesota, its defendant officials, and its state actors, destroy the pregnant mothers' rights and terminate the lives of their children. The Minnesota abortion laws are antithetical to plaintiff pregnancy help centers' own interests, the interests of their medical directors, and NIFLA's interests, and destroy their mission to protect the constitutional rights of the pregnant mothers they serve, the health of those mothers, and the lives of their children. The Minnesota abortion laws cause significant direct detriment and harm to PHC plaintiffs' own financial, reputational, and professional interests. To end this continued irreparable harm, the PHC plaintiffs seek declaratory and injunctive relief against implementation of Minnesota's current abortion scheme. Minnesota's abortion laws, as administered and enforced by the defendants, completely destroy the pregnant mother plaintiffs' relationships with their children and their interest in their children's lives, in violation of the 14th Amendment due process and equal protection rights and interests of both

the mothers and their children. The pregnant mother plaintiffs seek a declaratory judgment against all defendants, and compensatory and punitive money damages against the three abortion business defendants, and their Medical Directors, and other relief the court deems just and equitable.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, and 1367.

19.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court. Plaintiffs Clara Munger, Alexandra Johnson, and K.P.S. also have compensatory money damage claims and punitive money damage claims authorized by 42 U.S.C. §1983 against the three abortion businesses and their Medical Directors.

20.     Venue is appropriate under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to plaintiffs' claims occurs in this judicial district and the defendants are located and perform their work and duties in this district.

## PARTIES

### A.  Plaintiffs

21.     Plaintiff, **Women's Life Care Center** (**"WLCC"**), is a pregnancy help center located at 2870 Middle Street, Little Canada, in Ramsey County, Minnesota. Women's Life

Care Center is registered with the Office of the Minnesota Secretary of State as a domestic non-profit corporation. WLCC has operated since approximately 1983. WLCC is a medical facility, and all medical services are provided at the direction, and under the supervision and orders of its Medical Director, Dawn Schriefels, MD. WLCC's primary mission is to protect the pregnant mother's constitutionally protected right to keep and maintain her relationship with her child, her interest in her child's life and welfare, and her child's own interests, as well as the pregnant mother's right to procreate and her right to the equal protection of the law. WLCC has two different patients, the pregnant mother and her child she carries, and has duties to both. WLCC fulfills its mission by providing all advice, education, and other assistance necessary to help pregnant mothers from losing their children they want by involuntary or uninformed terminations. To that end, WLCC provides accurate and essential counseling and education, emotional support, material assistance, and information about available resources to pregnant mothers who want to keep their children. The need for WLCC to devote extensive time and resources to help protect pregnant mothers in Minnesota against unwanted abortions is the result, in great measure, of Minnesota abortion laws that fail to protect the mothers' most important intrinsic rights, and which delegate, expressly accommodate, authorize, and promote the destruction of those rights without any protections required by the 14th Amendment. WLCC helps protect its patients from coercion and pressure to submit to abortions they do not want. WLCC provides pregnant mothers with education, advice, and counsel that supports their true wishes and helps them make informed and

voluntary decisions which the mothers believe to be in their best interests. In addition to their essential education counseling, WLCC provides pregnancy testing, diagnostic ultrasounds, prenatal and parenting classes, other educational resources, material assistance, information about all financial and non-financial private and public assistance available to her to keep her child, and assistance to resist coercion and pressure to submit to an abortion. WLLC provides post-abortion counseling and also refers post-abortive women for other assistance and counseling. All services are provided to the pregnant mothers and post-abortive mothers completely free of charge. By providing counsel, education, and practical assistance to pregnant mothers, WLCC advances its mission to preserve and protect a pregnant mother's constitutionally protected relationship with her child, helps to protect the mother's other 14th Amendment rights, and helps to ensure that any consent by those mothers to waive their intrinsic rights and terminate their existing constitutionally protected parental relationship is fully informed and fully voluntary. WLCC is a member of plaintiff National Institute of Family and Life Advocates ("NIFLA"). WLCC sues on its own behalf, on behalf of its current and future patients who seek pregnancy help center services and want help to keep their constitutionally protected relationship with their children, as well as those pregnant mothers (and their children) who want the services of WLCC, or centers like it, but are prevented from obtaining them.

22.     Plaintiff, **National Institute of Family and Life Advocates ("NIFLA")**, was founded in 1993, and is headquartered in Fredericksburg, Virginia. NIFLA currently has

approximately 1,765 affiliate member pregnancy help centers ("PHCs") across the country, over 1,500 of which operate as medical clinics. About 40 NIFLA member PHCs operate in the State of Minnesota. Other NIFLA affiliates operate in the contiguous states of North Dakota, (like Dakota Hope and Relate Care), and South Dakota, and are negatively impacted by Minnesota's unconstitutional abortion laws and regulations. All NIFLA member centers have, as their central mission, the protection of pregnant mothers' constitutionally protected relationship with their children. To that end, NIFLA member centers provide an array of services to the mothers to help them keep the children they want. All NIFLA affiliates provide pregnancy counseling and education, and many members also provide post-abortion support for women who have been traumatized by a prior abortion. Many of NIFLA's member PHCs provide progesterone treatment to pregnant mothers who want their children despite being administered mifepristone by an abortion facility to start an abortion of their children. Since its founding, NIFLA has been the national leader in helping pregnancy centers convert to licensed medical clinics, and has assisted approximately 1,500 of its member PHCs in making that transition. NIFLA's comprehensive medical conversion program helps pregnancy help centers recruit and train medical professionals, advises centers about physical plant layout and necessary medical equipment, and provides model policies and procedures consistent with best practices. NIFLA works closely with its member PHCs, including those in Minnesota, to protect the health, rights, and interests of the pregnant mother patients and clients they serve. NIFLA sues on its own behalf, on behalf of its

member PHCs, on behalf of those members' current and future patients (both the mothers and their children who seek pregnancy help center services), and on behalf of the pregnant mothers and their children who want the services of NIFLA member centers, but who are prevented from obtaining them.

23.     Plaintiff, **Clara Munger**, is a Minnesota resident who was a pregnant mother subjected to an abortion she did not want, which was perpetrated on November 26, 2021, by defendants Planned Parenthood Minnesota, North Dakota, South Dakota ("PPMNS"), and its parent company, Planned Parenthood North Central States ("PPNCS"), at their abortion facility in Brooklyn Park, Minnesota.

24.     Plaintiff, **Alexandra Johnson**, is a North Dakota resident who was a pregnant mother who was coerced into an abortion she did not want, which was perpetrated on February 22, 2023, by defendant Red River Women's Clinic at its Moorhead abortion facility.

25.     Plaintiff, **K.P.S.** (full name submitted under seal), is a Minnesota resident who was a pregnant mother who was pressured and coerced into an abortion she did not want, which was perpetrated in the fall of 2020 by defendants PPMNS, and its parent company, PPNCS, at their abortion facility in St. Paul, Minnesota.

26.     Plaintiff, **Dakota Hope Clinic ("Dakota Hope")**, is a pregnancy help center located at 315 South Main Street, Suite 205, Minot, North Dakota. Dakota Hope Clinic is registered with the Office of the North Dakota Secretary of State as a domestic non-profit

corporation. Dakota Hope has operated since 2013. Dakota Hope is a medical facility and all medical services are provided at the direction, under the supervision of, and pursuant to the orders of its Medical Director, David Billings, MD. All of Dakota Hope's services are provided completely free of charge. Dakota Hope's primary mission is to protect the pregnant mother's constitutionally protected right to keep and maintain her relationship with her child, to protect her interest in her child's life and child's welfare, and to protect her child's own interests, as well as the pregnant mother's right to procreate, and her right to the equal protection of the law. Dakota Hope has two different patients, the pregnant mother and her child she carries, and has professional and legal duties to both. Dakota Hope fulfills its mission by providing all advice, education, and other assistance necessary to prevent pregnant mothers from losing their children by involuntary or uninformed terminations. The need for Dakota Hope to devote extensive time and resources to help protect pregnant mothers against unwanted abortions that take place in Minnesota is the result, in great measure, of Minnesota abortion laws that fail to protect the mothers' most important intrinsic rights, and laws that expressly delegate, authorize, accommodate, and promote the destruction of the mothers' rights without any protections required by the 14th Amendment. To that end, Dakota Hope provides accurate and essential counseling and education, emotional support, material assistance, and information about available resources, both financial and non-financial, both private and public, to pregnant mothers who want to keep their children. Dakota Hope helps protect their patients from coercion and pressure to submit

to abortions they do not want. The overwhelming majority of pregnant mothers who reside in North Dakota who are subjected to an abortion – including abortions resulting from pressure and coercion, and those that are uninformed – are subjected to those abortions in the State of Minnesota. Minnesota's laws protect the institution of abortion, provide no protections for the mother, and fail to protect her 14th Amendment rights against involuntary and uninformed termination. Dakota Hope provides pregnant mothers with education, advice, and counsel that supports their true wishes and helps them make informed and voluntary decisions which the mothers believe to be in their best interests. In addition to their essential pre-termination education and counseling, Dakota Hope provides pregnancy testing, diagnostic ultrasounds, prenatal and parenting classes, other educational resources, material assistance, assistance to resist pressure and coercion to abort, and important post-abortion counseling. Dakota Hope provides post-abortion counseling for those post-abortive women emotionally suffering from being subjected to an abortion. All services are provided to the pregnant mothers and post-abortive mothers completely free of charge. By providing counsel, education, and practical assistance to pregnant mothers, Dakota Hope advances its mission to preserve and protect a pregnant mother's constitutionally protected relationship with her child, helps protect the mother's other 14th Amendment rights, and helps to ensure that any consent by those mothers to terminate their existing relationship is fully informed and fully voluntary. Dakota Hope is often contacted by pregnant mothers following their being administered Mifopristone by abortion clinic personnel attempting to abort their babies.

Dakota Hope's Medical Director has provided progesterone treatment to save the babies these mothers want to keep, and will continue to do so. Dakota Hope is a member of Plaintiff National Institute of Family and Life Advocates ("NIFLA"). Dakota Hope sues on its own behalf, on behalf of its current and future patients and clients (both the mother and the children seeking pregnancy help center services), and on behalf of those pregnant mothers (and their children) who want the services of Dakota Hope, or centers like it, but are prevented from obtaining them.

27.    Plaintiff, **David Billings, MD**, is the Medical Director of Dakota Hope Clinic. In that capacity, Dr. Billings supervises all of the medical services provided at Dakota Hope, including pregnancy testing, diagnostic ultrasounds, and the disclosures and counseling associated with pre-termination education and counseling, and post-abortion counseling and assistance. As such, all of Dakota Hope's patients are patients of Dr. Billings, and he has a legal and professional duty to both the pregnant mothers and to their children in utero. All medical services provided at Dakota Hope are performed at Dr. Billings' direction, under his supervision, and pursuant to his medical orders. As such, Dakota Hope's patients are the patients of Dr. Billings. Dr. Billings' mission is the same as, and inextricably intertwined with that of Dakota Hope, its agents and employees, as are his own professional, reputational, and related interests. Dr. Billings has provided progesterone treatment to pregnant mothers who were administered Mifepristone on many occasions, and shall continue to do so in the future in his service to his patients. The unconstitutional Minnesota laws make his efforts and

20

expenditure of time and resources to assist these patients necessary. Dr. Billings sues on his own behalf, on behalf of his current and future patients (both the mothers and their children who seek pregnancy help center services), and on behalf of the pregnant mothers and their children who want the services of Dakota Hope or centers like it, but who are prevented from obtaining them.

28.    Plaintiff, **Dawn A. Schreifels, MD**, is the Medical Director of Women's Life Care Center ("WLCC"). In that capacity, Dr. Schreifels supervises all of the medical services provided at WLCC, including pregnancy testing, diagnostic ultrasounds, and the disclosures and counseling associated with pre-termination education and post-abortion counseling. All medical services provided at WLCC are performed at Dr. Schreifels' direction, under her supervision, and pursuant to her medical orders. As such, all of the pregnant mothers provided assistance at WLCC are patients of Dr. Schreifels, and she has a legal and professional duty to both the pregnant mothers and to their children in utero. Dr. Schreifels' mission is the same as, and inextricably intertwined with that of WLCC, its agents and employees, as are her own professional, reputational, and related interests. Dr. Schreifels sues on her own behalf, on behalf of her current and future patients (both the mothers and their children who seek pregnancy help center services), and on behalf of the pregnant mothers and their children who want the services of WLCC or centers like it, but who are prevented from obtaining them.

## B.  Defendants

29.    **Keith Ellison,** the Attorney General of the State of Minnesota, in his official capacity, is the State's chief law enforcement officer, and as such is responsible for the enforcement and legal defense of the State's abortion statutes which are used to deprive pregnant mothers of their 14th Amendment rights, including the right to their relationship with their child, their right to procreate, their protected interest in their children's lives and welfare, and their right to the equal protection of the law. Attorney General Ellison is instrumental in conferring and enforcing immunity from prosecution under Minnesota's murder statute even when a pregnant mother wants her child, when the so-called "consents" are uninformed, and when the abortion is involuntary. In his official capacity, he has violated the Equal Protection rights of pregnant mothers. In that capacity, defendant Ellison has deliberately failed to litigate the protection of the mothers' rights when he was required to do so. Defendant Ellison has also taken affirmative action to discourage pregnant mothers from obtaining help they need and want from pregnancy help centers, and tells those mothers not to obtain the progesterone treatment that can save the lives of their children they want. Defendant Ellison knew, or should have known, that a large percentage of pregnant mothers lose their children to unwanted, uninformed, and involuntary abortions in Minnesota, that Minnesota's abortion businesses do nothing to protect the mothers' rights and interests, and the abortion businesses perform abortions they know are not totally voluntary and rarely knowing and informed. He is sued in his official capacity.

30.    **Tim Walz**, Governor of the State of Minnesota, in his official capacity, is the Chief Executive Officer of the State of Minnesota and is responsible for overseeing, legally enacting, and implementing the state abortion regime which deprives pregnant mothers of their 14th Amendment rights, including the right to their relationship with their child, their right to procreate, their protected interest in their children's lives and welfare, and their right to the equal protection of the law. As Governor, he oversees the State's delegation of the traditional and exclusive state function of terminating a mother's parental rights to Planned Parenthood and other Minnesota abortion businesses. Those abortion businesses, acting pursuant to that delegation entrusted to them, solicit and take waivers of the mothers' constitutional rights and then terminate those rights without any due process protections, by murdering the mother's unborn child in violation of M.S.A. §§609.2661 and 609.266. Defendant Walz signed and promoted legislation that repealed every prior existing protection of the pregnant mothers' 14th Amendment right to keep her child, including the repeal of the Minnesota statute that made involuntary abortions illegal. By doing so, he made what is a murder under Minnesota law immunized as long as the actor labels the death of the mother's child "an abortion." On June 25, 2022, defendant Walz issued an executive order requiring all state agencies to act with one another to protect people or entities who perform abortions. Defendant Waltz's executive order also forbade any state agency to investigate or start a proceeding that seeks to enforce civil or criminal liabilities or professional sanctions upon

an abortion provider.[1] Defendant Walz promoted and signed legislation that prohibits the state courts from giving full faith and credit to the criminal and civil judgments of another state where a mother is victimized by an unwanted abortion, in contravention of federal law. Defendant Walz promoted and signed legislation that allows a person who violates a pregnant mother's rights and kills her child in another state, to file a lawsuit in Minnesota against the mother he victimized to recover the full amount of the pregnant mother victim's damages, and to obtain from the pregnant mother all attorneys' fees the wrongdoers spent for the cost of the suit in which the wrongdoer was found liable as well as attorneys' fees incurred in the new Minnesota case. Defendant Walz also promoted and signed legislation that provides sanctuary for a criminal, convicted of violating the rights of a pregnant mother and killing her child, who escapes from jail in another state, to flee to Minnesota for freedom from extradition. Defendant Walz acknowledged and boasted that he and other state officials are partners with defendants PPMNS and PPNCS, with whom they collaborate and help facilitate achieving their goals to maximize the number of abortions and terminations of the parental rights of all pregnant mothers brought to PPMNS/PPNCS facilities. Governor Walz states that the state officials will give PPMNS/PPNCS whatever its director says she needs from the state. Defendant Walz knew, or should have known, that a large percentage of pregnant mothers lose their children they want to unwanted, uninformed, and involuntary

---

[1] *See*, Second Declaration of Thomas J. Viggiano, III, Esq. ("Viggiano 2"), Ex.1, at p.2, ¶¶2-3.

abortions performed at PPMNS/PPNCS and other abortion facilities in Minnesota, and that the abortion businesses do nothing to protect the mothers' true wishes, or their rights and interests. Defendant Walz is sued in his official capacity.

31.    **Jodi Harpstead,** Commissioner of the Minnesota Department of Human Services, in her official capacity, is responsible for overseeing the implementation of all legal processes and procedures which effectuate the involuntary termination of a mother's parental rights, including the parental rights of pregnant mothers. Commissioner Harpstead is also responsible for overseeing the state officials charged with ensuring compliance with the requirements of the 14th Amendment due process and equal protection rights and interests of the mothers subjected to such involuntary terminations. She is also responsible to safeguard the best interests of the mother's child. The involuntary termination of a mother's parental rights is a traditional state function which may only be effectuated by the State, acting through the Department of Human Services and the state courts. Commissioner Harpstead is also responsible for overseeing the implementation of the legal process and proceedings which effectuate the presumed voluntary waiver of the pregnant mother's parental rights to her relationship with her child and the termination of the mother's constitutionally protected relationship. However, Commissioner Harpstead, working in collaboration with other Minnesota officials, and in partnership with PPMNS, PPNCS, Red River, and other abortion businesses, delegates that traditional state function of both involuntary and "voluntary" terminations of the pregnant mother's parental relationship to abortion facilities, their doctors

and employees, even when such terminations are involuntary. Defendant Harpstead knew, or should have known, that a large percentage of pregnant mothers lose their children to unwanted, involuntary, unknowing, and uninformed abortions. The Commissioner and other state officials act in concert and in partnership with the state actor defendants PPMNS, PPNCS, Red River, and other abortion businesses to terminate the mother's protected relationship without any due process or equal protection of the law as required by the 14th Amendment. In furtherance of such delegated terminations, Commissioner Harpstead administers the MinnesotaCare Program and other government funded programs under which government monies are used to pay the abortion businesses, including defendants PPMNS, PPNCS, and Red River, to terminate the mother's rights without due process and equal protection of the law, even when such terminations are involuntary or uninformed. The mother's child's interests are totally ignored and intentionally destroyed in the process. Commissioner Harpstead also oversees the State's implementation of voluntary terminations of the mother's rights in the context of adoption in which she, and those working under her and at her direction, are required to ensure that such terminations are truly voluntary and informed. She and other state defendants delegate to PPMNS/PPNCS, Red River, and other abortion businesses, the State's function of terminating a pregnant mother's parental rights under the guise of being "voluntary," regardless of whether such termination is truly voluntary or informed. She is sued in her official capacity.

32.     **Planned Parenthood Minnesota, North Dakota, South Dakota ("PPMNS")**, is a corporation organized under the laws of the State of Minnesota, maintaining a principal place of business in Ramsey County, located at 671 Vandalia Street, St. Paul, Minnesota. PPMNS operated abortion facilities in South Dakota until approximately June of 2022, continues to operate abortion referral sites in South Dakota and North Dakota, and operates multiple abortion facilities in Minnesota. PPMNS is now a subsidiary of its new parent corporation, Planned Parenthood North Central States ("PPNCS"). Minnesota delegates to PPMNS/PPNCS the traditional and exclusive state function of terminating a pregnant mother's parental rights which are always terminated without a court proceeding, and without any due process or equal protection for the pregnant mothers and their intrinsic rights. PPMNS, under, and in conjunction with PPNCS, performs a significant majority of the more than 12,000 abortions performed each year in Minnesota which terminate the mothers' relationships with their children by terminating the lives of the mothers' children. PPMNS/PPNCS abortions are performed on pregnant mothers who reside in Minnesota, and a significant number of pregnant mothers who reside out-of-state, especially pregnant mothers residing in North Dakota and South Dakota where abortions are not legal. PPMNS and PPNCS are so inextricably connected that they are one and the same. The "patient" records they use bear the name PPMNS or PPNCS or both names on a single patient record. PPMNS is sued as a state actor as an entity which partners and collaborates with Minnesota and its officials, including the named state defendants, to serve the State by performing the

traditional state function of terminating the parental rights of pregnant mothers, often against their will or intent. PPMNS is also sued as an entity acting under the color of state law and emboldened by it. The termination of the parental rights of plaintiffs Clara Munger and K.P.S. were performed at PPMNS/PPNCS. PPMNS/PPNCS is an affiliate of Planned Parenthood Federation of America ("PPFA"), a national organization which imposes its uniform policies and procedures upon all of its affiliates throughout the nation. PPMNS/PPNCS, while acting under the color of state law, has been completely aware that abortions terminate a pregnant mother's constitutional rights, including her protected interest in her relationship with her child, and interest in her child's life and welfare. PPMNS has also been completely aware that it is very common for pregnant mothers to lose their children against their will in uninformed and involuntary abortions, and that many of those mothers are coerced or pressured by others to submit to abortions they do not want. Such pressure is often from abortion facilities' personnel, and the abortions are often performed at PPMNS/PPNCS facilities.[2]

---

[2]PPMNS/PPNCS were in litigation for 17 years against the State of South Dakota, in which that state sought to protect the rights of pregnant mothers who wanted their children. *See, Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, No. 4:05-cv-4077-KES (D.S.D. 2005); *PPMNS v. Rounds*, 530 F.3d 724 (8th Cir. 2008) (*en banc*); *PPMNS v. Rounds*, 653 F.3d 662 (8th Cir. 2011); *PPMNS v. Rounds*, 686 F.3d 889 (8th Cir. 2011) (*en banc*); *PPMNS v. Daugaard/Noem*, No. 4:11-cv-4071-KES (D.S.D. 2011). PPMNS was presented with the evidence of the mothers being coerced. *See*, *e.g.*, Declaration of B.H., *PPMNS v. Daugaard/Noem* (D.S.D. April 8, 2019), ECF No. 206 (B.H. has submitted an updated declaration in support of the Plaintiffs' motion for a preliminary injunction in this case); Declaration of Brittany (Wilson) Weston,

33.    **Planned Parenthood North Central States ("PPNCS")**, is a corporation recently organized under the laws of the State of Minnesota maintaing a principal place of business in Ramsey County, located at 671 Vandalia Street, St. Paul, Minnesota. PPNCS operates as the parent corporation of PPMNS. One of the primary functions of PPNCS, like that of PPMNS, is to engage in the conduct and traditional state function, delegated to it by the State of Minnesota, of terminating the parental rights of pregnant mothers in Minnesota, and pregnant mothers who are taken into Minnesota from out-of-state. PPNCS is sued as a state actor as an entity which partners and collaborates with the State of Minnesota and its officials to serve the State by performing the traditional state function of terminating the parental rights of pregnant mothers, often by uninformed or involuntary abortions. PPNCS is also sued as an entity acting under the color of state law, and emboldened by it. PPNCS, like PPMNS, while acting under the color of state law, has been completely aware that abortions terminate a pregnant mother's constitutional rights, including the mother's constitutionally protected interest in her relationship with her child. PPNCS, like PPMNS, is also aware that it is very common that pregnant mothers lose their children against their will in uninformed and involuntary abortions, and are subjected to pressure and coercion by others, including from abortion clinic personnel, to submit to an abortion they do not want.

_____

*PPMNS v. Daugaard/Noem* (D.S.D. December 16, 2019), ECF No. 207 (Brittany Weston has submitted an updated declaration in support of the Plaintiffs' motion for a preliminary injunction in this case); Declaration of L.M., *PPMNS v. Daugaard/Noem* (D.S.D. February 22, 2021), ECF No. 302 (attached as Exhibit 2 to the Fourth Declaration of Harold Cassidy, dated Nov. 6, 2023 ("Cassidy 4")).

34.    **Sarah A. Traxler, MD**, is Medical Director/Chief Medical Officer of PPMNS/PPNCS, and as such, all surgical and medical abortions performed at PPMNS/PPNCS are performed by her or under her direction, supervision, and orders. All procedures, including all those that operate to destroy the rights of pregnant mothers at PPMNS/PPNCS, are by her direction and creation, and are all her responsibility. She is sued in her capacity as Medical Director and Chief Medical Officer of PPMNS/PPNCS, and individually.

35.    **Brooke Cunningham**, Commissioner, Department of Health, in her official capacity, is responsible for the state policies to promote the health and well-being of Minnesota residents. As such, she helps develop and draft policy for the executive branch that has helped create the policies and regulations that violate the 14th Amendment rights of pregnant mothers in Minnesota, and has helped make Minnesota the "abortion capital" of the Upper Midwest. In so doing, she is complicit in the overarching abortion scheme to terminate a pregnant mother's constitutionally protected intrinsic fundamental right to her relationship with her child, her right to procreate, and her protected liberty interest in her child's life and welfare. Commissioner Cunningham, in concert with the other defendants, promotes and effectuates the State's deprivation of the pregnant mothers' rights in an abortion under the false assertion and characterization of it as "healthcare," and as such, involves the Department of Health in all policy decisions promoting unconstitutional abortion laws. Defendant Cunningham, despite the fact she is one of the officials responsible for creating

regulations to protect the mother's rights, knows, or should know, that a large percentage of pregnant mothers lose their children to unwanted, uninformed, and involuntary abortions performed in Minnesota, and that the abortion businesses do nothing to protect the mothers' 14th Amendment rights and interests. She also knows, or should know, an abortion is not "healthcare." An abortion has no purpose other than the termination of a pregnant mother's parental relationship with her child, which is achieved by killing the mother's child. Commissioner Cunningham is sued in her official capacity.

36.   **Cheryl Bailey, MD**, President, Minnesota Board of Medical Practice, in her official capacity, is responsible for the licensing and regulation of physicians, and oversight of their medical practices, including the performance of abortions that deprive pregnant mothers of their 14th Amendment rights, including the right to their relationship with their child, their right to procreate, their protected interest in their children's lives and welfare, and their right to the equal protection of the law. Through their state-sanctioned medical licenses, physicians are delegated the power and authority to terminate the pregnant mothers' constitutionally protected parental rights without providing due process protections, by murdering the unborn child in violation of M.S.A. §§609.2661 and 609.266. The acts of Dr. Bailey, in conjunction with the acts of the other state official defendants, immunize those physicians from prosecution under that murder statute. In addition to those indiscretions, despite knowing the grave consequences of her authorizing and licensing such terminations, defendant Bailey fails to sanction or otherwise meaningfully regulate those physicians to

protect the mothers' rights. Defendant Bailey knew, or should have known, that a large percentage of pregnant mothers lose their children to unwanted, uninformed, and involuntary abortions. She is sued in her official capacity.

37.    **Laura Elseth, LPN**, President, Minnesota Board of Nursing, in her official capacity, is responsible for the licensing, regulation, and oversight of nurse practitioners and registered nurses, which includes their role in providing medical and surgical abortions that deprive pregnant mothers of their 14th Amendment rights, including the right to their relationship with their child, their right to procreate, their protected interest in their children's lives and welfare, and their right to the equal protection of the law. Through their state-sanctioned nursing licenses, nurses are authorized to terminate the pregnant mothers' protected rights, without any form of due process protections to safeguard their rights, by murdering the unborn child in direct violation of M.S.A. §§609.2661 and 609.266. Those nurses are immunized from prosecution. Defendant Elseth permits and encourages those violations, and fails to regulate the nurses to protect the mothers' rights. Defendant Elseth knew, or should have known, that a large percentage of pregnant mothers lose their children to unwanted, uninformed, and involuntary abortions. She is sued in her official capacity.

38.    **Ronda Chakolis**, President, Minnesota Board of Pharmacy, in her official capacity, is responsible for the licensing and regulation of pharmacists, and is responsible for overseeing pharmacists who dispense mifepristone and misoprostol which, when used together, cause the death of a pregnant mother's child, thereby depriving pregnant mothers

of their 14th Amendment rights, including the right to their relationship with their child, their right to procreate, their protected interest in their children's lives and welfare, and their right to the equal protection of the law. Through their state-sanctioned pharmaceutical licenses, pharmacists are authorized to terminate these constitutionally protected rights of the mothers without any form of due process protections, by enabling the murder of the unborn child in direct violation of M.S.A. §§609.2661 and 609.266. Those pharmacists are immunized from prosecution for violation of that murder statute. Despite knowing the consequential nature of her authorization and licensing, defendant Chakolis fails to impose regulation of those pharmacists that would protect the rights of the pregnant mothers. Defendant Chakolis knew, or should have known, that a large percentage of the pregnant mothers subjected to a medical abortion lose their children to unwanted, uninformed and involuntary medical abortions, and the pharmacists and abortion businesses do nothing to protect the mothers' rights and interests. She is sued in her official capacity.

39.    **Access Independent Health Services, Inc. d/b/a Red River Women's Clinic ("Red River")**, is a corporation originally incorporated in North Dakota, which fled the State of North Dakota when North Dakota stopped delegating termination of the mothers' parental rights to abortion businesses. Red River, while still organized under North Dakota law, operates its abortion business in Clay County, located at 302 Highway 75 North, Suite 108, Moorhead, Minnesota. Red River located its business just over the state line with North Dakota, to target the termination of the rights of North Dakota pregnant mothers, even when

33

the termination by an abortion is unwanted, uninformed, or involuntary. In February 2023, after abortions were made illegal in North Dakota, plaintiff Alexandra Johnson was driven across North Dakota's state line by her boyfriend to Red River to force her to submit to an involuntary abortion in Minnesota, where performance of involuntary abortions are not prohibited. In 2019, prior to Ms. Johnson's coerced abortion, Red River filed a lawsuit in federal court because it did not want to comply with a North Dakota law requiring abortion clinics to disclose that the proposed abortion terminated "the life of a whole, separate, unique, living human being," with the term "human being" defined in the biological sense. Despite that law, Red River never discussed that fact with the pregnant mothers whose children's lives were taken. In fact, Red River knew that the U.S. Court of Appeals for the 8th Circuit in *Planned Parenthood v. Rounds*, had already ruled that the required Human Being Disclosure was truthful, accurate, relevant to the mothers' decision, and constitutional. Red River also knew that it was a homicide to kill an unborn child in North Dakota any time after conception and punishable up to life imprisonment. Despite Red River's knowledge of these facts, it continued to perform abortions which otherwise would be a homicide without true voluntary and informed consent. That "consent" document now immunizes Red River in Minnesota even when an abortion is involuntary or uninformed. Red River moved to Minnesota because Minnesota law permits it to perform abortions without procedures to ensure that consent for abortion is voluntary and informed. Red River knows that it has been

terminating a mother's intrinsic constitutional rights when they perform abortions, and performed an abortion on plaintiff Alexandra Johnson, which was coerced.

40.     **Kathryn L. Eggleston, MD**, is the Medical Director of Red River Women's Clinic, and as such, all surgical and medical abortions performed at Red River are performed by her, or under her direction, supervision, and orders. All procedures, including all those that operate to destroy the rights of pregnant mothers at Red River, are by her direction and creation, and are all her responsibility. She is sued in her capacity as Medical Director, and individually.

## RELEVANT MINNESOTA LAW

I.     **General 14th Amendment Principles to Which Minnesota Must Adhere When Terminating a Pregnant Mother's Parental Rights**

41.     Every pregnant mother possesses intrinsic fundamental rights guaranteed by the 14th Amendment relating to the protection of her relationship with her child, which are among the greatest rights she possesses in all of life. The pregnant mother has an intrinsic right to keep and maintain her parental relationship with her child. She possesses her fundamental right to procreate, which includes her right to give birth. She has a protected interest in her child's welfare and child's life, and she enjoys the 14th Amendment right to the equal protection of the law. The relationship between a pregnant mother and her unborn child "is the touchstone and core of all civilized society. Its denigration is the denigration of

the human race."[3] As a consequence, the traditional legal protection of the mother-child relationship has been embedded in constitutional law.

42.    There is no interest of the mother protected by the 14th Amendment which conflicts with any of these fundamental rights.

43.    By its very nature an abortion is a method of terminating the pregnant mother's constitutionally protected relationship with her child. A "consent" to the termination of a pregnant mother's relationship with her child by an abortion, in fact, constitutes a waiver of her fundamental rights. Many such waivers and terminations are involuntary, and most are not truly informed. Under the 14th Amendment, a state is constitutionally prohibited from creating and implementing a legal regime that solicits and enforces a "waiver" of such a fundamental constitutional right without instituting legal protections which adhere to strict due process requirements to ensure that such a waiver, and the termination of the prenant mothers' relationship, is truly voluntary and informed.

44.    Given those demands of the 14th Amendment, the state officials cannot hand over vulnerable pregnant mothers to private state actors who aggressively seek and obtain involuntary or uninformed waivers of such critical rights. Yet, that is exactly what Minnesota law, its state officials, and the state actors who implement those laws, actually do. The state

_____

[3]Second Declaration of Harold J. Cassidy, November 2, 2023, ("Cassidy 2"), Ex.28, at p. 6 (South Dakota's Concurrent Resolution No. 1004 (2015)). All footnoted references to declarations refer to the declarations filed in support of Plaintiffs' motion for a preliminary injunction, to be filed shortly after the filing of this Complaint.

lets the abortion businesses, which have financial, ideological, and political interests that directly conflict with the interests of the pregnant mothers, to be solely responsible for taking "consents" that operate as the mothers' waiver of their fundamental constitutional rights – with absolutely no due process protections.

45.    When a physician has a pregnant mother as a patient, the physician has two separate patients, the mother and her child, and the physician has a legal and professional duty to both.[4] Defendant PPMNS's Medical Director, Carol Ball, MD, admitted that fact and stated the physician always has two separate patients, the mother and her child, with a dual duty to both of those patients.[5] Dr. Ball admitted that if a particular medical procedure poses risks to either, or both, the pregnant mother and her child in utero, the mother must make the decision for both patients.[6] Thus, the physician who proposes to a pregnant mother that she consent to submit to an abortion is proposing to kill one of the physician's patients. The pregnant mother, who is charged with the obligation to make a decision for both herself and her child, is not told that her child – a whole, separate, unique, living human being (the

---

[4]Declaration of Katherine Hartmann, MD, PhD, ¶25 and Endnotes 26 and 27 (citing, American College of Obstetricians and Gynecologists. *Ethics in Obstetrics and Gynecology*. 2nd ed. Washington DC: ACOG; 2004:34; Harrison MR, Golbus MS, Filly RA, eds. *The Unborn Patient: Prenatal Diagnosis and Treatment*. 2nd ed. Philadelphia, PA: W.B. Saunders Company; 1991); Declaration of Michael Valley, MD, ¶2; Declaration of Matthew Anderson, MD, ¶¶4-7.

[5]Cassidy 2, Ex.5 (Deposition of Carol Ball, MD, 63:15 - 64:20); Cassidy 2, Ex.6 (Ball Dep., 59:8-17; 60:21 - 61:5).

[6]Cassidy 2, Ex.6 (Ball Dep., 63:24 - 64:5).

physician's second patient) – even exists, or that without her "consent" the physician is guilty of murder.

46.     Consistent and in compliance with the obligations placed upon the states by the Due Process and Equal Protection Clauses of the 14th Amendment, Minnesota has provided, in some contexts, but not all, those protections necessary to safeguard against involuntary or uninformed terminations of a mother's protected relationship with her child, including the mother's relationship with her child during pregnancy. Those protections are required whether the state termination of the mother's rights is involuntary, or whether the state law creates a procedure for "voluntary" termination of the mothers' rights.

47.     No state can authorize or implement a scheme that involuntarily terminates a mother's protected relationship with her child unless there is clear and convincing evidence to conclude she is unfit, and that her child's best interests require such involuntary termination. Before involuntarily terminating a mother's intrinsic rights, the 14th Amendment requires all states, including Minnesota, to provide minimum protections, including: (1) a full factual hearing in a court of law; (2) that the mother be provided an attorney to protect her interests; (3) that she have the right to testify and produce witnesses on her own behalf; and (4) that only a court of law can enter an order terminating her parental relationship after concluding that the state proved, by clear and convincing evidence, that the child's best interests required such termination. Protection of the child's best interest is the only legitimate purpose of such involuntary termination.

38

## II.    Minnesota Laws Which Are Designed to Protect the Intrinsic 14th Amendment Rights of Pregnant Mothers Against Involuntary and Uninformed Termination of Parental Rights in Compliance with the 14th Amendment

### A.  Involuntary Terminations

48.    Among Minnesota's protections of the mother's rights are those provided by its murder statute. Under Minnesota law, it is a murder to intentionally kill a child in utero at any age after conception, punishable by *mandatory* life imprisonment. M.S.A. §609.2661; M.S.A. §609.266. That murder statute has as its intended purpose the protection (by deterrence) of both the pregnant mother's right to maintain her relationship with her child, and her interest in the protection of her child's life. *State v. Merrill*, 450 N.W. 2d 318, 322 (Minn. 1990).

49.    Minnesota has statutory requirements which adhere to 14th Amendment mandates when the State seeks involuntary termination of the mother's relationship with her child. For instance, when the State seeks a court order to protect the best interests of a mother's child, by permanently terminating the mother's parental relationship and rights, the State requires: (1) a full hearing in a court of law;[7] (2) that the mother have legal representation;[8] (3) the right to full participation in the court proceeding;[9] and (4) that no

---

[7]M.S.A. §260C.307.

[8]M.S.A. §260C.163.

[9]*Id.*

order can be entered against the interests of the mother unless the State proves, by clear and convincing evidence, that protection of her child's best interests requires it.[10]

50.    Minnesota courts have emphasized that the termination of parental rights must be proven by clear and convincing evidence that the child's best interests require termination. "The best interests of the child is the paramount consideration in a termination of parental rights proceeding."[11] Those statutes have application in the rare instances when a pregnant mother, who has already been found to be unfit as to her prior children, is threatened by the State to terminate her rights with the child she carries. In those instances, the State immediately files a termination action in court upon the birth of her child.[12]

## B. Voluntary Terminations

51.    Minnesota law has three separate statutorily-mandated court procedures before a mother can "voluntarily" waive her parental rights and submit to the termination of her parental relationship with her child. Two of those statutorily-mandated court procedures relate specifically to the "voluntary" termination of the parental rights of pregnant mothers. One of those two is statutorily mandated for non-abortion related terminations, while the

---

[10]M.S.A. §260C.317.

[11]*In re Welfare of Children of B.J.B.,* 747 N.W. 2d 605, 608 (Minn. App. Div. 2008); *see also, In re Welfare of Children of D.F.*, 752 N.W. 2d 88, 97 (Minn. App. Div. 2008) (citing *B.J.B.* and *Santosky v. Kramer*, 455 U.S. 745 (1982)).

[12]*See, e.g., In re Welfare of J.W.*, 807 N.W. 2d 441 (Minn. Ct. App. 2011).

other relates only to abortion-related terminations. The third statutorily-mandated court procedures specifically relate to post-birth "voluntary" terminations.

     **1.**     **Statutorily Mandated Court Proceedings Specific to the "Voluntary" Termination of the Rights of Pregnant Mothers**

     **(a)**     **Statutes Mandating Court Proceedings Specific to Non-Abortion Related Terminations for Pregnant Mothers**

52.    Under Minnesota law, if a pregnant mother thinks she wants to give up and waive her fundamental intrinsic right to maintain her relationship with her child, the State has a statutory scheme for her to do so. However, surrender of those rights in an adoption proceeding is subjected to strict requirements to protect the mother to help ensure that surrender of such cherished rights are truly voluntary and informed. As a result, before such termination of her rights can take place, the pregnant mother: (1) is entitled to an attorney free of charge to her;[13] (2) must be given a full disclosure of her rights;[14] (3) must be offered full counseling with no cost to her;[15] (4) cannot sign an enforceable consent to waive her rights at any time during pregnancy; for a mother's written waiver to form a valid basis for termination, the waiver cannot be signed sooner that three days after she has given birth, only after she gets to see and hold her baby, in order for her to fully understand what she is giving

---

[13]M.S.A. §259.47.

[14]M.S.A. §259.24.

[15]M.S.A. §259.47.

up;[16] (5) has the right to revoke her consent after signing the waiver of her rights;[17] (6) may only have her rights terminated by an order of a court of law;[18] and (7) is entitled to a hearing before a judge who cannot enter an order terminating the mother's parental relationship with her child without first finding that the waiver of her protected rights is voluntary and informed.[19] The placement of the child can take place only if the court finds it to be in the child's best interests.

<div align="center">

**(b)    Statutes    Mandating    Court Proceedings Specific to Abortion Related Terminations**

</div>

53.    Minnesota law created statutorily-mandated court proceedings for some pregnant mothers before an abortion facility can take a waiver of her parental rights and terminate her relationship by terminating the life of her child. Under Minnesota law, an abortion facility must refer some pregnant mothers who have not reached the age of majority to a court of law before the abortion business can accept a waiver of the mother's rights, and the court must specifically authorize the termination of the mother's relationship by an abortion.[20] By the terms of that statute, the court must advise the pregnant mother that she

---

[16] M.S.A. §259.24.

[17] M.S.A. §259.24, Subd. 6(a).

[18] M.S.A. §259.57.

[19] M.S.A. §259.47.

[20] M.S.A. §144.343, Subd. 6.

has a right to have the court appoint her counsel. The court must conduct "an appropriate hearing," and the court must make specific findings of fact and conclusions of law and make a permanent record of the proceeding.[21]

> **2.    Statutorily-Mandated Court Proceedings Specific for the "Voluntary" Termination of the Rights of Mothers of Children Already Born**

54.    Minnesota law governing the voluntary waiver and termination of a mother's parental relationship with her child is governed by M.S.A. §260C.301, Subd. 1(a). Such a voluntary waiver of parental rights requires the court to conduct hearings in the same manner and to the same extent as an involuntary termination under M.S.A. §260C.301, Subd. 1(b). The burden of proof is placed upon the State to the same extent as in involuntary terminations, and the voluntary nature of the mother's waiver and the justification for it must be proven by clear and convincing evidence. M.S.A. §260C.163. The mother has the right to be heard, the right to participate in the proceeding, the right to legal counsel, the right to have an attorney appointed for her, and the right to testify, present evidence, and cross-examine witnesses.[22] Only a court of law can terminate a mother's rights and parental relationship in the context of a voluntary termination.

---

[21]M.S.A. §144.343, Subd. 6(c). This statute has not been repealed, but in 2022, a state district court claimed it violates the Minnesota State Constitution.

[22]M.S.A. §260C.301, Subdivisions 1, 2, 3, 4, & 8.

### III. Minnesota Laws, Regulations, and State Action Which Terminate a Pregnant Mother's Intrinsic Constitutionally Protected Relationship with Her Child Involuntarily and Without Informed Consent in Violation of the Mother's 14th Amendment Rights

#### A. General Considerations: The Delegation of the Traditional State Function of Termination of a Pregnant Mother's Parental Rights to Private State Actors

55.     Minnesota abortion laws, regulations, and practices are a departure from the traditional practice whereby only the State, and only through its courts, can terminate anyone's parental rights, including those of pregnant mothers. Minnesota has delegated some of those terminations to abortion businesses, their doctors and employees, whose financial, ideological, and political interests directly conflict with the pregnant mother's constitutionally protected interests. As a result, there is no state court or other governmental authority standing between anyone coercing a pregnant mother into terminating her rights by an irrevocable abortion, and the entities and individuals who profit from it.

56.     That flaw in Minnesota law – fatal by itself – is even further compounded by a complete lack of any protections, due process, or equal protection of the law. The state abortion laws, promulgated, administered, and enforced by the defendants, authorize and effectuate involuntary terminations of the mothers' rights by coerced and pressured abortions, and also by uninformed waivers of the mothers' rights.

57.     Minnesota law is in such conflict with, and shows such disdain for, the 14th Amendment rights of pregnant mothers that the State will not give full faith and credit to the

44

laws of other states, and has made Minnesota a safe haven for anyone who violates the rights

of the mothers, whether the violation of the mothers' rights occurs in Minnesota or any other

state. Under Minnesota law, no criminal conviction, and no civil judgment, properly entered

in another state for the violation of the rights of pregnant mothers subjected to involuntary

and unwanted abortions, can be the basis for extradition or enforcement of judgments in

Minnesota. In fact, a civil defendant who has been compelled to pay money damages in

another state for the violation of the pregnant mothers' rights by performance of an improper

or illegal abortion, can seek and recover, in a Minnesota court, money damages against the

mothers who they victimized for:

1.  The entire amount of the judgment they had to pay to the victimized mothers;

2.  The entire amount of their attorneys' fees and costs from that lawsuit; and

3.  The full amount of the attorneys' fees and costs the wrongdoer spends in the lawsuit in Minnesota against the mothers they victimized.

By the terms of that Minnesota statute, even a non-resident of Minnesota who had a

judgment entered in another state for violating a pregnant mother's 14th Amendment rights

in another state, and killing her child that she wanted, could bring such a lawsuit in the State

of Minnesota against the mother whose rights he violated. Further, if someone was convicted

of the crime of killing a pregnant mother's child in an illegal abortion in another state, and

broke out of jail and fled to Minnesota, the State of Minnesota will provide the criminal

sanctuary, and will not extradite the criminal back to the state of conviction. Minnesota's

disdain for the 14th Amendment rights of pregnant mothers is so great that it has made itself a safe haven for criminals across the nation for crimes that destroy the mother's rights.[23]

58.     Those laws, as outlined herein, all violate the 14th Amendment rights of the pregnant mothers, and are especially egregious given the nature and magnitude of the destructive conduct of the abortion businesses which is known, or should be known, by the state officials. In short, Minnesota laws not only violate the 14th Amendment rights of pregnant mothers whose children are wrongfully killed in Minnesota, Minnesota gives protection and a safe haven for those who violate the pregnant mothers' rights, and kill their children in other states.

## B. The Unconstitutional Minnesota Legal Regime

### 1. The Inadequate Limited "Protections"

59.     Minnesota abortion laws never provided any meaningful protections of the pregnant mother's fundamental right to maintain her relationship with her child, her right to procreate, her protected interests in her child's life and welfare, or the her right to the equal protection of the law. The State's direct delegation of the termination of the pregnant mother's rights to abortion businesses which profit from the irrevocable terminations makes imposition of such protections impossible.

---

[23]M.S.A. §548.252; M.S.A. §604.415; M.S.A. §§629.01 to 629.29.

60.     Until May 2023, Minnesota statutes contained modest "protections" for the pregnant mothers, but those statutes and "protections" were, by their very nature, completely ineffective.

61.     M.S.A. §145.412, Subd. 1(1) specifically delegates and authorizes the termination of a pregnant mother's parental relationship with her child to licensed physicians. Among the Minnesota statutes were M.S.A. §§145.4241 through 145.4249, which required the abortion provider to disclose certain medical risks of an abortion (e.g. infection), and the fact that the baby's father was legally obligated to provide financial support for her child to the extent he was capable. In practice, those disclosures were never discussed with the pregnant mother and were buried in documents.

62.     Those statutory provisions did not require any meaningful disclosures or discussion of disclosures necessary for the pregnant mother to have any real chance to make a fully informed waiver of her rights, such as: (a) the fact that an abortion terminates the life of a whole, separate, unique, living human being; (b) that killing that human being, at any time in utero, was a murder punishable by life imprisonment; (c) that her "consent" would authorize that killing, and immunize the abortion provider from prosecution for what would otherwise be a murder resulting in life imprisonment; (d) that the pregnant mother has an existing relationship with her unborn child; and (e) that the pregnant mother possesses an intrinsic right to keep and maintain her existing relationship with her child, and that her

consent operates as a waiver of her own constitutional rights and authorizes what would otherwise be a murder.

63.     Those ineffective Minnesota laws provided that:

(a)     only a physician was authorized to perform an abortion;

(b)     an abortion had to be performed at an abortion facility or a hospital;

(c)     violations of those provisions were a felony; and

(d)     the abortion businesses were subject to mandatory abortion reporting requirements.[24]

64.     Although Minnesota law had required the Commissioner of Health to promulgate regulations for abortion facilities, such regulations were never written or adopted.[25]

65.     The law required abortion businesses to advise the pregnant mothers of information about where they could obtain help to keep their children.[26]

---

[24]M.S.A. §145.412, Subd. (c); M.S.A. §145,412, Subd. 1(2); M.S.A. §145.412 Subd. 4; M.S.A. §144.413; M.S.A. §144.413; M.S.A. §145.4131; M.S.A. §145.4132; M.S.A. §145.4133.

[25]M.S.A. §145.416; M.S.A. §145.412, Subd. 1(3).

[26]M.S.A. §145.4242.

66.     The Minnesota law made it illegal to perform an involuntary abortion,[27] but did not impose any protections to ensure an abortion *was* voluntary.

67.     The Minnesota law provided the pregnant mothers with only a 24 hour wait period between the time of her initial phone call to the abortion facility and the time the abortion was performed.[28] That was the only time the pregnant mother was given to make what would probably be the mothers' most important decision of their lives. No time and no provisions were provided for the mother to help her resist coercion and pressure to submit to an abortion she did not want.

68.     Those provisions legalizing the termination of the mother's protected relationship with her child did not ensure, in any meaningful way, that the termination of the mother's rights was truly voluntary and informed. No state court or other state authority stood between anyone coercing a mother into an abortion and the abortion businesses that killed her child, which is a murder under Minnesota law if the mother's waiver of her rights and consent to the abortion is not voluntary and informed.

69.     Collectively, these statutory provisions are referenced as "the pre-repeal Minnesota Abortion Laws." These laws were in effect at the time the Plaintiffs Clara Munger and K.P.S. were subjected to unwanted abortions under Minnesota law.

---

[27]M.S.A. §145.412, Subd. 1(4); M.S.A. §145.4242(a).

[28]M.S.A. §145.4242.

### 2.    The Complete Repeal of All of Minnesota's Limited and Ineffective Laws

70.    On July 11, 2022, the Ramsey County District Court Judge issued his opinion in the *Doe v. Minnesota* case, 62-cv-19-3868. That decision interpreted the pre-repeal Minnesota laws as unconstitutional under the Minnesota State Constitution, including, among others, the statute that forbade performance of involuntary abortions and required the 24-hour wait period and all of the minor disclosures. That opinion, in effect, repealed all of the limited protection for the pregnant mother but kept in place, as constitutional, and as the law of Minnesota, the delegation of the termination of the mother's parental relationship to licensed physicians and certain licensed nurses. In 2023, the Minnesota Legislature repealed every one of the statutory provisions listed in III B(1) above, including the statutory provision that made it illegal to perform an involuntary abortion, and that the mother must be given a 24-hour wait period before she submitted to an abortion, to provide a small measure of protection to guard against uninformed consent, and to help her ward off coercion from others.[29] Unlike other legal terminations of the mother's rights, under Minnesota abortion law the child's best interests are not taken into consideration. In fact, the sole purpose of the abortion procedure is to kill the mother's child.

71.    Collectively, the implementation of Minnesota law as created by the State Constitution, and as affirmed by the legislature's repeal of the Minnesota statutes, are

---

[29]*See*, Laws 2023, C.70, Art. 4, §113.

referenced as the "post-repeal Minnesota Abortion Laws." These "post-repeal" laws were in effect when Plaintiff Alexandra Johnson was subjected to a coerced abortion. Those "post-repeal" abortion laws are the subject of the Plaintiff pregnancy help center claims which seek preliminary and permanent injunctions.

### 3.    The Interpretation of Minnesota's State Constitution Strips Pregnant Mothers of Their Fundamental Rights Guaranteed by the 14th Amendment

72.    Minnesota has a state constitution which has been interpreted by its state courts to completely forbid state officials from implementing any due process protection for the rights of pregnant mothers guaranteed by the 14th Amendment of the U.S. Constitution when the termination of the mother's rights is implemented by performance of an abortion.[30] The State continues to immunize physicians and nurses from prosecution for violation of its murder statute as long as the killing of the child in utero is called an "abortion," whether or not the "consent" for the abortion is voluntary and truly informed.[31] When it repealed its modest statutory protections in 2023, Minnesota left in place only the law created by the state district court in its 2022 decision in *Doe v. Minnesota*.[32]

---

[30]*Doe v. Minnesota,* 2022, WL 2618040, County of Ramsey, District Court, No. 62-cv-19-3868 (July 11, 2022), [originally unnumbered, page numbers added by counsel] p.2, 58-65, attached as Ex.2 to Viggiano 2.

[31]*Id.*

[32]*Id.*

51

## FACTS

I.    **Minnesota Partners with the Abortion Industry to Terminate the Mother's Relationship with Her Child**

      A.    **The Partnership Between PPMNS and the State Officials**

73.    Governor Tim Walz, Lieutenant Governor Flanagan, and other state officials have declared that the state is in "partnership" with PPMNS/PPNCS and other abortion businesses. To that end, the state officials have delegated the traditional exclusive state function of terminating the parental rights of pregnant mothers and the relationship with their children to abortion businesses. To advance that partnership, the State provides protection of the interests of the abortion businesses, as state actors, and provides them with, among other things, immunity from criminal prosecution and state funding for them to terminate the rights of pregnant mothers. On June 25, 2022, Governor Walz issued an executive order *requiring* all state agencies to act in concert with one another "to protect people or entities" who perform abortions. Governor Waltz's executive order also *forbade* any state agency to investigate or start a proceeding that seeks "to impose civil or criminal liability or professional sanctions" upon any abortion provider, facility, abortion doctor, nurse, or their employees and agents.[33] That executive order required the Minnesota Department of Health to produce a report to him concerning the "importance" of "reproductive health care

---

[33]Viggiano 2, Ex.1, at p.2, ¶¶2,3.

services," "no later than August 1, 2022." The Minnesota Department of Health produced

that report on the "importance of abortion care" on August 1, 2022.[34]

74.    On January 8, 2024, Governor Tim Walz and Lieutenant Governor Peggy

Flanagan appeared at a joint press conference with the CEO of defendant PPNCS, Ruth

Richardson, and PPMNS/PPNCS's Medical Director/Chief Medical Officer, Sarah Traxler,

MD.

75.    At that press conference, Governor Walz, referring to his administration's

ongoing collaboration with Minnesota abortion businesses, observed that PPMNS/PPNCS

were "our partners" who they "work with."[35]

76.    Governor Walz, also stated: "we have adequate services and funding for

Planned Parenthood and those providers, and make sure we continue to advocate and enforce

what we already have."[36] At that press conference, Lt. Governor Flanagan stated that she

would "associate herself" with the remarks of Planned Parenthood who she referred to as

"my colleagues,"and that "there are a lot of tools in our tool box [to advance the work of

PPMNS]. We've been very intentional about using a lot of those tools..."[37]

---

[34]*See,* Viggiano 2, Ex.1 (Executive Order), at p.2, ¶2a ; *see also*, Viggiano 2, Ex.3
(Report on "importance of abortion.")

[35]*See*, Viggiano 1, Ex.4, (Transcript of January 8, 2024 Press Conference, at 2:18-
19).

[36]*Id.* at 3:4-8.

[37]*Id.* at 3:21-24.

77.     At that press conference, PPMNS/PPNCS's Medical Director/Chief Medical Officer Traxler gushed over her state official "colleagues" stating:

> " and what we have also seen in the State of Minnesota is that because we live in such a supportive environment and we have *so much support from our wonderful colleagues standing here with us* that we expanded the number of abortion providers in Minnesota... We have a really supportive community and that is what is demonstrated when you have a supportive political environment that providers and organizations feel really comfortable providing that 'care,' because they know that they are *protected* and so we've seen a *huge expansion* in the number of people who provide abortions in the State of Minnesota."[38](Emphasis added.)

78.     Dr. Traxler observed that Defendant Red River moved its abortion business into Minnesota because of Minnesota's accommodating laws and the State's partnership with the abortion businesses.[39]

79.     At that same press conference, Governor Walz stated that "I would, first of all, say whatever job Ruth's [PPNCS's CEO] doing, I'm with it."[40] After Lt. Governor Flanagan asked "Can I pump up Ruth for a minute?," Governor Walz responded: "Yes. Of course. It's one of our favorite things."[41]

---

[38]*Id.* at 5:14-20; 4:16-23.

[39]*Id.* at 6:2-5.

[40]*Id.* at 6:17-19.

[41]*Id.* at 7:19-20, 24-25.

80.    Incredibly, at that January 8, 2024 press conference, Governor Walz boasted about how he and the Minnesota Legislature, in 2023, repealed all of the modest protections for the rights of the pregnant mothers. In referring to those repeals, he called those modest protections "harmful," stating "[w]e removed really harmful pieces of legislation this last time..."[42] Those laws defendant Walz labeled "harmful" included the law that prohibited involuntary terminations and the 24-hour "wait" period given to mothers to make one of the most important decisions of their lives.

81.    The close nature of the relationship between the Governor and the Lt. Governor and PPNCS's CEO, Ruth Richardson, and PPMNS/PPNCS's Medical Director/Chief Medical Officer is clearly shown in the video of the January 8, 2024 press conference. That video shows the state officials and PPNCS officials warmly hugging one another.[43]

## B. Mutually Advancing the Partnership

82.    Every time PPMNS, PPNCS, and Red River destroy and terminate the parental rights of a pregnant mother, their abortion businesses are paid. In addition to that revenue, the State of Minnesota and the state defendants give those entities large annual grants to advance the State's partnership with them.

---

[42]*Id.* at 4:5-6.

[43]*See*, video referenced and submitted with Viggiano 1; *see also*, Viggiano 1, Ex.11 (screen shot from video of January 8, 2024 press conference showing state officials hugging with PPNCS officers); and Ex.12 (screen shot from video of a second press conference between the Governor and PPMNS/PPNCS on March 13, 2024).

83. By contrast, while the plaintiff PHCs work to protect the constitutional rights of pregnant mothers, they do not receive any payment from those mothers for their services. While the PHCs are actually protecting the mothers' fundamental constitutional rights – an obligation the State possesses – the State provides no funding for their work preserving the mothers' rights.

84. Every time a pregnancy help center provides the necessary assistance and education to an "abortion minded" or "abortion vulnerable" pregnant mother, and that pregnant mother, because of the help provided by the PHC, decides to keep her child, the abortion businesses, especially those run by PPMNS/PPNCS, lose the sale of an abortion.

85. As a result, the abortion clinics led by PPMNS/PPNCS spend resources to dissuade and prevent pregnant mothers from obtaining the help from PHCs which those mothers need to keep their children. To that end, PPMNS/PPNCS has, for many years, provided pregnant mothers with printed brochures copyrighted by Planned Parenthood Federation of America which expressly tell the mothers not to go to a PHC, and falsely claim that PHCs "lie" to the mothers.[44] PPMNS operates to maximize the number of pregnant mothers who lose their children in an abortion. PPMNS directly opposes any PHC which helps mothers keep their children, thereby reducing the number of abortions they can perform to terminate the mothers' rights.

---

[44]*See*, First Declaration of Harold Cassidy, dated Nov. 1, 2023 ("Cassidy 1"), Ex.76, at p.5 (Planned Parenthood brochure).

86.     In addition to the Governor's order demanding the "protection" of the abortion businesses and the prohibition against investigating them, the state officials' effort to advance the interests of the State's partnership with PPMNS/PPNCS and other abortion businesses, like Red River, the state defendants join in with PPMNS/PPNCS to denigrate the reputations of PHCs and discourage pregnant mothers from seeking the aid of PHCs. In August 2022, the Defendant Attorney General Keith Ellison issued what he called a "Consumer Alert." That "Consumer Alert" directly and forcefully attempts to discourage pregnant mothers from seeking the help they need to keep their children they want, and to promote abortion. Much of the "Consumer Alert" is completely inaccurate, and it opposes a mother's opportunity to exercise her right to keep her child.

87.     Defendant Ellison's "Consumer Alert" also advises pregnant mothers who were subjected to the start of the medical abortion process – mothers who decided that they want to keep their children – not to seek and obtain the progesterone treatment that would protect their rights and save the lives of their children. That "Consumer Alert" of the Attorney General is harmful to, and in conflict with, the mothers' rights and interests. The progesterone treatment saves the lives of the children for a large number of the mothers who want their children, who were administered mifepristone by an abortion clinic in order to terminate the life of their child.

88.     Progesterone is a female hormone associated with a woman's menstrual cycle and pregnancy. It has long been the standard of care for a physician to administer

progesterone when it is determined that the pregnant mother's progesterone level is dangerously low. A proper progesterone level is needed to increase the mother's blood flow. During ovulation, the woman's progesterone level naturally rises in anticipation and for accommodation of a pregnancy. If the pregnant mother has bleeding in the 1st trimester of pregnancy, progesterone treatment is appropriate. The purpose of an abortion business when it administers mifepristone is to deliberately lower the progesterone level to kill the mother's child.[45]

89.    Progesterone treatment for a pregnant mother who was administered mifepristone, and wants to keep her child, has proven to be highly successful.[46] That progesterone treatment to stop the effects of the administration of mifepristone by an abortion business, is now widely practiced.[47]

90.    That 2022 "Consumer Alert" asks the public to provide "information" about PHCs, and requests people to report to the State what they think is "deceptive" or "inaccurate." That alert gives telephone numbers to the public for the purpose of reporting against PHCs. At no time has Defendant Ellison, or any other state defendant, ever warned

---

[45]Declaration of David Billings, MD, ¶¶11-14.

[46]First Declaration of Mary Davenport, MD, dated Feb. 8, 2023 ("Dr. Davenport 1"), ¶¶4-14, 16-21; *see also*, Second Declaration of Mary Davenport, MD, dated Jul. 11, 2024 ("Dr. Davenport, 2"), ¶¶2-8.

[47]Dr. Davenport 1; *see also*, Dr. Billings Decl., ¶¶11-14; Declaration of Matthew Anderson, MD, ¶¶2, 8; Dr. Valley Decl., ¶¶4-9.

the public about the uncountable bad policies, misrepresentations, and derelictions made by their partners at PPMNS, PPNCS, Red River, or any other abortion business.[48] They never provided a call-in number to report the derelictions of their partners in the abortion industry.

91.    The protection of the rights of pregnant mothers requires, first and foremost, dedication to the protection of the pregnant mothers' right to keep their constitutionally protected relationship with their children, their right to procreate, their personal interest in their children's welfare, and their right to the equal protection of Minnesota's murder statute. Any other perceived interest which conflicts with those, either that of the State, the abortion industry, or others, must be subordinate to those paramount rights of the mothers. The state defendants not only fail to protect those rights of the mothers, but aggressively promote the destruction of those rights in partnership with abortion businesses whose financial, political, and philosophical interests directly conflict with the intrinsic rights of the pregnant mothers.

**II.    The Complete Derelictions of Defendants PPMNS/PPNCS and Red River with Whom Minnesota's Officials Partner and to Whom They Delegate the Complete Termination of the Pregnant Mother's Parental Rights**

92.    PPMNS/PPNCS and Red River, in partnership with the state defendants, are state actors performing the traditional state function of terminating the parental rights of

---

[48]*See*, First Declaration of Jacinta Lagasse, dated Dec. 31, 2022 ("Lagasse 1"), Ex.1 (Attorney General Ellison's "Consumer Alert").

pregnant mothers. Further, they are entities acting under the color of state law within the meaning of 42 U.S.C. §1983. PPMNS/PPNCS and Red River have proven to be derelict as state actors in numerous ways, and have proven to be incompetent to serve in that capacity. They routinely violate the 14th Amendment rights of pregnant mothers at their Minnesota abortion facilities. The defendant state officials have been put on notice of those facts, and despite that knowledge, continue to partner with them to violate the mothers' rights. It is clear from their prior litigations with South Dakota and North Dakota that PPMNS/PPNCS and Red River, while acting under the color of state law, fully understand that they have been terminating the intrinsic fundamental rights of pregnant mothers, and that their practices have violated those rights. The defendant abortion businesses have also been aware of the devastating loss to those mothers, and the deep psychological suffering they experience as a result of the injurious practices of the abortion businesses. The defendant state officials know, or should know, that their abortion business partners, acting under the color of state law, are aware of the deprivation of the rights of the mothers.

### A. Violations of the Mothers' Rights by PPMNS/PPNCS

#### 1. Prior Condemnation of the Derelict Practices of PPMNS/PPNCS

93. The complete disregard for the constitutionally protected interests of pregnant mothers by PPMNS and PPNCS has been apparent and well documented for two decades. Their derelictions of duty and harmful practices have been so destructive of the mothers'

rights, that in 2018 the South Dakota Legislature felt compelled to make findings of fact about those practices and incorporated those findings in the official state statutes.[49] Those factual findings followed 13 years of litigation between PPMNS and South Dakota state officials and pregnancy help centers.[50] Because of the evidence amassed in two different lawsuits, and the clear violation by PPMNS of federal court orders and the rights of pregnant mothers, the South Dakota Legislature stated in part:

> "The Legislature finds that failure to adequately provide and discuss the disclosures required by subsections 34-23A-10.1(1)(c) and (d) is contrary to the interests of pregnant mothers considering an abortion and the required disclosures are important for the pregnant mothers to fully understand that the pregnant mother has an existing relationship with her unborn child while the child is in utero, that the law recognizes this relationship has value to her, and that by terminating that relationship she loses something of great value to herself, and gives up one of the greatest rights she has in all of life."[51]

94.     When the South Dakota Legislature became aware of PPMNS' refusal to protect the 14th Amendment rights of pregnant mothers, and to obey the laws designed to better protect those rights, the South Dakota Legislature clearly articulated the interests it sought to protect. The legislature expressly stated the purpose of the 2005 Informed Consent Statute:

---

[49]*See*, Cassidy 1, Ex.74 (SDCL §34-23A-74 to 88).

[50]*See*, *PPMNS v. Rounds*; *PPMNS v. Daugaard/Noem*.

[51]Cassidy 1, Ex.74 (SDCL §34-23A-85).

> "The Legislature finds that pregnant women contemplating the termination of their right to their relationship with their unborn children ... are faced with ... pressures from circumstances and from other persons, and that there exists a need for special protection of the rights of such pregnant women..."[52]

95.    To that end, to provide a measure of protection for the pregnant mother's fundamental right to maintain her relationship with her child, the South Dakota Legislature passed its Informed Consent Statute to require abortion providers to provide various disclosures before taking a consent to submit to an abortion. Those disclosures included: (1) "that the abortion will terminate the life of a whole, separate, unique, living human being" ("human being" defined in the biological sense) ("Human Being Disclosure")[53]; (2) "that the pregnant woman has an existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota[54]; (3) "that by having an abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated;" (together, "Relationship Disclosures")[55] and (4) "that an abortion places a woman at increased risk of suicide ideation and suicide" ("Suicide Disclosure").[56]

---

[52]SDCL §34-23A-1.5.

[53]SDCL §34-23A-10.1(1)(b).

[54]SDCL §34-23A-10.1(1)(c).

[55]SDCL §34-23A-10.1(1)(d).

[56]SDCL §34-23A-10.1(e)(ii).

96.     At that time, PPMNS had clinic locations in the states of Minnesota, North Dakota, and South Dakota. PPMNS knew that all three of those states, where they conducted business, had laws making the killing of an unborn human being at any age after conception, a murder or homicide, punishable by life imprisonment, mandatory life imprisonment in Minnesota and South Dakota.[57]

97.     PPMNS knew that the Human Being Disclosure was a truthful and accurate statement of scientific fact. PPMNS also knew that by seeking a consent for an abortion, PPMNS was asking a pregnant mother for permission to kill a human being, her child, thereby authorizing a murder, and that the consent would extend immunity to the abortion doctors and workers.

98.     Despite that knowledge, PPMNS never made any disclosures that gave information necessary for a pregnant mother to understand the magnitude and nature of her consent. In fact, it was the practice of PPMNS to deliberately deceive pregnant mothers by deliberately mischaracterizing the human being in utero as nothing but "some tissue," or "product of conception."[58]

---

[57]M.S.A. §609.2661, and M.S.A. §609:266; SDCL §22-16-1.1 and SDCL §22-6-1; NDCL §12.1-17.1-02; NDCL §12.1-17.1-01; and NDCC §12.1-32.01.

[58]*See*, Cassidy1, Ex.51, at p. 14-19 (Report of the South Dakota Task Force to Study Abortion, dated 2005, regarding PPMNS's unprofessional, destructive, and deceptive practices).

99.     When the South Dakota Legislature passed its 2005 Informed Consent Statute requiring the Human Being Disclosure and the Relationship Disclosure, PPMNS – despite knowing its importance to the pregnant mother – refused to provide them and instead PPMNS sued the State of South Dakota claiming that the Human Being, Relationship, and Suicide Disclosures, which were designed to protect the rights of the pregnant mother, *violated the constitutional right of PPMNS and its doctors.*[59] PPMNS, in effect, argued that their own perceived "right" not to make a disclosure they did not like was more important than protection of the mothers' right and help for the mothers to keep their children they wanted.

100.     PPMNS lost its lawsuit and was ordered to make the Human Being Disclosure using the precise language of the statute.[60] Despite losing that lawsuit and being ordered to make the Human Being Disclosure, PPMNS failed to do so, compelling the South Dakota Legislature to make numerous findings concerning PPMNS's derelictions in failing to adequately counsel pregnant mothers, and in failing to make necessary disclosures to the mothers.[61] Among its factual determinations, the Legislature stated, among 15 different findings:

---

[59]Complaint, *PPMNS v. Rounds* (D.S.D. Jun. 6, 2005), ECF No. 1.

[60]*PPMNS v. Rounds,* 530 F.3d 724 (8th Cir. 2008) (*en banc*); *PPMNS v. Rounds,* 650 F.Supp. 2d 972, 976-77 (D.S.D. 2009); *PPMNS v. Rounds*, 653 F.3d 662 (8th Cir. 2011); *PPMNS v. Rounds*, 686 F.3d 889 (8th Cir. 2012) (*en banc*).

[61]*See*, Cassidy1, Ex.74 (SDCL §34-23A-74 to 88).

(1)     "The Legislature finds that the failure [by PPMNS] to comply with subsection 34-23A-10.1(1)(b) [Human Being Disclosure] is contrary to the interests of pregnant mothers and pregnant mothers' need to make truly informed and voluntary decisions, and is not in keeping with the spirit and purpose of the law and the holdings of the United States Court of Appeals in *Planned Parenthood v. Rounds*, 530 F.3d 724 (8th Cir. 2008)(*en banc*) and the United States District Court, entered August 20, 2009, *Planned Parenthood v. Rounds*, 650 F.Supp.2d 972, 976 (S.D., S. Div. 2009)"[62];

(2)     "The Legislature finds and reaffirms that it is essential to the ability of a pregnant mother to make a truly informed and voluntary consent to an abortion, and essential to the legal protection of her constitutional rights to maintain her relationship with her child, and that she have a full appreciation and understanding of the disclosures required by subsections 34-23A-10.1(1)(b) [Human Being Disclosure] (c) and (d) [Relationship Disclosures]."[63]

101.    Because of the evidence amassed in two different lawsuits, PPMNS's flagrant and continued violations of federal court orders, and its demonstration of the total disregard of the rights of the pregnant mothers, the South Dakota Legislature concluded:

"The Legislature finds that the physicians, agents, and employees who perform or assist in the performance of

---

[62]SDCL §34-23A-81.

[63]SDCL §34-23A-85.

abortions at the Planned Parenthood facility in Sioux Falls, South Dakota have proven to be unreliable providers and counselors of disclosures required by subsections 34-23A-10.1(1)(b), (c), (d) and (e)(ii) [Suicide Disclosure], such that it is in the interests of the pregnant mothers that [those] disclosures ... [be] provided by registered pregnancy help centers..."[64]

### 2. The Nature and History of the Derelictions of PPMNS and PPNCS Which Have Violated the 14th Amendment Rights of Pregnant Mothers

102.    Despite the fact that the State has delegated and entrusted to PPMNS/PPNCS the function of accepting a pregnant mother's waiver of one of her greatest rights, PPMNS/PPNCS has never instituted any procedures to ensure that a mother's submission to an abortion is truly voluntary and truly informed. Their practices ensure that the overwhelming majority of waivers of the mothers' rights (the "consent" to an abortion) are uninformed. Likewise, their practices make certain that many such waivers (consents) are the result of pressure or coercion from other persons and, in some instances, from abortion clinic workers. No assistance is given to help pregnant mothers who wind up at their facilities who are ambivalent or who would prefer to keep their children. PPMNS's derelictions that destroy the rights of pregnant mothers are severe, legion, and well documented.[65]

---

[64]SDCL §34-23A-88.

[65]Hartmann, MD, PhD Decl., ¶¶54-79.

      (a)      **PPMNS/PPNCS Admits that the Decision of a Pregnant Mother to Submit to an Abortion is _Not_ a Medical Decision, and Involves the Waiver and Termination of "One of the Greatest Rights that a Mother has in Her Lifetime"**

103.    PPMNS' Medical Director, Dr. Carol Ball, admitted that a pregnant mother's decision whether she should, or should not, keep her relationship with her child, is not a medical decision.[66] Dr. Nichola Moore – another physician who performed abortions at PPMNS abortion facilities – also admitted that fact, that it is not a medical decision. Dr. Moore further acknowledged that – while she performs such terminations – she has no expertise or special qualifications to counsel a pregnant mother about that mother's decision of whether to keep or terminate her relationship with her child.[67]

104.    PPMNS Medical Director Dr. Ball admitted that:

      (a)      "the relationship that a mother has with her child can give great joy and benefit to the mother over her lifetime"[68];

      (b)      "the right that a mother has to keep her relationship with her child is one of the greatest rights that a mother would have in her lifetime"[69]; and

---

[66]Cassidy 2, Ex.3 (Ball, at 52:8-13).

[67]Cassidy 2, Ex.4 (Deposition of Dr. Nichola Moore, at 142:20 - 144:3).

[68]Cassidy 2, Ex.1 (Ball, at 49:11-22).

[69]*Id.*

     (c)     the decision of a pregnant mother of whether to keep her relationship with her child, or give it up – regardless of the circumstances – is one of the greatest decisions for a mother to face, is very difficult, and one that has significance for her.[70]

105.    The termination of the mother's rights in the context of an abortion is uniquely perilous, because that termination is achieved by killing her child. PPMNS and Dr. Ball admitted that they knew that it was a criminal homicide in South Dakota for any person to intentionally kill an unborn child at any age after conception, and that the only thing immunizing the PPMNS abortion doctors from criminal prosecution under that homicide statute is their soliciting and obtaining a signature on a consent form.[71]

106.    Incredibly, despite acknowledging that the termination of the mother's relationship with her child is one of the most important and difficult decisions a mother makes in all of life, and the fact PPMNS proposes to kill her child – immunity from prosecution depends on obtaining a consent – PPMNS and Dr. Ball claim that they don't think it is more important that the consent for an abortion be truly voluntary any more than a consent to suture a finger.[72]

---

[70]Cassidy 2, Ex.2 (Ball, at 49:23 - 50:17).

[71]Cassidy 2, Ex.7 (Ball, at 65:18 - 66:1).

[72]Cassidy 2, Ex.8 (Ball, at 67:19 - 68:23).

107.    As a result of that attitude, prevalent throughout the entire Planned Parenthood organization, PPMNS/PPNCS impose no procedures to even attempt to ensure that the most important decision the pregnant mother will ever make is voluntary and truly informed.

### (b)    PPMNS/PPNCS Assumes There is No Need for an Informed Consent Process, So No Counseling or Consent Process is Provided

108.    There is no "informed consent" process at PPMNS/PPNCS facilities. PPMNS/PPNCS "patient educators" (term used by PPMNS/PPNCS) assume that by the time the pregnant mothers arrive at the abortion clinic, their minds are already made up.[73]

109.    When the pregnant mother first arrived at the PPMNS abortion clinic on the day an abortion was scheduled, she was given forms to fill out at a front desk, including the consent for a surgical (SAB) or medical abortion (MAB), which had to be signed and returned to the front desk before she met or spoke with a counselor or physician.[74]

---

[73]Cassidy 1, Ex.60 (Deposition of "Jaime," at 70:9-10); Cassidy 1, Ex.75 (Deposition of Andrea Adams, at 117:6-18).

[74]Cassidy 1, Ex.6 (Deposition of Clinic Manager, Kate Looby, at 75:10 (with consent for surgical abortion)); Cassidy1, Ex.7, ("Jaime," at 33:5-36:19 (with Jaime, Exhibits 3, 4, & 5 (consent forms)); Cassidy1, Ex.8, (Deposition of Kylene Guse, at 33:17-23 (with Ball Deposition, Ex. 13). *See also*, Declaration of Plaintiff Clara Munger, ¶16; Declaration of Plaintiff K.P.S., ¶21 (regarding procedure at PPMNS's St. Paul, Minnesota facility); Declaration of Tanya Humphreys, ¶¶ 29-32 (regarding procedure at PPMNS's St. Paul, Minnesota facility); B.H. Decl., ¶13 (regarding procedure at PPMNS's Sioux Falls, South Dakota facility); Weston Decl., ¶20 (regarding procedure at PPMNS's Sioux Falls, South Dakota facility).

110.    There is no discussion at PPMNS/PPNCS about the pregnant mother's rights and "the entire process is dismissive of any notion that there is anything of significance taking place."[75]

111.    The consents at PPMNS/PPNCS are signed before the pregnant mother sees a "patient educator." When the patient educator meets the pregnant mother, she only checks to see that the consents are signed.[76]

112.    The pregnant mother, having signed the consent in a waiting area without ever receiving counseling or seeing a nurse, counselor, or physician, is required to pay for the abortion procedure before meeting with anyone.[77] This practice is employed by Planned Parenthood abortion facilities throughout the country, and is designed to increase the psychological pressure on the mother to submit to the abortion.[78]

---

[75]Declaration of Plaintiff Clara Munger, ¶¶17, 18 (regarding procedures at defendant PPMNS's Brooklyn Park, Minn. facility).

[76]Cassidy 1, Ex.9 (Adams, at 69:2-21); Cassidy1, Ex.7, (Jaime, at 33:5 - 36:19; Cassidy1, Ex.10 (Adams, at 39:11-21); Cassidy1, Ex.11 (Looby, at 1:3; 88:1-22); Cassidy1, Ex.12 (PPMNS's Medical Director, Dr. Ball, at 126:23 - 127:24 (with Dep. Exhibits)).

[77]Cassidy 1, Ex.13 (Adams, at 39:1-21; 47:10 - 50:13; 92:5 - 93:10; Cassidy 1, Ex.14 (Looby, at 83:10 - 84:25); Munger Decl., ¶16.

[78]Declaration of Annette Sosa-Rodriguez, ¶12; *see*, Weston Decl., ¶22.

113.    PPMNS/PPNCS's "patient educators" do not believe that "the pregnant mother's existing relationship with her unborn child" is important to that mother or that it provides any benefits to her.[79]

114.    Thus, there is no counseling of any kind relevant to help inform a pregnant mother in a "consent" process. For instance, the PPMNS "patient educators" volunteer no information about fetal development.[80]

115.    In fact, PPMNS's Medical Director, Dr. Ball, testified that she and other PPMNS physicians believed that any information about fetal development was totally irrelevant to a pregnant mother's decision of whether to waive her rights and consent to an abortion. PPMNS/PPNCS and Dr. Ball take that position despite the fact that an abortion terminates the life of a whole, separate, unique, living human being. As a result, PPMNS's physicians refer to the human being, whose life they terminate, only as "the contents of the uterus," and do not explain what they are actually killing. One of the PPMNS abortion doctors, Dr. McCreary, testified that she liked the phrase "contents of the uterus" precisely because it is "non-specific."[81]

---

[79]Cassidy 1, Ex.15 (Looby, at 214:16 - 215:13).

[80]Cassidy 1, Ex.16 (Looby, at 116:10-13); Cassidy 1, Ex.17 (Deposition of Pamela Nelson, at 93:21 - 97:4); Cassidy 1, Ex.18 (Adams, at 65:17-19); Cassidy 1, Ex.19 (Guse, at 59:20 - 60:18).

[81]Cassidy1, Ex.71 (Deposition of Dr. Miriam McCreary, at 76:11 - 77:17); Cassidy 1, Ex.22 (Ball, at 176:20-25); Cassidy 1, Ex.23 (Deposition of Dr. Dirk Van Oppen, at 133:17 - 134:13); *see also*, Cassidy 1, Ex.51, at p. 17 (Task Force Report).

116.    Thus, the PPMNS/PPNCS doctors and patient educators did not volunteer any information about the nature or status of the human being the mother was carrying, and nothing about fetal development.[82]

117.    PPMNS offered no true counseling services, employed no "counselors," and provided no real "education" for the pregnant mothers considering an abortion.[83]

118.    If a pregnant mother wanted to know anything about the unborn human being, or related matters about fetal development, the "patient educators" could not answer a single question because they knew nothing about those matters. PPMNS "patient educators" admitted that they: (a) had no background, training, or education in medicine or science; (b) were not trained and not competent to assess for pre-existing risk factors that place a pregnant mother at increased risk for psychological harm following an abortion; (c) knew nothing about molecular biology, and had no rudimentary knowledge of fetal development, human embryology, human genetics, or any science relevant to the abortion procedure; (d) were not competent to determine whether the Carnegie Stages of fetal development would have any significance for the pregnant mother, and could not answer any questions about

---

[82]Cassidy 1, Ex.24 (Looby, at 66:3 - 67:6; 116:10-13; 141:24 - 142:19; 146:23 - 147:4); Cassidy1, Ex.25 (Deposition of Peter D'Ascoli, MD, at 221:13 - 222:17; 99:9-15); Cassidy1, Ex.26 (McCreary, at 76:20 - 77:25; 186:2-15); Cassidy1, Ex.27 (Van Oppen, at 219:8 - 220:13); Cassidy1, Ex.28 (Adams, at 65:17-19; 106:7 - 107:23); Cassidy1, Ex.29 (Nelson, at 76:12-28; 93:21 - 97:4); Cassidy1, Ex.30 (Guse, at 59:8 - 60:18; 72:21 - 73:8); Cassidy1, Ex.22 (Ball, at 176:20-25); Cassidy1, Ex.70 (Adams, at 65:6 - 66:6).

[83]Cassidy1, Ex.33 (Looby, at 20:6 - 21:3).

them; (e) did not know the legal or professional standards for disclosure; (f) acknowledged that those matters are never discussed among the clinic counselors; (g) did not attempt to answer questions about fetal development; (h) did not know if scientists can observe organs in the "embryo" or "fetus;" (i) did not know whether the pregnant mothers knew anything about what is inside of them. Jaime, the "patient educator," believes that there is no neurological development in a fetus at all up to 15 weeks; patient educator, Kylene Guse, didn't believe an unborn child could experience pain until the "third or fourth trimester;" and state director Katherine Looby thought that a human being had only 13 pairs of chromosomes (not 23).[84] In short, the so-called "educators" were completely ignorant about anything relevant for the mother, and are incompetent as "educators."

119.    At the PPFA abortion affiliate facilities at large, if a pregnant mother asked a question like "what is there" or "is my baby already there," she was told it was "just some tissue."[85]

---

[84] Cassidy1, Ex.34 (Looby, at 23:17 - 24:12)); Cassidy1, Ex.36 (Looby, at 200:7-8; 197:1 - 202:19); Cassidy1, Ex.37 (Looby, at 230:2-20); Cassidy1, Ex.38 (Adams, at 8:4-12; 121:7-17; 122:20 - 124:4; 118:1 - 120:8); Cassidy1, Ex.39 (Guse, at 61:15 - 62:23; 88:17 - 89:25; 114:20-23; 115:14-17); Cassidy1, Ex.40 (Jaime, at 96:23 - 97:6); Cassidy1, Ex.41 (Nelson, at 98:6 - 102:2; 142:11-17; 143:16 - 146:23; 150:15 - 152:15).

[85] Declaration of C.M., ¶26; Declaration of Myra Neyer, ¶9; *see also*, First Declaration of Mayra Rodriguez, dated, Jan 5, 2024 ("Rodriguez 1"), ¶20.

120.    PPMNS had no certification program and offered no training for its "patient educators."[86]

121.    There is no traditional physician-patient relationship between the physicians at PPMNS/PPNCS and the pregnant mothers who are subjected to abortions at their abortion facilities. PPMNS's Medical Director, Dr. Ball, admitted that she never saw the pregnant mothers either before or after the abortions.[87] The PPMNS physicians admitted that they spent only a total of 10 to 15 minutes with the pregnant mothers, essentially the time it took to perform the abortion.[88] The physicians, themselves, never counseled the pregnant mothers.[89]

122.    The complete lack of an informed consent process at PPMNS/PPNCS is exemplified by the testimony of Dr. Patricia Giebink, MD, who performed abortions at PPMNS. Dr. Giebink testifies that the lack of an informed consent process, described here, is the same implemented as early as 1996 and 1997.[90]

---

[86]Cassidy1, Ex.32 (Looby, at 193:21 - 195:6).

[87]Cassidy1, Ex.73 (Ball, at 34:22 - 35:3).

[88]Cassidy1, Ex.45 (McCreary, at 205:2-9; 233:16 - 234:3); Ex.46 (Ball, at 46:19-22; 58:19-23).

[89]Cassidy1, Ex.45 (McCreary, at 205:2-9; 233:16 - 234:3); Cassidy1, Ex.73 (Ball, at 34:22 - 35:3); Cassidy1, Ex.46 (Ball, at 46:19-22; 58:19-23); Cassidy1, Ex.42 (McCreary, at 185:16 - 186:25); Cassidy 1, Ex.43 (D'Ascoli, at 99:5-15); Cassidy 1, Ex.44 (Van Oppen, at 219:12-18); Cassidy 1, Ex.22 (Ball, at 176:20-25).

[90]Declaration of Patricia Giebink, MD, ¶¶13-14.

123.    Dr. Giebink testifies that as a physician she "was forbidden to be involved in counseling at all."[91] She explains that all of the pregnant women who arrived at the PPMNS abortion clinic were expected to have an abortion, and that the assumption at the PPMNS clinic *"was that the woman made her decision to have an abortion before she arrived and so there was no real need to engage in a decision-making process. The consent was a formality and the 'counseling' even more so."*[92] (Emphasis added.) Dr. Giebink testies that at PPMNS "there was no true doctor-patient relationship."[93]

124.    Dr. Giebink also testifies that PPMNS's practices and procedures are not calculated to ensure that "the woman's decision is truly voluntary." She states that PPMNS assumed that the pregnant mothers "already sought counseling on their own before they arrived at the clinic, and they had already made a decision. In fact, most women received no counseling and have not thought it through with another responsible objective person."[94]

125.    The need for revenue interfered with proper counseling of the pregnant mothers. PPMNS pressured their doctors and other workers to "sell" abortions, and perform the abortions quickly. The doctors were limited in the amount of time they could spend with the mothers, and Dr. Giebink was chastised for taking too much time with them. She was told

---

[91]*Id*. ¶24.

[92]*Id*. ¶23.

[93]*Id*. ¶24; ¶23; ¶28.

[94]*Id*. ¶32.

she wasn't "supposed to talk to the women." There is no screening for coercion, and no one properly counseled women who were crying.[95]

### (c)    PPMNS/PPNCS Creates a Dark Culture and Forbids Its Workers to Advise Pregnant Mothers How They Can Obtain Help to Keep Their Children

126.    Not only does PPMNS/PPNCS not permit its doctors or "patient educators" to provide any counseling, but PPMNS/PPNCS even forbids their workers from telling a pregnant mother where she can obtain help if she wants to keep her child. Chastity Fyksen-Ladoucer was a licensed registered nurse who worked at PPMNS/PPNCS's St. Paul Minnesota abortion facility between 2019 and 2020. She was responsible for making calls to pregnant mothers whose abortions had been scheduled at the PPMNS/PPNCS St. Paul facility to determine if the mother's abortion would be a medical or surgical abortion. Chastity also called the women following an abortion to confirm that the abortions were complete. When Chastity made her follow-up calls to the women who had been subjected to an abortion, three to six women each week had incomplete abortions. Since PPMNS/PPNCS did not provide any follow-up care, these women had to go to the emergency room at a local hospital to complete the abortion to avoid injury or disease. When a woman scheduled to have an abortion indicated she might want help to keep her child, Chastity would provide general information with no detail, like the fact that the State had a WIC program. She never

---

[95]*Id*. ¶¶21-30; *see also,* Declaration of L.M., ¶¶13-21; Weston Decl., ¶¶19-32.

gave telephone numbers or the names of organizations that could help her. At times it was clear that a pregnant mother with an abortion scheduled at PPMNS/PPNCS was ambivalent or even came out and told Chastity she probably didn't want an abortion. It was these women who Chastity told that there was some help available for them.[96]

127.    When Chastity took the job at Planned Parenthood, she thought that PPMNS/PPNCS helped all pregnant mothers regardless of what kind of help they wanted. She thought she would be part of a noble effort that was good for women. She shortly learned that PPMNS/PPNCS provided no help at all for pregnant mothers who preferred to keep their children and forbade its employees from telling the mother she could obtain such assistance. In fact, PPMNS/PPNCS would not provide any pregnant mother with an ultrasound unless she had already signed a consent for an abortion. An ultrasound was never provided to help the mother make her decision of whether or not to submit to an abortion. PPMNS/PPNCS was only in the business of performing abortions.[97]

128.    Over time, Chastity became disillusioned when she realized that Planned Parenthood did not offer help for women to keep their children even if that was what they wanted. Chastity became disturbed by PPMNS's refusal to help these mothers at all.

---

[96]Declaration of Chastity Fyksen-Ladoucer, ¶¶1-15.

[97]*Id*. ¶¶3, 4, 9, 10.

129.    Each day, Chastity called between 30 and 34 women who had abortions scheduled. When it seemed clear that the pregnant mother was ambivalent or indicated she did not know if she wanted an abortion, Chastity began to tell those women, in general terms, that help to keep her baby was available elsewhere, while never giving names of organizations. Some of those women, after receiving the information she gave them, cancelled their appointments for their abortions.[98] PPMNS/PPNCS forbade its employees to tell a pregnant mother where she could get help to keep her child.

130.    One day, Chastity was called into a meeting in which she was advised that her superiors had listened in and monitored some of her calls to the pregnant mothers. She was told that she was being fired because she was giving the pregnant mothers information about getting help that was "not in line" with Planned Parenthood's "values."[99]

131.    Because of the deep distress and emotional turmoil experienced from witnessing PPMNS/PPNCS's complete contempt for the women at its facility, being fired was a great relief for Chastity. She had felt that she had been part of something bad and harmful for those women, and suddenly she was "freed and out from under the darkness of the existence and practices at Planned Parenthood." She states: "I felt I obtained my freedom."[100]

---

[98] *Id*. ¶¶5-15.

[99] *Id*. ¶16.

[100] *Id*. ¶17.

132.    Chastity immediately left Minnesota to leave PPMNS/PPNCS behind, moved to Florida, and has worked as a nurse in the delivery room at a local hospital. Chastity observed: "I witness joy and fulfilment. It is in stark contrast to the doubt, grief, and sadness sold at Planned Parenthood."[101]

133.    That kind of relief of being freed from the dark culture that destroys the rights of pregnant mothers at defendant PPMNS/PPNCS clinics and other Planned Parenthood facilities was experienced by many other abortion clinic workers.

134.    C.M. worked at PPMNS's St. Paul Minnesota abortion facility for three years, from 2014 to 2017. At that time, Dr. Ball was one of the medical directors.[102] C.M. describes the enormous suffering of the women in the recovery room and during the check-out process. She witnessed deep profound suffering, grief, and humiliation, all associated with the loss of their children by an abortion.[103]

135.    Despite the open grief and suffering of the women at PPMNS, there was no mechanism or procedure in place to address the women's emotional state and grief. The physician never saw the women before or after the abortion. There was no physician-patient relationship. There was no "celebration about liberty," only distress, depression, grief, and

---

[101]*Id*. ¶¶18, 19.

[102]C.M. Decl., ¶¶1-5.

[103]*Id*. ¶¶11-18.

zombie-like disassociation.[104] That negative environment affected the workers at PPMNS/PPNCS, and the workers were angry and depressed. The environment was distressing to C.M.[105]

136.    C.M. describes an overarching pro-abortion ideology and dogmatic atmosphere at PPMNS that permeated its entire culture, in which abortion was almost like a "religious sacrament." It was clear to C.M., and even discussed among the PPMNS clinic workers, that "a large percentage of pregnant mothers who had abortions at PPMNS would have preferred to keep their child" but needed some help. C.M. testifies, like Chastity Fyksen-Ladoucer, that PPMNS "never gave" information to pregnant mothers who wanted to keep their children about where they could obtain help. PPMNS only sold abortions.[106]

137.    C.M. explains why she had to leave PPMNS:

> "The PPMNS abortion clinic was a dark place, full of sadness, grief and pain. ... The pain, grief, crying and even wailing, forced no other conclusion than the fact a pregnant mother who was involved in the killing of her child cuts against every natural instinct of that mother."[107]

---

[104]*Id.* ¶¶20-21.

[105]*Id.* ¶¶22-23.

[106]*Id.* ¶¶24-28.

[107]*Id.* ¶27.

138.    PPMNS/PPNCS is *totally* dedicated to depriving pregnant mothers of any information about where the pregnant mother can obtain help to keep her child. In 2005, South Dakota, where PPMNS was the only abortion business operating in the state, passed its "Informed Consent Statute."[108] That legislation was intended to require disclosures to the pregnant mother prior to her signing a consent for an abortion, to help make any decision to submit to an abortion better informed. SDCL §34-23A-10.1(2)(c) required PPMNS to simply advise the pregnant mother of the name, address, and telephone number of a local pregnancy help center, and nothing more. PPMNS refused to obey the statute because it didn't want the pregnant mothers to have any information about a pregnancy help center which would help the mother, and thereby cause PPMNS to lose an abortion sale. As a result, PPMNS – looking out for its own interests and not those of the mothers – brought a lawsuit against South Dakota state officials claiming that being required to give such information, that might be helpful to the mothers, violated PPMNS's right to free speech.[109] PPMNS opposed every single disclosure requirement, and lost all of its claims.[110] In 2011, South Dakota passed its "Anti-Coercion Statute," which was intended to protect pregnant mothers from being coerced or pressured into an abortion they did not want. SDCL §34-23A-53, *et seq.* One modest provision in that statute required the abortion facility to advise the mother of the names of

---

[108]SDCL §34-23-1(4); §34-23A-1.2 to 1.7; §34-23-10.1.

[109]*PPMNS, Carol Ball, MD v. Rounds et al.*, CIV. 11-4011-KES, (D.S.D. 2005).

[110]*PPMNS v. Rounds*, 530 F.3d 724 (8th Cir. 2008) (*en banc*); *PPMNS v. Rounds*, 653 F.3d 662 (8th Cir. 2011); *PPMNS v. Rounds*, 686 F.3d 889 (8th Cir. 2012) (*en banc*).

PHCs which were screened to be registered with the state. The statute also required PPMNS to confirm that the pregnant mother went to a registered PHC to receive counseling about what help was available to the mother if she preferred to keep her child. SDCL §34-23A-56(3). PPMNS was not required to give the information to the pregnant mother itself, but rather first let the mother learn at a PHC what help was available before PPMNS killed her baby. PPMNS did not want the pregnant mother to have that information and counseling because it feared it would lose sales of abortions. Thus, PPMNS refused to comply with the statute and sued the state. *PPMNS v. Daugaard/Noem*, No. 4:11-cv-4071-KES (D.S.D. 2011).

139.    PPMNS/PPNCS has known for many years that its practices have caused the pregnant mothers profound suffering and grief at its abortion clinics. PPMNS/PPNCS has long known that Planned Parenthood abortion clinic workers across the nation have suffered serious psychological harm caused by the workers' realization that they were involved in the destruction of women's rights and the women's lives. Many hundreds of abortion clinic workers who left that dark world sought psychological help from an organization of former abortion clinic workers known as "And Then There Were None." Defendants PPMNS/PPNCS have known for many years that those former abortion clinic workers need therapy because of the violations of the rights of pregnant mothers they witnessed.[111]

---

[111]*See generally,* Neyer Decl.; Declaration of Abby Johnson; Rodriguez 1 Decl.; Declaration of Nichola Morrison; Declaration of Amanda Willie, DMin.

**B.    PPMNS/PPNCS Knows Its Practices Violate the 14th Amendment Rights of Pregnant Mothers by Performing Involuntary and Uninformed Abortions on Pregnant Mothers and Their Children**

**1.    PPMNS/PPNCS's General Knowledge of its Violations**

140.    PPMNS/PPNCS violate the 14th Amendment rights of pregnant mothers by performing involuntary abortions, and abortions on pregnant mothers who are ambivalent. Virtually all the abortions it performs are not truly informed, and PPMNS/PPNCS routinely subjects pregnant mothers to abortions the mothers do not want. PPMNS's "patient educators" have estimated that 25% of the pregnant mothers they meet with prior to an abortion are teary-eyed, have tears running down their cheeks, or weep openly.[112] Dr. Ball admitted that it was not surprising to her that 25% of the pregnant mothers who come to Planned Parenthood's clinic are teary-eyed, crying, and bawling.[113]

141.    A former Planned Parenthood abortion clinic manager testifies that:

> "Planned Parenthood Federation affiliates do not assess for coercion or pressure exerted on the pregnant mother by other people. Since it is assumed by Planned Parenthood personnel that the decision was already made to have an abortion before the woman arrives at the clinic, Planned Parenthood does not see its role as assisting in a decision-making process. Some women will cry during the sessions with the 'counselors,' but the abortions will be performed anyway ... The counselors are taught to tell the women that it is normal to cry. The affiliate

---

[112]Cassidy 1, Ex.53 (Jaime, at 161:14-18); Cassidy 1, Ex.54 (Jaime, at 163:22 - 164:5; 164:16-22).

[113]Cassidy 2, Ex.36 (Ball, at 192:18).

employees were not trained to explore what was disturbing the women that resulted in their distress and crying."[114]

142.  Carol Everett, who ran multiple abortion clinics and later provided post-abortion counseling for women in the settings of PHCs, testifies:

"In my experience providing pre-abortion counseling and discussing women's abortion experiences during post-abortive counseling, crying was often an indication that the pregnant mother was either ambivalent or was being pressured or coerced into having an abortion she really did not want."[115]

143.  Plaintiffs' expert psychiatrist, Patricia Casey, MD, PhD, who has treated many post-abortive women, observes: "Crying is often a sign that the pregnant mother does not want the abortion."[116]

144.  Plaintiffs' expert, Katherine Hartmann, MD, PhD, states:

"Perhaps most disturbing, discovery in the first case involving PPMNS also reveals that there is no assessment for coercion or pressure ... Consent should never be taken under such circumstances where it is clear that the pregnant mother is conflicted, ambivalent, or being subjected to pressure or coercion. There can be little doubt that most of those abortions should not have been performed."[117]

---

[114]Johnson Decl., ¶16.

[115]Declaration of Carol Everett, ¶19.

[116]Declaration of Patricia Casey, MD, PhD, ¶41.

[117]Hartmann, MD, PhD Decl., ¶77.

2.    **PPMNS/PPNCS's Knowledge of Specific Instances of Its Violations of the Rights of Pregnant Mothers**

145.   Numerous women subjected to involuntary abortions at PPMNS/PPNCS facilities have testified in two different lawsuits brought by PPMNS/PPNCS about how they tried to resist the abortion and how they cried at the PPMNS clinics, but PPMNS/PPNCS performed the abortions on them anyway. Five of the women who lost their children to involuntary or uninformed abortions at PPMNS's abortion facilities filed sworn declarations in those two lawsuits brought by PPMNS: L.M., B.H., Brittany Weston, Alyssa Carlson, and S.C. PPMNS/PPNCS has known of these and other examples of how it has violated the rights of pregnant mothers for many years. The purpose of the state statutes PPMNS refused to obey, and attempted to avoid, were expressly stated to be for the purpose of protecting the very rights of the mothers PPMNS/PPNCS violated.

**(a) L.M.**

146.   In 2021, L.M. filed a declaration in the *PPMNS v. Daugaard/Noem* case in which she testified to a shocking and disturbing violation of her parental rights by PPMNS/PPNCS in an abortion in late 2020.[118]

---

[118]*See*, Declaration of L.M., *PPMNS v. Daugaard/Noem*, (D.S.D. Feb. 22, 2021), ECF No. 302. A declaration setting forth L.M.'s full name was submitted under seal. L.M.'s declaration is attached as Ex.2 to Cassidy 4.

147.    At 28 years old, L.M. was the employee of the 48 year old man ("Robert") with whom she lived, in a three year relationship. When she learned she was pregnant, Robert became upset and demanded she submit to an abortion. When she initially refused, he demanded that she move out of his house that night, and told her she could not come back until she agreed to submit to an abortion. L.M. did not want an abortion, she wanted her baby. She was forced to sleep in her car in bitter cold weather for five nights. His demands continued, and L.M. had nowhere to obtain help and was placed under great stress. In order to have a place to stay and placate Robert, she called PPMNS in Sioux Falls (then a subsidiary of PPNCS). PPMNS in Sioux Falls told her she had to go to the PPNCS facility in Sioux City, Iowa. L.M. held out hope that she could convince Robert not to force her to have an abortion.[119]

148.    After L.M. arrived at the PPNCS in Sioux City, she began to cry and continued to "cry openly" for at least one and a half hours. The Planned Parenthood personnel at the clinic witnessed her crying, her level of distress, and deep despair.[120] While L.M. was at the Planned Parenthood abortion clinic, she spoke with Robert over the phone on four different occasions to beg him not to make her get an abortion. L.M. had her phone on speaker, and the PPNCS "counselor" heard her beg Robert not to force an abortion on her. Despite her openly crying, and the PPNCS workers hearing her state over and over that she did not want

---

[119]*See*, Cassidy 4, Ex.2 (Declaration of L.M., ¶¶8-14).

[120]*Id*. ¶17.

an abortion, PPMNS/PPNCS performed an abortion on her anyway. While at the abortion facility, she never met a doctor in person, but only had a four or five minute remote zoom call. L.M. states about PPMNS/PPNCS:

> "They actually did the bidding of Robert. Planned Parenthood acted as if they were protecting *his* right to compel an abortion, not my right to decide for myself that I wanted my child."[121]

149.    L.M. testified how devastating the abortion was for her, even becoming depressed and suicidal, and she even "hated" herself for "allowing Robert to force" her into the abortion, stating:

> "I felt like I, myself, didn't deserve to live ... I thought about suicide often. I was obsessed with the thought of suicide to the point where I drafted a number of suicide notes."

She stated that the drafting of suicide notes to her loved ones actually helped save her life.[122]

### (b)  B.H.

150.    In 2019, B.H. submitted a declaration in the *PPMNS v. Daugaard/Noem* case, testifying about how she was coerced into an abortion performed at Defendant PPMNS/PPNCS's Sioux Falls abortion facility.[123]

---

[121]*Id*. ¶¶17-21.

[122]*Id*. ¶¶26-28.

[123]*See*, Declaration of B.H., *PPMNS v. Daugaard*, (D.S.D. April 8, 2019) ECF 206. B.H. submitted a declaration in support of Plaintiffs' motion for a preliminary injunction

151.    B.H. lived with her father and was completely dependent upon him. She was in high school when she learned she was pregnant, and her boyfriend who fathered her child was four years older than her. She and her boyfriend were totally committed in an exclusive relationship. When her father found out she was pregnant, he demanded she submit to an abortion and threatened to have her boyfriend – who she loved – prosecuted for "statutory rape" because of the difference in their ages. B.H.'s father threatened to make her "life a living hell" if she refused his demands to submit to an abortion.[124]

152.    B.H. and her boyfriend discussed how they wanted the baby and wanted to get married, but were faced with the dilemma of how to resist her father's threats.[125]

153.    The day after her father demanded she submit to an abortion she did not want, B.H. communicated with her boyfriend. Her boyfriend told her that B.H.'s father had called him, and told him that if B.H. did not have an abortion, he would report him to the police to be prosecuted for statutory rape. B.H. felt her father was trying to isolate her from any help. Her boyfriend told her they couldn't have a baby if he was going to be in jail. B.H. suggested

_____

in this case, and a declaration setting forth her full name will be filed under seal. All citations to her declaration relate to her declaration to be filed in this case.

[124]Declaration of B.H., ¶¶1-8, 12.

[125]*Id.* ¶¶9-10.

that perhaps she could go to Texas to live with her mother and he could join them. Her boyfriend feared he would still be sent to jail.[126]

154.    B.H.'s father called PPMNS, and without obtaining permission from "the patient," PPMNS scheduled surgery for B.H.[127]

155.    On the day the abortion was scheduled by PPMNS, without ever speaking with her, her father and his girlfriend drove her to PPMNS's Sioux Falls abortion facility, a three-and-a-half-hour drive from B.H.'s home. The two of them walked B.H. into PPMNS, and B.H. was made to sit next to her father. Then, her father, without her participation, checked her in and paid for the abortion. B.H.'s father then sat next to her in the waiting room and he filled out the "paperwork" which had been given to him at the front desk. B.H. never saw or read what her father was filling out, and he told her to sign it. She did not know what she signed. B.H. was not given any chance to speak with anyone at PPMNS before she signed the documents.[128]

156.    The PPMNS worker had no discussion with her. She was isolated under the control of her father, and while she wanted to let PPMNS workers know that she wanted her baby, no one spoke with her. The doctor did not ask her any questions, and did not engage

---

[126]*Id.* ¶9.

[127]*Id.*, ¶¶12, 13.

[128]*Id.* ¶¶12, 13.

in any discussion to determine that she actually wanted an abortion. She never saw that doctor before or after the five minutes the doctor spent performing the procedure.[129]

157.    As her father drove her home, B.H. was distraught and kept thinking about how no one at PPMNS ever talked to her or engaged in any discussion that would let them know she wanted her baby. Everyone at PPMNS was very cold, and failed to show they cared about her at all. The next day, she called her maternal grandmother to tell her what had happened. One day later, after B.H.'s mother was told, her mother traveled to South Dakota, rescued B.H., and brought her to Texas.[130]

158.    Immediately after the abortion, B.H. started having major psychological problems. She felt deep guilt for not finding a way to prevent her father from coercing her into the abortion. She had nightmares almost every night in which she would relive seeing parts of her baby pass through the tube she "was hooked up to," over and over again. B.H. developed insomnia because she was afraid to fall asleep out of fear of the nightmares and seeing her baby being killed. In some of her nightmares, she relived the drive to PPMNS and "desperately" wanting to find some way out of the abortion and the distress of experiencing the Planned Parenthood workers and doctor who didn't seem to care about "her at all." She

---

[129]*Id*. ¶¶13-19.

[130]*Id*. ¶¶19-27.

relived the abortion procedure itself, and she has "envisioned that tube hundreds of times." She had flashbacks and chest pains.[131]

159.    B.H. sees her baby who died in the abortion as a little girl, and wonders what she would be like now, what she would have named her, and how she would now be in school. B.H.'s nightmares have become less frequent, only about two nights a week. B.H. loves children and, in the ten years after she was subjected to that abortion at PPMNS, she married and has carried and given birth to four sons. She still sees that tube, and how her four boys would have had an older sister. Often she has sat and cried about how they lost their sister.[132]

160.    B.H. states: "I was racked with guilt and wished that there had been a way for me to prevent my father and Planned Parenthood from killing my child."[133]

161.    B.H. explains how she is still forced to live with the pain of losing her baby, and living with her guilt and depression. She summarizes her loss:

> "I wanted my baby who died in the abortion. I feel that I had the right to keep her and that right should have been respected. I am the one forced to live with the pain of losing my baby, the isolation of it, and the guilt and depression that followed."[134]

---

[131]*Id*. ¶¶23-25.

[132]*Id*. ¶¶26-27.

[133]*Id*. ¶¶23-25.

[134]*Id*. ¶¶26, 30.

### (c)  Brittany Weston

162.    In 2005, Brittany Weston submitted a declaration in the *Planned Parenthood v. Rounds* case, testifying how she was forced to have an abortion by her baby's father, and how PPMNS subjected her to an abortion knowing she did not want it. She submitted another declaration reciting those same facts in the *PPMNS v. Daugaard/Noem* case.[135]

163.    In 2005, when Brittany Weston was 22 years old and graduating college, she started dating a 41-year-old man who she called "Joe." When she found out at a medical clinic that she was pregnant, she immediately ruled out an abortion. She wanted to raise her baby herself. Joe demanded that she have an abortion, and coerced her to go to PPMNS's abortion facility in Sioux Falls. She went to PPMNS to avoid his constant harassment.[136]

164.    On two different phone calls there was no effort by PPMNS to determine whether Brittany actually wanted an abortion, or whether she even understood the nature of the procedure.[137] There was no informed consent process on the day she went to PPMNS's

---

[135]*See,* Brittany Weston's declaration submitted under the pseudonym "Jane Doe #1," *PPMNS v. Rounds*, (D.S.D. May 16, 2006), ECF No. 119. A declaration containing Brittany's full name was submitted under seal, and she was deposed in *Rounds* by PPMNS's lawyer for six hours. *See*, declaration of Brittany (Wilson) Weston, *PPMNS v. Daugard/Noem* (D.S.D. December 16, 2019), ECF No. 207. Brittany has submitted a declaration in support of Plaintiffs' motion for a preliminary injunction in this case. All citations to her declaration testimony, herein, relate to her declaration to be filed in this case in support of the motion.

[136]Weston Decl., ¶¶13-16.

[137]*Id*. ¶¶16-18.

abortion facility. She was required to sign a "consent" and pay for the procedure at the front desk without ever speaking with a "counselor." She filled in, on the form that required her medical history, that she suffered from depression and was on medication for it. No one at PPMNS ever discussed her medical condition with her. She tried to initiate a discussion about the fact she didn't want the abortion. Her session with the so-called counselor was only five minutes, and only to ensure she signed the needed documents. There was no effort by PPMNS to determine if Brittany was submitting to the abortion voluntarily. She desperately wanted her baby and received no help at PPMNS. Brittany became distraught that she was given no help, and began to cry. She "was bawling" at the PPMNS facility in front of the abortion workers. While openly crying, she blurted out to the PPMNS worker, "I feel like I'm killing my baby if I go through with this." She was openly crying as she was, in her own way, begging for help. She wanted to be rescued from Joe's demands. When she "bawled her eyes out," she expected that her crying would cause PPMNS to stop and help her keep her baby. Her crying was a cry for help.[138]

165.    PPMNS subjected Brittany to the abortion she did not want anyway. The doctor (Dr. Van Oppen) saw her for five minutes, and didn't have any meaningful discussion with her. He never asked why she had been crying even though the "counselor" had told him how distraught Brittany had been. When she later obtained her medical records, they confirmed Dr. Van Oppen spent no more than five minutes with her, and that the doctor had certified

---

[138]*Id*. ¶¶21-32.

that Brittany had "given informed consent freely and without coercion to this abortion." That consent was involuntary and not informed.[139]

166.    That forced abortion caused Brittany deep suffering. She became depressed and started drinking alcohol heavily until she obtained counseling.[140]

167.    When Brittany Weston submitted a declaration in the *Planned Parenthood v. Rounds* case, PPMNS's lawyer deposed her for six hours. She put all of PPMNS's superiors on notice of how her rights were violated, and in return, she was harshly treated by PPMNS's lawyer.

### (d)  Alyssa Carlson

168.    Alyssa Carlson submitted a declaration in the *PPMNS v. Daugaard*/Noem case testifying how, at the age of 19, her mother forced her to submit to an abortion she didn't want and tried to resist. That forced abortion was performed by Defendant PPMNS at its South Dakota abortion facility.[141]

169.    When she became pregnant, Alyssa was living with her mother, who immediately insisted she had to submit to the abortion. Alyssa's mother called PPMNS and

---

[139]*Id*. ¶¶34-46.

[140]*Id.*

[141]*See*, Declaration of Alyssa Carlson, *PPMNS v. Daugaard* (D.S.D. Oct. 21, 2018), ECF No. 209. Alyssa's declaration is attached as Ex.11 to Cassidy 4.

scheduled the abortion. PPMNS scheduled surgery without ever speaking with Alyssa. Her mother drove her to PPMNS's abortion facility to ensure Alyssa would keep the appointment. Alyssa cried the entire time she was at PPMNS's abortion clinic, but PPMNS performed an abortion on her anyway. Alyssa testified that "I wanted to have my baby, but my mother effectively compelled me to have an abortion ... The pressure she placed on me was unbearable, and there was no one to offer me help..."[142]

170.    After that abortion, Alyssa suffered severe emotional problems.[143]

171.    Like many other women who were subjected to an abortion, Alyssa suffered from recurring nightmares. In the nightmares, she gave birth to "a tiny baby girl that was so small" that she couldn't find her. In her dreams, Alyssa would search frantically for her baby girl, but could never find her.[144]

---

[142]Cassidy 4, Ex.11 (Carlson Decl., ¶7, ¶16, ¶¶4-9).

[143]*Id.* ¶¶10-15.

[144]*Id.* ¶13.

### (e) S.C.

172.    S.C. submitted a declaration in the *PPMNS v. Daugaard*/Noem case.[145] PPMNS/PPNCS was made aware of the attempt by PPMNS/PPNCS workers and physicians to pressure S.C. into a second trimester abortion at its St. Paul abortion facility in 2017.

173.    Although S.C. wanted her baby, she called PPMNS on Vandalia Street in St. Paul because she wanted to discuss her options. Because the child's father would not help her, she needed help elsewhere. The personnel at PPMNS scheduled an abortion despite the fact she had not decided to have an abortion. When she arrived at PPMNS's St. Paul facility she was told to sign a consent for an abortion, and PPMNS had her pay for an abortion without ever seeing or speaking with a nurse, doctor, or counselor of any kind. When she did meet with a nurse, there was no meaningful discussion about her intents, her interests, her circumstances, or whether she even wanted an abortion. S.C. was completely undecided on what she wanted to do. She needed help to think everything through, and "everyone seemed cold and indifferent at PPMNS." She "felt completely isolated and alone." She "didn't find that anyone [at PPMNS] was interested in helping me."[146]

---

[145]*See*, Declaration of S.C., *PPMNS v. Daugaard* (D.S.D. Mar. 30, 2019), ECF No. 208. S.C. has submitted a declaration in support of Plaintiffs' motion for a preliminary injunction in this case, and a declaration containing her full name will be submitted under seal. All citations to her declaration relate to her declaration to be filed in this case.

[146]Declaration of S.C., ¶¶1-8.

174.    After an ultrasound, S.C. was told that she was 22 weeks LMP. She was pushed through the process without an explanation about what was happening. A nurse gave her a white pill despite the fact that S.C. indicated that she may not want an abortion at all. S.C. made it clear to the nurse who administered the medication that she wanted to stop the procedure.[147]

175.    Before S.C. was given a chance to speak with a physician, she was stripped from the waist down, lying on her back in stirrups. She never knew the names of either doctor who entered the room. The doctors explained that they would insert dilators and she had to return the next day. S.C. wanted to know if she could stop the abortion after she went home. The doctors appeared to her to be surprised. One of the doctors told her it was a bad idea to stop the abortion at that point because the baby may have already been harmed. S.C. testifies that she found the doctor's response very disturbing "because the process had been started without any discussion and now I was told it might be too late to stop it without harming the baby." Then, the "male doctor" fumbled around trying to inject the baby despite knowing she hadn't decided whether she even wanted an abortion. She wanted help to keep her child.[148]

176.    S.C. was given no information that helped her understand the process the doctor intended to undertake. She was told that the injection was intended to stop the baby's

---

[147] *Id.* ¶¶9-10.

[148] *Id.* ¶¶11-16.

heart, which prompted S.C. to ask "What would the clinic do if the baby was born alive after the procedure had already started." One of the doctors told her "Most likely we would break its neck." The cruelty and brutality of the abortion process was made clear in a way she never had understood before. She wanted to leave the PPMNS facility right then.[149]

177.    S.C. had a very difficult night. She experienced extreme physical discomfort, but her emotional turmoil was far worse than the physical pain. She laid awake all night thinking about her baby. When she returned to Planned Parenthood the next morning, she was crying. She told the nurse that she wanted the dilators removed. When the two doctors entered the room she demanded that the dilators be removed and the procedure terminated. The doctors argued with her and insisted that she had to complete the abortion. They claimed that even if the procedure wasn't completed, the baby would not survive for more than 48 hours. Despite S.C. making it clear that she did not want an abortion, the doctors continued to be forceful and they made S.C. "feel incredibly stupid." After a prolonged debate, and only after S.C.'s adamant demands, the doctors relented and removed the dilators. Once the dilators were removed, S.C. bawled her eyes out. She was overwhelmed by the stress PPMNS placed her under. While she was in the recovery room, the doctors came in and told her she could still have the abortion. S.C. begged them to go away, to leave her alone and let her go home.[150]

---

[149]*Id*. ¶16.

[150]*Id*. ¶¶17-20.

178.    S.C. gave birth to a baby boy who turned seven years old in June 2024. Her son is a source of joy and fulfillment for her. Her son has some health issues that may be the result of PPMNS's negligence and disregard for S.C.'s true wishes.[151]

179.    S.C. explains how she never wanted an abortion and always wanted her baby, but PPMNS had rushed her through a process with no counseling sessions of any kind despite the magnitude of what PPMNS proposed. S.C. has suffered psychologically and has had repeated panic attacks since her experience at PPMNS. In her declaration, S.C. states:

> "I didn't really want an abortion; I wanted my baby – I just didn't know what help and assistance was available to help me keep and raise my child. If I had been given information about available resources, I never would have considered an abortion. If just one person had supported my desire to have my son, I never would have contacted Planned Parenthood. It seems absurd to me, in retrospect, that Planned Parenthood was allowed to take a consent for an abortion immediately after I walked into the clinic, and was permitted to start an abortion without my seeing a doctor or receiving any semblance of meaningful counseling."[152]

180.    Having lived through her experience at PPMNS, S.C. states, unequivocally, that if the State of Minnesota insists on the termination of a mother's relationship with her child by an abortion, at a minimum, only a court of law would have any chance of determining whether a mother's decision to give up her rights and submit to the killing of her

---

[151] *Id.* ¶1.

[152] *Id.* ¶24.

baby was truly voluntary and informed, and that determination cannot be made at an abortion clinic like those run by PPMNS/PPNCS.[153]

### C. PPMNS/PPNCS Has Known That in the Process of Destroying the Rights of Pregnant Mothers It Subjects the Mothers to the Significant Risk of Psychological Harm

#### 1. The Existing Risk Factors

181.    PPMNS's Medical Director, Dr. Carol Ball, admitted that if a pregnant mother has any one of the six different risk factors, that pregnant mother is placed at increased risk for psychological harm. Those risk factors identified by Dr. Ball, and universally recognized even by the abortion industry, include: (1) being coerced into an abortion; (2) being pressured into having an abortion; (3) an abortion conflicts with the pregnant mother's personal or religious values; (4) being ambivalent about whether to have an abortion; (5) the woman finds that the decision of whether or not to have the abortion is difficult and distressing; or (6) if she prefers to continue her pregnancy.[154]

182.    PPMNS's other doctor, Nicola Moore, MD, testified that each of those six risk factors, if the pregnant mother is subjected to an abortion, placed the pregnant mother at increased risk for psychological harm, including depression, self-harm, sadness, post-traumatic stress disorder, and even suicide ideation and suicide.[155]

---

[153]*Id.* ¶23.

[154]Cassidy2, Ex.9 (Ball, at 177:5 - 179:3).

[155]Cassidy2, Ex.10 (Moore, at 130:4 - 133:17).

183.    Despite that knowledge, PPMNS/PPNCS perform abortions without screening for any of those risk factors, never discuss them with the pregnant mother, and, in fact, try to convince pregnant mothers who have those risk factors to submit to an abortion anyway.

184.    In the *PPMNS, Dr. Carol Ball v. Rounds* case, PPMNS claimed that South Dakota's required Informed Consent Disclosure that an abortion placed a "pregnant woman" at "increased risk of suicide ideation and suicide" (SDCL §34-23A-10.1(i)(e)(ii)), violated the constitutional free speech rights of the abortion doctors. PPMNS claimed that that statement was false, misleading, and irrelevant to the mother's decision of whether to have an abortion. An *en banc* panel of the U.S. Court of Appeals for the 8th Circuit reversed a district court's order denying the state's motion for summary judgment. The court held that there was no genuine issue of material fact about the truth and relevance of the "Suicide Disclosure," ruled in favor of the State and directed entry for summary judgment, requiring PPMNS to make that disclosure before taking the mother's waiver. *PPMNS v. Rounds*, 686 F.3d 889 (8th Cir. 2012) (*en banc*).

185.    Thus, PPMNS/PPNCS have known, for almost two decades, that if a pregnant mother has any one of six risk factors, including being pressured or coerced, being ambivalent, preferring to keep her child, and that the abortion is inconsistent with the mother's personal or religious values, she is at increased risk of serious psychological harm, even the risk of living with suicide ideation and dying from suicide.

186.    In the *Rounds* case, PPMNS was presented with a startling example of a 21-year-old-college woman who became depressed after being subjected to a coerced abortion, who committed suicide by hanging, leaving a suicide note behind that read, in part, "Now I can be with my unborn child."[156]

187.    Despite that knowledge, PPMNS/PPNCS does not provide any informed consent process or screening for coercion or pressure. PPMNS/PPNCS actually pressures women into violating their own religious beliefs despite the fact they know that places the mother at great risk of psychological injury.

## 2.    PPMNS/PPNCS Pressures Pregnant Mothers to Violate Their Religious Beliefs

188.    PPMNS/PPNCS's "counseling" about pregnant mothers' religious beliefs is extremely disingenuous and particularly harmful. Despite the fact that PPMNS acknowledges that a woman who has religious beliefs in conflict with the submission to an abortion, places the pregnant mother at significant risk of psychological harm, PPMNS/PPNCS provides its personnel with training materials that explain how they can convince a woman who is a devout Christian why it is morally and religiously acceptable for her, despite her religious beliefs, to submit to an abortion.[157]

---

[156]Declaration of George Zallie, father of Stacy Zallie.

[157]Third Declaration of Harold Cassidy, dated Nov. 2, 2023 ("Cassidy 3") (submitted under seal), Ex.1 (Ball, at 146:25 - 147:16).

189.    Despite the fact that PPMNS/PPNCS knows that if a pregnant mother violates her religious beliefs and she is placed at risk of serious psychological harm, in their effort to sell their abortions, Dr. Ball (who admitted she was an atheist) contends that it is proper for PPMNS's "educators" and physicians "to discuss the religious beliefs of a woman who is very serious about Christianity," and that "a person who identifies as an atheist, and has no religious beliefs, is an appropriate person to discuss religious beliefs with a woman who is grappling with a decision because she thinks it may be inconsistent with her personal value structure and her church's teachings."[158]

190.    Despite the fact that Dr. Nicola Moore admitted that if a woman violated her religious beliefs by submitting to an abortion, she is at risk for serious psychological injury – including death by suicide – she, too, testified that she thinks it is perfectly acceptable for an atheist who does not believe that God even exists, to counsel a devout Christian woman about her religious beliefs and her relationship with God. Dr. Moore, who does not believe in God, admitted that she, too, counsels devout Christian women about their religious beliefs.[159] Dr. Moore, of course, admitted that if those women had an abortion, they are placed at higher risk for suicidal ideation and suicide.[160]

---

[158]Cassidy 2, Ex.11 (Ball, at 150:19 - 152:5).

[159]Cassidy 2, Ex.12 (Moore, at 156:14 - 158:25).

[160]Cassidy 2, Ex.10 (Moore, at 130:4 - 133:17).

### D.    The Violations of the Mother's Rights by Red River Women's Clinic

191.    A number of years ago the states of South Dakota and North Dakota concluded that delegating and entrusting to an abortion business the soliciting and taking of a waiver of one of a pregnant mother's most cherished, intrinsic, fundamental rights, and the termination of a mother's relationship with her child, was a completely unworkable method of the termination of the mother's parental rights.[161]

192.    In 2005, the South Dakota Legislature passed a statute that created a task force to study the practice of abortion. That statute listed the areas of inquiry to be undertaken. The task force, after numerous hearings, explained in its report, issued a final Task Force Report upon which the state legislature relied. That Task Force Report stated in part:

> "A mother's unique relationship with her child during pregnancy is one of the most intimate and important of relationships, and worthy of protection. The unique bond between mother and child creates a human relationship that may be the most rewarding in all of the human experience.
>
> It is for these reasons that our laws have traditionally protected the mother. Our laws dealing with surrender of the mother's rights in the context of adoption, for example, are based upon the premise that the mother's intrinsic natural right is fundamental, and its termination is a great loss to the mother.

---

[161] *See*, Cassidy 1, Ex.51 (South Dakota Task Force Report, Section II H (*Unworkable Method for the Pregnant Woman to Waive Her Rights*), at p. 55 of report).

The unworkable nature of using abortion to waive a woman's right to her relationship with her child is manifest in numerous ways."[162]

193.    In 2022, both South Dakota and North Dakota stopped delegating to abortion facilities the function of terminating the pregnant mother's parental rights. As a result, defendant PPMNS/PPNCS sent South Dakota pregnant mothers to its facilities in Minnesota where there are no protections for the mothers. Defendant Red River, which had operated its abortion business in North Dakota for many years, moved its abortion business across the state lines into Minnesota, which accommodates its practices. North Dakota pregnant mothers, like plaintiff Alexandra Johnson, are often taken across the state line to be forced to submit to an abortion at Red River.

194.    Defendant Red River essentially follows the same general procedures as those employed at PPMNS/PPNCS, and other Planned Parenthood abortion businesses.

195.    The Red River employees just assume that by the time a pregnant mother made an appointment and arrived at the clinic they already made a final decision to submit to an abortion.[163] Thus, there was no true informed consent process.

_____

[162]*See, Id*. (S.D. Task Force Report, p.55-56 (which goes on to list seven different ways in which it is unworkable)).

[163]Fifth Declaration of Harold Cassidy, dated Jun. 3, 2024 ("Cassidy 5"), Ex.5 (Deposition Transcript of Staff Member #6, Dec. 9, 2021, at 134:13 - 135:11); Cassidy 5, Ex.6 (Deposition Transcript of Staff Member #2, Dec. 7, 2021, at 102:24 - 103:5). The deposition transcripts are part of the record in a federal suit, explained in Cassidy 5; numbers were used to identify Red River staff names at the insistence of Red River; *see*, Cassidy 5, ¶¶3, 5, & 6.

196.    There were no disclosures or discussion about the nature of an abortion or its risks. There was no hint of the fact Red River was seeking a document which would immunize the doctors and clinic personnel from prosecution for homicide. Whatever so-called disclosures were made were made over the phone by a staff member who just read them to the mother. The staff member did not engage the pregnant mother in any kind of discussion about what was read. The employee only read what was written.[164]

197.    Even if there was any, a discussion wouldn't have been helpful to the pregnant mother because the staff members were totally ignorant, and knew nothing about the relevant medicine or science. They knew nothing about molecular biology, human embryology, or human genetics. If one of the pregnant mothers asked them a medical or scientific question about the disclosures they read to them over the phone, the Red River employees admitted they were not able or competent to provide an answer to any question.[165]

198.    When a pregnant mother – assumed to have already decided to submit to an abortion – arrived at Red River, that mother was given a number of documents to be filled out, including the consent. Some were signed in the waiting area, and sometimes, even the consent was signed. All of this took place before the pregnant mother ever saw a physician,

---

[164]Cassidy 5, Ex.1 (Deposition Transcript of Staff Member #1, Dec. 17, 2021, at 71:6 - 74:18); Cassidy 5, Ex.2 (Deposition Transcript of Staff Member #4, Jan. 17, 2022, at 73:6-24).

[165]Cassidy 5, Ex.12 (Staff Member #1, at 15:13 - 17:8); Ex.13 (Staff Member #1, at 102:8 - 104:25); Ex.16 (Staff Member #2, Dec. 7, 2021, at 98:19 - 101:7); Ex.17 (Staff Member #2, at 109:25 - 112:44); Ex.18 (Staff Member #6, Dec. 9, 2021, at 100:3-18).

and even before she saw a "counselor." When the "counselor" employee met with the pregnant mother, it was primarily to check to see that all of the forms were filled out and signed.[166]

199.    It was not uncommon, at Red River, for a pregnant mother to be crying.[167]

200.    There is no physician-patient relationship. The first time a physician saw a pregnant mother, she had already been prepped for the abortion. There is rarely any follow-up after the abortion.[168]

201.    Despite Red River, its owners, its physicians, and its clinic director knowing that it was a criminal homicide to kill an unborn human being in utero at any time or age after conception, and that only a mother's consent could immunize them from criminal prosecution, there was never any discussion about the fact that the physician was proposing to terminate the life of a whole, separate, unique, living human being. In fact, Red River brought a lawsuit against the State of North Dakota because it didn't want its physicians and employees to make that critical disclosure. Thus, Red River filed a lawsuit in which Red

---

[166]Cassidy 5, Ex.14 (Staff Member #1, at 86:7 - 88:23, 92:22 - 93:11); Ex.9 (Staff Member #4, at 39:22 - 40:13).

[167]Cassidy 5, Ex.20 (Staff Member #1, at 99:5-23).

[168]Cassidy 5, Ex.21 (Staff Member #4, at 66:1 - 67:8).

River claimed that North Dakota's "Human Being" disclosure violated the free speech rights of its physicians.[169]

202.   Red River instituted that lawsuit against North Dakota's Human Being Disclosure Statute despite the fact that the North Dakota statute was identical to the South Dakota statute that ten years earlier had been upheld by the U.S. Court of Appeals for the 8th Circuit, as constitutional.[170] The South Dakota Human Being Disclosure, identical to the North Dakota disclosure, including the statutory definition of "human being," was upheld by the U.S. Court of Appeals for the 8th Circuit, which expressly rejected the free speech argument, holding that the Human Being Disclosure was an accurate and truthful statement of scientific fact (not a statement of ideology), that it was not misleading, and was relevant to the mother's decision of whether or not to submit to an abortion.[171]

203.   Despite the truth of the Human Being Disclosure and its relevance and importance to the mother having been resolved, Tammi Kromenaker, Red River's clinic director and Red River representative, testified that she didn't want to disclose that truthful

---

[169]*See*, Cassidy 5, ¶¶3, 5, & 6.

[170]*See and compare*, South Dakota Human Being Disclosure, SDCL §34-23-10.1(1)(b), and SDCL §34-23A-1(4); with NDCC §14-02.1-02(7) and (9)(a)(2).

[171]*Planned Parenthood Minnesota, North Dakota, South Dakota, et al. v. Rounds, et al.*, 530 F.3d 724 (8th Cir. 2008) (*en banc*); *PPMNS v. Rounds*, 650 F.Supp. 2d 972, 976-77 (D.S.D. 2009); *PPMNS v. Rounds* 653 F.3d 662 (8th Cir. 2011); *PPMNS v. Rounds* 656 F.3d 889 (8th Cir. 2012) (*en banc*).

information to pregnant mothers. Red River wanted to ignore the law and impose its own ideology.[172]

204.    It was that total disregard of, and disdain for, the pregnant mother's rights that led to the forced abortion of plaintiff Alexandra Johnson at the Red River business in 2023. Alexandra states:

> "There is a total disregard for the most important of the rights of the pregnant mother. On that day, February 22, 2023, at Red River Clinic, I saw a doctor for only all of 30 seconds, only the time it took for her to hand me the medication which would kill my child. That doctor never spoke with me about Anthony; there was no informed consent process; no effort to determine if I was at her clinic voluntarily; no discussion about why I was there or what brought me there, or anything else meaningful during that worst day of my life. The personnel and the doctor at Red River *all acted like killing my child was nothing of concern, nothing out of the ordinary, and of no consequence to me or even my child*. (Emphasis added.)[173]

Red River has always known that a pregnant mother loves her child, a whole, separate, unique, living human being, a child who has great value to that mother, and that the abortion terminates some of the mother's most precious rights.

---

[172]Cassidy 5, Ex.4 (Deposition of Tammi Kromenaker, at 169:10-22); Ex.3 (Kromenaker, at 137:5-23).

[173]First Declaration of Alexandra Johnson, dated Oct. 19, 2023, ¶35.

E.    **PPMNS/PPNCS and Red River Take Part in the National Practice of NAF and the Abortion Industry Which Pressures Pregnant Mothers into Violating Their Religious and Moral Beliefs to Submit to an Abortion, Knowing it Not Only Violates Their Fundamental Rights, But Causes Significant Psychological Injury**

205.    The fact that abortion businesses pressure pregnant mothers into having an abortion by attempting to convince them that it is morally acceptable in their religion to submit to an abortion (when the pregnant mother thinks otherwise) is an industry-wide practice across the nation.

206.    PPMNS's Medical Director, Carol Ball, MD, was on the Board of Directors of the National Abortion Federation (NAF)[174] for a period of six straight years, and then had a subsequent tenure on the board.[175] Red River's CEO and owner, Tammi Kromenaker, is currently on the board of NAF.[176]

207.    The NAF is an organization that represents abortion providers throughout the country, and even internationally. The NAF is the "spokesperson for abortion providers." It has "an accreditation branch," and the NAF produces official "National Abortion Federation

---

[174]National Abortion Federation is usually referenced as NAF, Cassidy 2, Ex.30 (Ball, at 24:20-22).

[175]Cassidy 2, Ex.30 (Ball, at 27:2-18).

[176]*See*, NAF Website, at www.prochoice.org/about/mission-leadership/.

Clinical Policy Guidelines" which are the guidelines for abortion "care," with a central office in Washington, D.C.[177]

208.    Abortion clinics across the country are members of NAF, and PPMNS/PPNCS is such a member, as is Red River.[178] To maintain membership in NAF, an abortion clinic must certify, every year, that it follows the NAF Clinical Guidelines, and must pay dues.

209.    As a member of NAF's Board of Directors, Dr. Ball helps "oversee the organization and its activities and functions as a member of committees that oversee the various parts of the staff at the National Abortion Federation."[179] Dr. Ball was a member of the NAF committee on "Clinical Policy Guidelines," and the "Quality Assessment and Improvement Committee" which "oversees the accreditation process and assuring that quality patient care is being provided in member clinics."[180]

210.    Being a member of the Clinical Policy Guidelines Committee, Dr. Ball was involved in creating the guidelines for "informed consent."[181] Thus, Dr. Ball states that as part of the clinical guidelines, abortion clinics and their physicians must be familiar with the

---

[177]Cassidy 2, Ex. 30 (Ball, at 24:23 - 25:11).

[178]Cassidy 5, Ex.7 (Kromenaker, at 17:3-12).

[179]Cassidy 2, Ex.30 (Ball, at 27:19-24).

[180]*Id*. at 27:25 - 28:18.

[181]*Id*. at 28:1-10.

various regulations they must follow within their individual states.[182] However, despite the fact that understanding the difference between the "reasonable patient standard", and the "professional" standard for informed consent imposed by different states is essential to understand the physicians' duties, Dr. Ball admitted that she was "not familiar" with those standards, and Dr. Ball did not know whether North Dakota and South Dakota imposed the "reasonable patient" standard or the "professional" standard for informed consent.[183] Thus, it is clear that despite the fact that she was Medical Director of PPMNS, and a member of the "Clinical Policy Guidelines Committee" of NAF, which provides guidelines for informed consent, Dr. Ball had no knowledge of what informed consent standard she and those working under her were required to follow under relevant state law.[184]

211.   Dr. Ball, as a board member of NAF and Medical Director of Defendant PPMNS/PPNCS, attended annual meetings of NAF continuously beginning in the early 1990's.[185] At the annual NAF conferences there are teaching seminars, which Dr. Ball not only attended, but taught as a member of the "faculty" on a number of occasions. Those seminars are attended by physicians, nurses, clinic managers, and "patient educators."[186]

---

[182]*Id*. at 30:2-14.

[183]*Id*. at 29:23-25.

[184]*Id.*

[185]*Id*. at 25:19 - 26:16.

[186]*Id*. at 31:13 - 32:25.

212.    As a member of the board of NAF, Dr. Ball considers the education sessions at the NAF national convention for the previous 25 years (1989 to 2014) as "instructive for the abortion providers throughout the country." The presenters, Dr. Ball asserts, are all qualified and hand-picked by an "Education Committee," which Dr. Ball was also a member of, thus helping select the presenters. Dr. Ball testified that every presenter, from 1994 to 2014, was qualified to present, that she, herself, relies upon standards promoted at the NAF conferences, and there were no policies or procedures, or educational techniques, presented at the NAF conferences that she disagreed with over that time.[187]

213.    One of the NAF teaching sessions at an annual NAF convention epitomizes the disdain the abortion industry possesses for pregnant mothers who have any moral or religious beliefs. In that session, the NAF presenters, in turn, declare that they are atheists, and laugh about the best techniques to persuade a religious woman that God finds her submitting to an abortion to be morally acceptable. The presenters debated whether the atheist counselors can best sell an abortion by using a technique that promotes a "loving God" versus the employment of an argument about "the forgiving God." One member states that, while emphasizing that she doesn't "believe in God either" talks about her methods of persuasion:

> "...someone's telling me they believe in God is usually a Christian and I say 'tell me about the God you believe in. Tell me about your God. Does your God forgive? Yes. Okay so what's the problem here?'"

---

[187]*Id*. at 33:20 - 35:24.

That statement drew laughter. But it also instituted debate when one of the presenters, one Joseph Feldman, argued that he found that the "forgiving God" argument doesn't always work, so he has gone to an argument he calls "the loving God." Feldman drew more laughter, and thereafter another presenter, one Sherry Kreiger, declared to great laughter:

> "Okay, try the 'loving God.' I'll remember – I'm going to switch
> camps to the 'loving God.' Okay, thanks."[188]

That teaching seminar, like other NAF seminars, was recorded and produced on audio tapes to be disseminated and made available to the entire abortion industry.[189]

214.    Those pressure sales techniques are employed by the abortion industry despite the fact it is known by defendants and those throughout the industry that a pregnant mother's violation of her religious beliefs leads, not only to her loss of her child she otherwise would want to keep, and 14th Amendment rights, but also to subjecting that mother to serious psychological harm.

215.    PPMNS/PPNCS's Medical Director, Dr. Ball, who had testified that she, herself, was an atheist who thinks it completely appropriate for an atheist to "counsel" a

---

[188]Transcript of relevant portions of the NAF seminar session is attached to the Declaration of Carol Everett and marked as Ex. B.

[189]A photocopy of the cassette tape of that NAF seminar, which was entitled "Case Studies in Counseling" is attached to the Declaration of Carol Everett and marked as Ex. C. The transcript marked as Ex. B attached to the Everett declaration, accurately reproduces the discussion referenced above, on Side A of the cassette from minute 23:05 to 30:30 and 34:58 to 35:48. A thumb drive of those relevant portions will be filed with the Court in support of Plaintiffs' Motion for a Preliminary Injunction. A full cassette is in the possession of Plaintiffs' counsel for production.

religious woman about her religious beliefs and God, vouches for the merits of all NAF seminars. Defendant Red River's owner and operator, Tammi Kromenaker, is also a member of NAFs board of directors.[190]

216.    Abortion clinics routinely "push the sale of abortions." Those who are called "counselors" or "educators" are trained to persuade reluctant women to submit to an abortion. It has been routine in the abortion industry to reward "educators" who have a high rate of successful persuasion, with raises, while women like Chastity Fyksen-Ladoucer are fired.[191]

### III.    The Overwhelming Majority of Abortions are Coerced, Pressured, or Uninformed

217.    The record in this case demonstrates that it is a widespread, national problem that a large percentage of pregnant mothers who are subjected to an abortion would prefer to have kept their children. Pregnant mothers are routinely coerced and pressured by others into submitting to abortions which they do not want. The record further demonstrates that abortion providers in general, and PPMNS/PPNCS in particular, are unwilling and unable to institute safeguards to ensure that pregnant mothers do not lose their wanted children. Those mothers who lose wanted children suffer a unique and devastating emotional pain, and many of them will never experience any meaningful emotional healing at all. The record also reveals that many women who submit to an abortion have one or more preexisting risk

---

[190]NAF website: http;//prochoice.org/about/mission-leadership.

[191]Declaration of Plaintiffs' expert, Carol Everett, ¶¶4 to 40.

factors placing them at increased risk for negative psychological outcomes post abortion. These preexisting risk factors include coercion, pressure, ambivalence, commitment to the child, moral or religious views which conflict with abortion, and pre-existing mental health issues.[192] Most women who submit to an abortion have one or more of these risk factors.

218.    While pregnant mothers lose one of their greatest rights, while they lose a child who is precious to them, while they are subjected to coercion and pressure from others, and while they are being subjected to suffering from suicide ideation and depression, the abortion industry instructs its workers how to employ sales techniques to persuade mothers to violate their conscience, even laughing as they debate between a sales technique promoting "a loving God," versed a sales technique arguing for "a forgiving God." They ask "What's the problem here?"

### A.    Pregnant Mothers are Often Subjected to Involuntary Abortions

219.    It is a widespread national problem that pregnant mothers are coerced and pressured into having abortions they do not want.[193] Forced abortions have become so

---

[192]Declaration of Plaintiffs' expert Katherine Hartmann, MD, PhD, ¶¶4, 80-103; Declaration of Plaintiffs' expert Patricia Casey, MD, PhD, ¶¶2-3; Declaration of Plaintiffs' expert Priscilla Coleman, PhD, ¶¶16-86; Declaration of Plaintiffs' expert Elizabeth Flanagan, PhD, ¶¶22-25; Declaration of Plaintiffs' expert Carol Everett, ¶¶3-42; 45-46; Declaration of Plaintiffs' expert Dorothy Wallis, ¶¶32-35.

[193]Hartmann, MD, PhD Decl., ¶¶81-87; Flanagan, PhD Decl., ¶¶22-25; Casey, MD, PhD Decl., ¶¶2-3; 26-35; Everett Decl., ¶¶3-42; 45-46; Wallis Decl., ¶¶32-35; Coleman, PhD Decl., ¶¶16-86; Declaration of Allan Parker, Esq., ¶¶5-10.

widespread, that in 2009, the *Center Against Forced Abortions* (CAFA) was created to fight the infliction of the injustice of involuntary abortions on pregnant mothers. CAFA provides direct legal help to pregnant mothers, and collaborates with attorneys across the country to protect pregnant mothers from being forced to submit to an abortion in which the mother loses her child she wants and cherishes. CAFA provides these services *pro bono*. Despite the fact it is extremely difficult for most pregnant mothers to even know such services are available for them,[194] it is estimated that, as of 2022, CAFA has saved over 12,000 pregnant mothers from coerced abortions.[195]

220.    The pressure and coercion that forces a pregnant mother to lose her child she wants has taken on many different forms, and in varying degrees of each. At an extreme end, it involves threats of physical force and even violence, it involves coercion which denies the mother of basic needs until she submits, it involves the demands of the child's biological father insisting on an abortion and even scheduling it for the mother, and it involves more subtle pressures, like those around the mother insisting it is something she must do, and her natural support system refusing to provide any assistance.

---

[194]Parker, Esq. Decl., ¶9.

[195]*Id*. ¶¶5-10.

## 1. Acts of Violence and Threats of Physical Force

221.    At the most extreme end of the violent demands of men, are the pregnant mothers who are murdered for refusing to have an abortion. Attached as Exhibit B to the declaration of plaintiffs' expert, Katherine Hartmann, is a list of 83 documented cases in which men who were the biological father of a pregnant mother's baby, murdered the mother because she refused to have an abortion.[196] That list likely represents a mere fraction of such instances, and some of those instances listed in Exhibit B involve high profile personalities.[197] These disturbing facts have been well known for many years, and it has been incumbent upon the state defendants to make note of them, and to take action to protect the rights of the mothers. It has also been well known that numerous studies have shown that murder is a leading cause of death among pregnant mothers,[198] that in two studies, murder

---

[196]Hartmann, MD, PhD Decl., ¶88, and Exhibit B attached.

[197]Hartmann, MD, PhD Decl., ¶88.

[198]*Id.,* citing: Martin SL, Macy RJ, Sullivan K, Magee ML. Pregnancy-associated violent deaths: the role of intimate partner violence. *Trauma Violence Abuse*. 2007;8(2):135-148. doi:10.1177/1524838007301223; Chang J, Berg CJ, Saltzman LE, Herndon J.; Homicide: a leading cause of injury deaths among pregnant and postpartum women in the United States, 1991-1999. *Am J Public Health*. 2005;95(3):471-477. doi:10.2105/AJPH.2003.029868.

was the number one cause of death among pregnant mothers in one state studied,[199] and that in most instances, the murderers were the pregnant mother's intimate male partner.[200]

222.    Those who have worked with post-abortive women testify that it was common that these women had been coerced into an abortion, resulting in devastating psychological injury to the mothers.[201] Those who found homes for battered women report that some of those women were pregnant and being forced into an abortion they did not want.

> "Many of these women were being physically assaulted, and some even lost their children as a result of the physical violence they sustained."[202]

According to the founder and operator of many shelters for battered women, about half of the pregnant mothers they sheltered were being coerced or pressured to have an abortion.[203]

---

[199]Horon IL, Cheng D. Enhanced surveillance for pregnancy-associated mortality-Maryland, 1993-1998. *JAMA*. 2001;285(11):1455-1459. doi:10.1001/jama.285.11.1455; Cheng D, Horon IL. Intimate-partner homicide among pregnant and postpartum women. *Obstet Gynecol*. 2010;115(6):1181-1186. doi:10.1097/AOG.0b013e3181de0194.

[200]Cheng D, Horon IL. Intimate-partner homicide among pregnant and postpartum women. *Obstet Gynecol*. 2010;115(6):1181-1186. doi:10.1097/AOG.0b013e3181de0194.

[201]Declaration of Yvonne Florczak-Seeman, ¶¶7-15 (who operated organizations that assisted post-abortive and pregnant mothers being pressured into an abortion; she personally counseled thousands of these women and interviewed thousands more); Declaration of Sandra Ramos, ¶¶1-15.

[202]Ramos Decl., ¶13.

[203]*Id*. ¶¶1-15.

119

223.    Christopher Bell founded a non-profit called *Good Counsel, Inc.*, which operates four homeless shelters for homeless pregnant mothers and mothers of young children. *Good Counsel* has provided shelter for over 8,000 women, many of whom were pregnant. *Good Counsel* helps women from every part of the country. *Good Counsel* provides housing for 12 to 18 months, and it helped facilitate a national maternity housing coalition of over 100 maternity homes. Christopher Bell has personally counseled thousands of women who were coerced or pressured by others to have an abortion they did not want, resulting in significant psychological problems, including depression, anxiety, post-traumatic stress disorder, and even suicidal ideation from their abortions. "Almost all of the pregnant mothers *Good Counsel* helps are homeless precisely because they have refused others' pressure to have an abortion, and for that reason, they were kicked out of their homes *or needed shelter to avoid being subjected to violence*" (emphasis added).[204]

224.    Many have witnessed women going into PPMNS' abortion clinic in St. Paul who were both ambivalent and pressured. In some instances, physical force was exerted on women resisting being forced into the PPMNS abortion facility.[205]

225.    Numerous women who were coerced into an abortion testify that threats of violence and acts of violence were used to force them to submit to an abortion.

---

[204]Declaration of Christopher Bell, ¶¶1-6, (quote from ¶4).

[205]Declaration of Brian Gibson, ¶¶9-12.

PPMNS/PPNCS has been aware of these facts for many years. Vixie Miller's husband demanded that she have an abortion. When she refused, he screamed at her and struck her. On the day the abortion was scheduled, Vixie's husband grabbed her by the arm and forced her into the passenger seat of his car. Despite that violence, Vixie continued to refuse to have an abortion. Then, while in the car, Vixie sat helplessly while her husband pulled out his 44 magnum handgun, and then displayed a 12-inch long buck knife. Vixie's husband grabbed her by the arm and took her into the abortion clinic. He warned her not to "say anything stupid" while at the abortion clinic. In the clinic, Vixie's husband was with her all the time. There was no private counseling. After that abortion was forced on her, she became pregnant again. This time she got a lawyer and sought a divorce before her husband forced another abortion.[206]

226.     Margie Ayers was physically abused by her mother who demanded that Margie get an abortion. Margie was able to escape from her mother's grasp and fled to her boyfriend's house, where his mother was supportive of the two of them and Margie having the baby. Margie's mother continued to curse at her, and scream demands that she submit to an abortion. Her mother threatened to permanently ban her from their home. Margie finally packed her belongings to move into her boyfriends house when her mother came into her room, slammed Margie to the floor, jumped on her and started slapping her as she sat on top

---

[206]Declaration of Vixie Miller, ¶¶8-14.

of her. Margie's mother threatened to "kick the baby" out of her. Margie feared for her life, and tried to grab her phone to call 911. Her mother smashed the phone and started to strangle her. She escaped the house that day.[207] Margie's boyfriend's mother, Myrna Deere, helped Margie and her son, William, and tried to intervene with Margie's mother to get her to stop her demands. Margie's mother was angry and insisted on an abortion. Myrna and her husband tried to save Margie by getting temporary custody, and they hired a lawyer. Margie stayed at a shelter for a few days. William and Margie married and now have four children. However, they lost their first child to an abortion that Margie's mother ultimately violently forced upon her at a Planned Parenthood abortion business despite Margie telling Planned Parenthood she wanted her baby.[208] PPMNS/PPNCS have known about this forced abortion for the past four years.

227.    Former abortion clinic workers report that pregnant mothers were forced to have an abortion against their will by Planned Parenthood physicians, and even were physically held down to bully her into an abortion.[209] Even when a pregnant mother asked a Planned Parenthood doctor not to perform an abortion, the doctors lied to the mothers, telling them it was too late and the doctors performed the abortions anyway.[210]

---

[207]Declaration of Margie Ayers, ¶¶5-9.

[208]Cassidy 4, Ex.3 (Declaration of Myrna Deere, ¶¶1-12).

[209]Neyer Decl., ¶14.

[210]Rodriguez 1 Decl., ¶15.

**2.    Pregnant Mothers are Coerced, Pressured, and Deceived to Submit into Submitting to an Abortion**

### (a) Testimony of the Experts

### (i) Coercion and Pressure

228.    It has been well established and has been well known for many years that pregnant mothers are often coerced or pressured to submit to an abortion they do not want. Katherine E. Hartmann, MD, PhD, is the Vice President for Research at Vanderbilt University Medical Center, is Deputy Director of the Vanderbilt Institute for Medicine and Public Health, and is a tenured professor, Obstetrics and Gynecology and Medicine at Vanderbilt, and holds the Lucius E. Burch Chair of Reproductive Physiology and Family Planning at Vanderbilt University. She is the primary, contributing or senior author on over 138 peer-reviewed publications in scientific journals. Dr. Hartmann has served as a reviewer for 15 peer-reviewed medical journals, including: *Obstetrics & Gynecology*; *The New England Journal of Medicine*; *The American Journal of Obstetrics and Gynecology*; *British Journal of Obstetrics and Gynecology*; and *The American Journal of Epidemiology*. She founded the *Evidence-Based Practice Center* which focuses, in part, on medical decision-making. Dr. Hartmann has extensive experience in providing care for women having first and second trimester abortions, in all settings, including clinics, outpatient surgical centers, and hospital ward admissions, and in-patient surgical procedures. Her expertise includes counseling women in the consent process, evaluating mental health needs, and providing post-abortion care and services, including incomplete abortions and mental health issues. Dr.

123

Hartmann's C.V. is attached to her declaration and marked as Exhibit A.[211] Dr. Hartmann states, based upon her knowledge, her experience, expertise, and the record in this case, that it is common for women to be coerced and pressured to submit to an abortion they do not want.[212]

229.    Patricia Casey, MD, is a leading international expert psychiatrist specializing in the areas of suicide and self-harm, and of adjustment disorder. Dr. Casey has authored 16 academic books, 29 book chapters, and 75 original published research papers in peer-reviewed journals, along with a long list of teaching accomplishments. In her clinical practice, Dr. Casey has a special expertise in treating women who have suffered adverse reactions to an abortion, including her treatment of those women's depression and anxiety. In her practice, she has treated women who were pressured into submitting to an abortion, and even treated women for mental illness related to their having coerced their daughters into abortions.[213] Dr. Casey testifies that pregnant mothers are "routinely coerced or pressured into submitted to an abortion," and are subjected to significant psychological injury.[214] Dr.

---

[211]Hartmann, MD, PhD Decl., ¶¶5-11, 65, 81-103.

[212]Hartmann, MD, PhD Decl., ¶¶4, 80-103; Dr. Hartmann, in her declaration, cites to over 100 authorities in support of her opinions expressed.

[213]Casey, MD, PhD Decl., ¶¶9, 13; Dr. Casey's experience and expertise is set forth in her declaration at ¶¶4-15, and in more detail in her C.V. attached to her declaration as Exhibit A.

[214]Casey, MD, PhD Decl., ¶¶3, 19, 33-60.

Casey has personally treated over one hundred women for the psychological harm resulting from their abortions.[215]

230.    Elizabeth Flanagan, PhD who is a respected research scientist in the psychology section of the Department of Psychiatry at Yale School of Medicine, has authored 50 published peer-reviewed scientific journal articles, 15 book chapters, and has served as a peer-reviewer for multiple professional mental health journals, including *The American Journal of Psychiatry*, and *The British Journal of Psychiatry*, and many others.[216] In her clinical practice and experience, Dr. Flanagan has "observed the decision-making processes of women considering an abortion, as well as the effects of coercion and pressure on pregnant women who have had abortions." She has also studied the scientific literature which addresses the psychological sequella of abortion, and she has witnessed, in her practice, the depression, suicidal thinking, anxiety, and substance abuse that abortion can precipitate or worsen in some women.[217] Dr. Flanagan states that there is compelling evidence that pregnant mothers are frequently subjected to coercion, pressure, and manipulation to compel them to have an abortion.[218]

---

[215]Casey, MD, PhD Decl., ¶58.

[216]Flanagan, PhD Decl., ¶¶1-2.

[217]Flanagan, PhD Decl., ¶6.

[218]Flanagan, PhD Decl., ¶¶31-41.

231.    Priscilla K. Coleman, PhD, was a full-tenured Professor of Human Development and Family at Bowling Green State University. Dr. Coleman published over 60 peer-reviewed scientific articles, with 41 of them related to the psychology of abortion (psychology of decision making, psychological outcomes, probability of post-abortion mental health declines, coercion and pressure to abort, and intimate partner violence to coerce an abortion). Dr. Coleman's C.V. is attached to her declaration as Exhibit A.[219] Dr. Coleman notes that it is critical to recognize the "widespread phenomenon of pressured and coerced abortions," and the fact these pregnant mothers are not making "autonomous" decisions.[220] Dr. Coleman provides a detailed analysis of the numerous peer-reviewed studies that indicate that coercion and pressure to submit to an abortion is frequently experienced by pregnant mothers, and she provides analysis of other evidence of that phenomenon,[221] including a survey of 987 post-abortive women. Dr. Coleman describes the evidence that demonstrates that a large percentage of women, not only lose the child they wanted, but suffer from negative sequella due to the abortion.[222] In a survey of 987 post-abortive women, 61.9% of

---

[219]Coleman, PhD Decl., ¶¶1-5.

[220]Coleman, PhD Decl., ¶¶16-25 (and Table 2), ¶¶32-39.

[221]Coleman, PhD Decl., ¶¶16-25.

[222]*Id*. ¶¶26-39, 57-67 (and Table 4).

the women stated that they felt deceived by the abortion workers, and 85.6% stated that the counseling at the abortion clinics was inadequate.[223]

232.    Carol Everett has worked with pregnant mothers being coerced or deceived into abortions, and post-abortive women since 1976. She worked at, and helped in the operation of, four different abortion clinics for seven years, all of which were members of NAF. While she worked at those abortion businesses, those clinics performed about 35,000 abortions in which she was involved. As an operator of four abortion clinics which were all members of NAF, she became intimately familiar with the operations of abortion clinics across the nation, and is still familiar with them up to the current time.[224] Carol Everett has worked with pregnant mothers and post-abortive women in some capacity for most of the past 48 years, since 1976. After operating the abortion clinics, she operated pregnancy help centers which help pregnant mothers keep their babies. She founded *The Heidi Group* in 1995 where she provides both pre-abortion counseling for pregnant mothers, and post-abortion counseling. She explains that at the abortion clinics where she worked, the abortion clinics "push" and sell abortions, when they attempt to convince pregnant mothers to submit to an abortion, and where bonuses were given to counselors who helped get women to abort, and where physicians were paid only by the abortions he or she performed. In her experiences, both at

---

[223]*Id*. ¶69 (and Table 6).

[224]Everett Decl., ¶¶3-6.

abortion clinics and at her pregnancy help centers, it was very common for women to be coerced and pressured into abortions they did not want. The abortion clinics where she worked had the same practices and same disregard for the mothers' rights as that at PPMNS and throughout the abortion business.[225] Carol Everett's C.V. is marked as Exhibit A to her declaration. In 1992, Carol Everett published a book setting forth the abuses at abortion clinics that accommodated the coercion and exploitation of women, entitled "Blood Money," Everett, C., ©1992.[226] Carol Everett concludes, based upon her four decades of experience and expertise, that "abortion is a war on women."[227]

233.     Dorothy Wallis has worked with, and provided support for, pregnant mothers who lost their children they wanted by coerced and pressured abortion, for the past 44 years, since 1980. As a result of all of the work she has done with these women over the years, and her work with about 2,500 pregnancy help centers across the country, she is thoroughly familiar with the policies, practices, and procedures routinely employed at abortion clinics throughout the nation and those at pregnancy help centers. She founded two pregnancy help centers that she has operated since 1980.[228] She was a founding member of the board at

---

[225]Everett Decl., ¶¶1, 6-47.

[226]*Id*. ¶7.

[227]*Id*. ¶47.

[228]Wallis Decl., ¶¶2-7.

plaintiff National Institute of Family and Life Advocates (NIFLA) in 1990.[229] In order to

fight the prevalence of forced abortions, Dorothy Wallis operated *House of Hope*, that

provided a place to stay for pregnant mothers. Dorothy Wallis states:

> "I, myself, have taken pregnant mothers into my own home on
> a regular basis. Some pregnant mothers served by *House of
> Hope* needed a place to live to escape the violence they were
> subjected to as a result of their refusal to submit to the demands
> of others to have an abortion."[230]

234.    Dorothy Wallis explains the stark differences between the abortion industry,

which destroys the rights of pregnant mothers, often against their will, and the pregnancy

help centers that defend and protect the mothers' rights and interests. Dorothy Wallis states,

based upon her 44 years of experience:

> "The pregnancy help center network is a women's movement
> run virtually exclusively by women for the benefit of women."[231]

Between 1 million and 1.5 million women receive pre-abortion counseling at a pregnancy

help center in the United States each year, and the overwhelming majority of those pregnant

mothers are vulnerable to an abortion for various reasons. As a result of the counseling and

help they receive at the pregnancy help centers, the "overwhelming majority" of these women

---

[229]*Id*. ¶¶12-13.

[230]*Id*. ¶14.

[231]*Id*. ¶18; *see also,* ¶¶19-20.

keep and raise their children themselves, and experience the joy and fulfillment of the relationship with their children. The pregnancy help centers help fight the coercion and pressure to which the mothers are subjected.[232] The abortion businesses are the destroyers of women's rights. The women and the women's movement operating the pregnancy help centers are the defenders and protectors of women's rights.

235.    Mary Davenport, MD has been a certified obstetrician and gynocologist since 1982. Dr. Davenport has practiced her ob/gyn specialty in private practice since 1985. Since 2011, Dr. Davenport, along with other colleagues, has studied the use of the accepted standard practice of administering progesterone to pregnant mothers whose progesterone levels are dangerously low, in the context of mothers who were first administered Mifepristone at an abortion clinic. Mifepristone is administered precisely to lower the mother's progesterone level. In those cases where the mother did not want the abortion and was able to get to a physician in time, the progesterone treatment for those mothers has been proven successful to save the mother's baby, and both the mother and child are completely healthy after birth.[233]

236.    Dr. Davenport testifies that the large number of pregnant mothers who seek the progesterone treatment after the start of a medical abortion evidences the fact that there are

---

[232]*Id*. ¶¶25-26.

[233]Dr. Davenport 1, ¶¶4-13; s*ee also*, Dr. Davenport 2, ¶¶2-8.

a large number of abortions in which a pregnant mother was pressured or coerced to submit to a medical abortion (like plaintiff Alexandra Johnson) or, at the very least, ambivalent, and no abortion should have been performed.[234]

237.    The experts observe that it is common for abortion clinics to pressure and coerce a pregnant mother to submit to an abortion.[235]

238.    The nature of the pressure to abort to which pregnant mothers are subjected takes different forms and in different degrees.[236]

### (ii)    The Devastating Aftermath of a Pressured or Coerced Abortion

239.    There are six universally recognized pre-existing risk factors that place a pregnant mother at significant increased risk of psychological harm following an abortion. Among those two major preexistent risk factors that can cause such harm, the mother being

---

[234]Dr. Davenport 1, ¶¶10, 14, 16-21; *see also*, Dr. Davenport 2, ¶¶2-8; *see also*, Dr. Billings Decl., ¶¶11-14; Dr. Anderson Decl., ¶¶2, 8; Dr. Valley Decl., ¶¶4-9.

[235]Hartmann, MD, PhD Decl., ¶¶70, 71, 78,91-103; Flanagan, PhD Decl., ¶¶32, 37, 39; Wallis Decl., ¶34; Casey, MD, PhD Decl., ¶¶21, 36-42, 53, 55, 57; Everett Decl., ¶¶6, 7, 9-15, 20-22, 24-46, 36-40; Coleman, PhD Decl., ¶¶17, 18, 35, 68, 70; Dr. Davenport 1, ¶¶18, 20.

[236]Hartmann, MD, PhD Decl., ¶¶49, 87, 88, 91, 116; Flanagan, PhD Decl., ¶¶24-28, 30, 41; Casey, MD, PhD Decl., ¶¶20, 22, 24-26, 29, 30; Wallis Decl., ¶¶13, 26, 30; Coleman, PhD Decl., ¶¶13, 19-20, 25 (and Table 2), 40; Everett Decl., ¶¶46, 47; Dr. Davenport 1, ¶¶4, 17.

subjected to an abortion resulting from being pressured or coerced into it.[237] Defendant PPMNS' medical director, Carol Ball, MD, and PPMNS' abortion doctor, Nichola Moore, MD, both admitted that pressure and coercion placed a mother at increased risk of psychological harm.[238] PPMNS' abortion doctor even admitted that such preexisting risk factors placed the mother at increased risk for suicide ideation, and suicide itself.[239] Most pregnant mothers have one or more of those six preexisting risk factors that place them at risk of psychological injury.[240]

240.    In 2005, the State of South Dakota passed an informed consent statute in an effort to compel defendant PPMNS to provide some basic disclosures to the pregnant mothers before they signed a consent for an abortion to help make such an important consent better informed. One of the disclosure provisions required the abortion doctor to inform the pregnant mother that an abortion places her at increased risk of suicide ideation and suicide. SDCL §23A-10.1(1)(e)(ii). Defendant PPMNS, despite the fact that their physicians knew that abortions placed the mothers at such risk, filed a lawsuit against the South Dakota state officials claiming that the state's effort to assist the pregnant mothers and help protect their

---

[237]Casey, MD, PhD Decl., ¶¶55-60, and authorities cited.

[238]Casey, MD, PhD Decl., ¶55; Cassidy 2, Ex.9 (Ball, at 177:5 - 179:13); Cassidy 2, Ex.10 (Moore, at 130:4 - 133:17).

[239]Cassidy 2, Ex.10 (Moore, at 130:4 - 133:17).

[240]Casey, MD, PhD Decl., ¶¶55, 58.

rights violated the free speech rights of the doctors. An *en banc* panel of the U.S. Court of Appeals for the 8th Circuit ruled against PPMNS and its doctors, holding that requiring such disclosures was constitutional because it was a true statement of scientific fact, and was relevant for the pregnant mothers' decision of whether or not to submit to an abortion. *Planned Parenthood Minnesota, North Dakota, South Dakota, et al. v. Rounds, et al.,* 686 F.3d 889 (8th Cir. 2012)(*en banc*). The Minnesota state officials and the Minnesota state legislature have known of that decision, and is duty bound to know it. To this day the defendants PPMNS/PPNCS do not make that disclosure, and withhold the fact that those six risk factors place a mother who has an abortion at increased risk for suicide ideation and suicide. Many of the post-abortive women who submitted declarations in this case have disclosed their suicidal thoughts and suicide attempts because of their abortions.

241.    Priscilla Coleman, PhD, explains the nature of the psychological harm caused by pressured or coerced abortions, including anxiety, paranoia, emotional difficulty, serious "suicide preoccupation," and haunting nightmares.[241]

242.    Yale University professor and research scientist, Elizabeth Flanagan, PhD describes some of the post-traumatic pain the abortion causes the mothers.[242]

---

[241]Coleman, PhD Decl., ¶¶19, 22, 26 (and Table 3), 30.

[242]Flanagan, PhD Decl., ¶¶42-48.

243.    One aspect of the deep pain and deep isolation of the mothers following an abortion is referenced by Dr. Flanagan. She relates how the post-abortive mothers describe a problem which many (if not most) of them suffer. The pregnant mothers often have nightmares about their abortions for years after the event.[243]

244.    B.H., who was forced to have an abortion at defendant PPMNS' abortion clinic (without any effort by PPMNS to protect her), testifies that she was racked with guilt by her not finding a way to "prevent my father and Planned Parenthood from killing my child." B.H. testifies that "for the first year following the abortion, I had nightmares about the abortion *almost every night*. When I had the nightmares, I would relive seeing parts of my baby pass through the tube I was hooked up to."[244] B.H. testifies that "because the nightmares were so frequent, I developed insomnia because I was scared to fall asleep." She relived the forced drive to the abortion clinic and her distress that "Planned Parenthood workers" didn't care that her child was being killed against her will. B.H. tells us: "I would relive the abortion procedure itself. I have envisioned that tube hundreds of times." Her chest would hurt as she had panic attacks four or five times a week.[245] B.H. feels strongly that her child was a little

---

[243] *Id.*

[244] B.H. Decl., ¶23.

[245] *Id.* ¶¶24, 25.

134

girl and she often reflects about what she would look like, what she would have named her and such things as what her favorite color would be.[246]

245.    Megan Bartz, who was pressured to submit to an abortion in Minnesota, testifies: "I often dreamt that my child stood in front of me and I was trying to comfort and snuggle him. In the dreams, as I reached out to hug the baby, the baby drifts away from me and I can never reach him. The baby disappears. When I wake up, often suddenly, I am overwhelmed by grief and sadness. I feel I am suffering the loss of my baby again and again, over and over."[247]

246.    Twenty-nine women who were subjected to unwanted abortions that killed their children they wanted have filed declarations in this case in support of the plaintiffs' motion for a preliminary injunction. They want the court to understand their experiences. They all explain the horror of those experiences, and many experienced similar nightmares and worse, and all of them suffered psychologically from the abortions, some reporting that they were suicidal and had even attempted suicide. George Zallie, the father of Stacy Zallie, a beautiful 21-year-old college student, relates how following a forced abortion Stacy became deeply

---

[246]*Id*. ¶26.

[247]Bartz Decl., ¶18.

depressed, attempted suicide on two occasions, and finally committed suicide in her own bedroom. Stacy left a note that said, in part: "Now I can be with my unborn child."[248]

### (b) Testimony of Planned Parenthood and Other Abortion Clinic Workers

247.    The entire abortion industry in general, and PPMNS/PPNCS in particular, have known for many years that the abortion clinics, its workers, and its physicians, have not taken any action, or created any procedures, to protect pregnant mothers against being coerced or pressured into an abortion. Far worse, it has been known that the abortion clinics, workers, and physicians, actually apply pressure of their own on those pregnant mothers, and have systematically and deliberately deceived pregnant mothers to convince them to submit to an abortion.

### (i) Planned Parenthood Forces Its Employees to Maximize the Sale of Abortions

248.    PPMNS/PPNCS was made aware of the testimony of Susan Thayer in the South Dakota cases a number of years ago. Susan Thayer, who worked 17½ years for Planned Parenthood affiliates in Iowa, was completely familiar with PPFA corporate structure, client flow and intake processes, its training protocols, its lack of any meaningful counseling for pregnant mothers considering an abortion, and its business practices, which manipulate women into having abortions to which they would not have otherwise

---

[248]Zallie Decl.

submitted.[249] The goal of PPFA and Planned Parenthood affiliates was to maximize the number of abortions for the PP affiliate. Every clinic was always given quotas for the number of abortions to be performed, and upper management, over the years, increased its pressure on the employees to maximize the number of abortions and abortion referrals. Every clinic was given firm quotas for the number of surgical abortions, medication abortions and abortion referrals each month. Planned Parenthood was an abortion business with a stated interest of maximizing the number of abortions sold. The sale of abortions provided a source of income for PPFA and its affiliates. PPFA took a percentage of the affiliates' income from abortions performed, and placed pressure on the affiliates to maximize abortion sales.[250]

249.    The fact that Planned Parenthood abortion clinics were in the business of maximizing the number of abortions sold, is supported by numerous former abortion clinic workers. Ramona Trevino testified that Planned Parenthood set goals and "targets" to maximize the number of abortions sold; that the abortion-providing clinics depended upon maximizing sales of abortions to achieve its revenue needs. Employees were even threatened

---

[249] Cassidy 4, Ex.1 (Declaration of Susan Thayer, ¶¶2-4, 32-42). The Thayer Declaration was part of the public record in *PPMNS v. Daugaard/Noem* (D.S.D. Aug. 22, 2019), ECF No. 210.

[250]Cassidy 4, Ex.1 (Thayer Decl., ¶¶7-12, 32-42).

that if they did not meet revenue targets, they would not be given raises. Sales of abortions were used to subsidize all of Planned Parenthood's programs.[251]

250.    At the defendant PPMNS' abortion clinic, "there was constant pressure to 'sell' surgery at Planned Parenthood because it was a source of revenue."[252] The pressure applied by PPMNS on its physicians was to perform as many abortions as possible.[253] The practices and procedures at PPMNS are the same as those used throughout Planned Parenthood affiliates across the nation.[254]

251.    Mayra Rodriguez, who worked at Planned Parenthood abortion clinics for 17 years, states:

> "One of the most disturbing aspects of the work at the Planned Parenthood abortion clinics was that the personnel were forced to 'push' abortion, even to sell abortions. If a pregnant mother was ambivalent, the clinic workers were trained to convince the mother to have an abortion. No help was offered to pregnant mothers who wanted to keep their children. We were taught to convince them that an abortion was the best thing for them."[255]

---

[251]Cassidy 4, Ex.8 (Declaration of Ramona Trevino, ¶¶5-7, 9-12, 32-42).

[252]Dr. Giebink Decl., ¶22.

[253]*Id*. ¶23.

[254]*Id*. ¶¶13, 17.

[255]Rodriguez 1 Decl., ¶11.

252.    Abby Johnson worked at a Planned Parenthood abortion clinic for eight years, and in her last two years at Planned Parenthood she was the Health Center Director. In that capacity, she was responsible for running all aspects of the abortion clinic, working directly with the New York office of Planned Parenthood Federation of America. The policies and protocols at all Planned Parenthood affiliates were developed, defined, and dictated by Planned Parenthood Federation of America (PPFA), and no affiliate could alter the protocols, procedures or disclosures without obtaining clearance from PPFA's New York office. The practices were universally employed across the country.[256] The policy to maximize the sales of abortions, as if pushing a harmless product, came from the top of PPFA down to the local leaders, top to bottom. The pressure was always to "increase the number of abortions we did." Techniques were employed to persuade pregnant mothers to have abortions

> "... rather than protect them from coercion or pressure or help them make truly voluntary and informed decisions. It is what we all did at Planned Parenthood. Our job was to persuade women to have abortions ... our job was to steer the woman to an abortion."[257]

The workers at Planned Parenthood were given quotas of abortions to meet, and the quotas prevented any real counseling because of the overriding need for revenue. At monthly

---

[256]Johnson Decl., ¶¶1, 8-12.

[257]*Id*. ¶17.

management meetings, directors yelled at workers because revenue was never high enough.[258]

253.    Myra Neyer explained that the goal at the abortion clinics was not to provide information to the pregnant mother to better understand the nature of the procedure, because the central "goal was not to have the mother leave the facility without first submitting to an abortion."[259]

254.    Annette Sosa-Rodriguez testifies that "there was constant pressure to keep our abortion numbers up ... [t]he regional director always emphasized the need to maximize the number of abortions ... we were constantly pressured to maximize the number of abortions."[260] Over time, Annette became "increasingly distressed at the lack of appropriate counseling and the utter disregard for the welfare of the mothers." Annette started to actually have discussions with the pregnant mothers, and many of the women told her they did not want an abortion. She allowed – against the policy of Planned Parenthood – to let those mothers leave the facility without an abortion. The Planned Parenthood Regional Director told her that the clinic's abortion numbers were dropping and didn't think that Annette "was fitting in." She was then fired, being told that the abortion numbers were too low. The time

---

[258]*Id*. ¶18.

[259]Neyer Decl., ¶11.

[260]Declaration of Annette Sosa-Rodriguez, ¶9.

Annette had begun giving ambivalent pregnant mothers actual relevant counseling resulted in an "unacceptable decrease" in the abortion sales.[261]

255.    Just like at virtually every abortion clinic in the nation, the Planned Parenthood facility where Annette was the Health Center Manager, Planned Parenthood tried to persuade religious pregnant mothers that it was alright for them to have an abortion because her God was "a forgiving God," and "so she could have an abortion."[262]

256.    Noemi Padilla testifies that at the *Tampa Women's Health Center*, where she worked as interim director, an "abortion clinic is the worst place for a woman to decide whether or not to keep her child." Her abortion clinic encouraged its employees to "seal the procedure," to make sure the woman "chose" to have an abortion, that is to "seal the deal," as if selling a used car.[263] The workers at her abortion facility were not permitted to protect the mothers' real interests, and the fact the pregnant mothers were being pressured to have an abortion they didn't want was to be ignored and even encouraged.[264]

---

[261]*Id*. ¶¶14-15.

[262]*Id*. ¶11.

[263]Declaration of Noemi Padilla, ¶¶6, 9.

[264]*Id*. ¶¶12-14.

> **(ii)** **It is Known at Abortion Clinics that Pregnant Mothers are Often Coerced or Pressured to Have an Abortion, but the Abortion Businesses do Nothing to Stop It, and Often Help to Advance the Coercion**

257.    Mayra Rodriguez worked in Planned Parenthood clinics for 17 years, and near the end of her tenure, was the Center Director at one of Planned Parenthood's clinics, oversaw the work at three different clinics, and had an office at each location. In the Glendale Arizona Planned Parenthood clinic, she witnessed some of the greatest horrors. She states:

> "A majority of the pregnant mothers cried. Their pain in losing their children was striking. There were aspects of the treatment of these pregnant mothers that were cruel and deeply disturbing. In Glendale, a single Planned Parenthood doctor would perform as many as 45 abortions in a single day. ... The doctors had no time to spend with the mothers and the doctors did not know what women were ambivalent, which ones were being pressured, and which ones actually wanted an abortion. ... On many occasions I saw a doctor start a late-term abortion by inserting Laminaria and then see the pregnant mother state she didn't want the abortion. The pregnant mother would ask the doctor to stop, but in each instance the doctor falsely told her it was too late, and the doctor would complete the abortion. Those doctors could have let those mothers have their babies, but didn't."[265]

---

[265]Rodriguez 1 Decl., ¶15.

258.   It became clear to Mayra that Planned Parenthood "thought their job was to kill babies," and relates how she witnessed a baby born alive and the doctor never told that fact to the baby's mother. Instead, he placed a living baby in a container to have the baby die.[266]

259.   Men who worked as sex traffickers who exploited women under their control, frequently brought mothers to abortion clinics to force them to have an abortion so they could put them back on the street. These men came to Planned Parenthood so regularly, that the Planned Parenthood personnel knew who these men were and what business they were in. The traffickers were a regular source of business for Planned Parenthood. When Mayra Rodriguez complained to her superiors that Planned Parenthood was accommodating the exploitation of the young helpless women, and working in partnership with them, she was told to "forget it," that it was "no concern" of hers, and no concern of Planned Parenthood. She was told to "ignore it.[267]

260.   A study revealed that it was common for sex traffickers to impose their will upon women they victimized by taking them to an abortion clinic, and that study revealed that the sex traffickers often brought those women to a Planned Parenthood facility.[268]

---

[266]*Id*. ¶16.

[267]Second Declaration of Mayra Rodriguez, dated Jan. 24, 2024, ¶¶4-6.

[268]*Id*. ¶10.

261.    Mayra witnessed the fact that abortion accommodates the exploitation of women, and "nowhere is that exploitation more evident, or more openly practiced, as when these men trafficked women for prostetution, and then take a pregnant mother into an abortion clinic so they could continue to sell these women to men willing to exploit them.[269]

262.    Myra Neyer testifies that at the Planned Parenthood abortion facility where she worked, about 50 abortions, 45 of which were surgical abortions, were performed each day of the six days the clinic was open. The pressure was to keep the "line" moving. The doctor saw the pregnant mother only for the seven to ten minutes it took to perform the abortion, and there was no counseling and the doctor did not go through "any informed consent process." Myra observes that "the doctors were too busy rushing through the process in order to complete all of the day's abortions." In fact, there was no counseling at all at the Planned Parenthood facility, and no informed consent process at all, even with the so-called counselors.[270]

263.    Planned Parenthood would schedule an abortion for a pregnant mother even when it was someone other than the mother who called to schedule it, when the mother didn't even know the nature of the procedure. Myra testifies:

---

[269]*Id*. ¶¶7-8.

[270]Neyer Decl., ¶¶5-8.

"Despite the fact it was clear that many of the pregnant mothers preferred to keep their child, or were ambivalent and struggling with the idea of losing their child, Planned Parenthood's personnel were taught to tell them the abortion was the best thing for them. That kind of advice was given to them even when it appeared that the mother's boyfriend was the one who wanted the abortion."[271]

264.    One of the most disturbing practices at Planned Parenthood is that the personnel were instructed to lie to women struggling with the idea of an abortion. The Planned Parenthood personnel:

"...were trained to tell any pregnant mother who would ask questions like 'What's there?' or 'Is my baby there?' that it was just some tissue. If the pregnant mother asked if the fetus could feel pain, we were taught to say that 'the tissue could not feel pain.'"[272]

265.    The intrinsic injustice of those misrepresentations made to the mothers became most clear for Myra in the "Parts Room." The "Parts Room" was where the Planned Parenthood workers, like Myra, had to piece the babies back together following an abortion in order to determine if all of the unborn child had been removed. Myra was required to locate the baby's head, arms, and each part. The workers, like Myra, who assisted on a particular surgical abortion was required to take the jar that the baby was suctioned into, back to the Parts Room to reassemble the babies. Myra states:

---

[271]*Id*. ¶¶10, 13.

[272]*Id*. ¶9.

145

> "Every day when I pieced their babies back together in the Parts Room, I was reminded how we lied to these mothers – telling them it was nothing but tissue."[273]

266.    The injustice of lying to the mothers was most amplified in the Parts Room. Myra observes that if the pregnant mothers first went to the Parts Room to understand the nature of the procedure being proposed, and saw the remains of the babies, "virtually every pregnant mother would have run out of that abortion clinic – if the doctors didn't first restrain them."[274] Myra states:

> "Planned Parenthood prevented these mothers from knowing the actual nature of the conduct it planned to perform under the guise that the mothers gave their permission. We deceived them so Planned Parenthood could make money. ... There was a dedication to abortions and no dedication to the mothers themselves."[275]

267.    Susan Thayer testifies that the entire purpose of the Planned Parenthood procedures and "counseling" was to pressure pregnant mothers to have an abortion.[276] As part of pressuring and steering the pregnant mothers to have an abortion, Planned Parenthood lied to the mothers, deliberately deceived those mothers to prevent them from understanding the true nature of the procedure, and even hid written material helpful to the mother required to

---

[273]*Id*. ¶¶17-21.

[274]*Id*. ¶20.

[275]*Id*. ¶21.

[276]Cassidy 4, Ex.1 (Thayer Decl., ¶¶7-14, 32-42).

146

be made available by law. Planned Parenthood didn't let the mothers see that helpful material.[277] Susan Testified:

> "Because we did not explain fetal development or the nature of the abortion procedure, once PPGI started doing medication abortions, I received lots of complaints from women who were surprised when they expelled a tiny baby at home. The complaints increased dramatically after PPGI started doing medication abortions by webcam. Women would come in or call the clinic yelling and cursing. They would say things like: "what the hell, I just saw a f------ baby in the toilet!" One time, during our regular manager's meeting, I was privately commiserating with one of the abortion clinic managers who I was friendly with. We discussed how the women getting medication abortions were not being properly informed and how there were so many "cattle in the chute" that it was impossible to provide the women with the information and care they needed and deserved. When I explained that I got those types of complaints regularly, she told me that a woman had recently come into her clinic yelling at her; she pulled a Ziplock bag from her pocket with a seven to nine week old baby in it and screamed, "you never told me it was a baby!"[278]

268. Abby Johnson testifies that at the Planned Parenthood abortion clinic that she helped manage, women were often being pressured or coerced to have an abortion, and others were clearly ambivalent. There was no counseling at all to help protect the mother against being pressured or to determine what was causing the mother's ambivalence. Planned Parenthood didn't care to explore any of those facts and hired so-called counselors who could never help counsel the mothers. In fact, attempting to protect the mother from coercion and

---

[277]*Id*. ¶¶16, 17.

[278]*Id*. ¶18.

pressure or an uninformed consent was in direct conflict with Planned Parenthood's goal of maximizing the number of abortions sold.[279] The interests of the abortion clinics conflict with the interests of the mothers.[280]

269.   It was apparent and discussed among the abortion clinic workers at the defendant PPMNS/PPNCS' St. Paul abortion facility:

> "That a large percentage of pregnant mothers who had abortions at PPMNS would have preferred to keep their child, but needed some financial or other help. PPMNS never gave any information about what help was available. PPMNS just gave them abortions."[281]

270.   Planned Parenthood affiliates knew that pregnant mothers were brought to their facilities while they were being coerced and pressured into an abortion they did not want. Planned Parenthood worker, Dana Behrhorst, testified that it was common – once or twice a month – that pregnant mothers were so disruptive in their refusal to have an abortion, that they were removed from areas where the other mothers were. At the Planned Parenthood clinic where Dana worked, the women were taken to a room on the second floor where the mother's male partner or parent could give her a talking to.[282] When Dana received a call at Planned Parenthood from a pregnant mother seeking help to give birth and keep her child she

---

[279]Declaration of Abby Johnson, ¶¶14-20.

[280]*Id*. ¶25.

[281]C.M. Decl., ¶28.

[282]Cassidy 4, Ex.9 (Declaration of Dana Behrhorst, ¶8).

gave the mother the telephone number of a pregnancy help center in town which would help her. When Dana's superior learned that she gave that information out, her manager told her in sharp language "We don't do that here." She was instructed to never give out such information again. As a result of such total disregard for the interests and needs of the pregnant mothers, Dana quit her job at Planned Parenthood even though she did not first obtain other employment elsewhere.[283]

271.    Planned Parenthood accommodates those pressuring and coercing pregnant mothers, and never help women who come for help to keep their child. Planned Parenthood never cared to protect pregnant mothers being sexually trafficked. Ramona Trevino "found Planned Parenthood's cynical public posturing and simultaneous lack of concern for victimized women, deeply troubling." For that reason, she quit her job at Planned Parenthood.[284] Planned Parenthood ignored the fact that a pregnant mother was being coerced, and rushed her through the abortion process.[285]

---

[283]*Id.* ¶10, 11.

[284]Cassidy 4, Ex.8 (Trevino Decl., ¶¶10-14).

[285]Sosa-Rodriguez Decl., ¶13.

149

      **(iii)**    **Participation in the Dark Culture at Abortion Clinics where the Rights of Pregnant Mothers are Destroyed, Results in Abortion Workers' Depression and Self-Loathing, Causing Them to Seek Therapy**

272.    The abortion clinic workers who witness the great suffering and grief of the pregnant mothers at the abortion clinics, and the destruction of the rights of those pregnant mothers, often suffer themselves. Their realization of their participation in the injustice against the mothers, and the depressive dark culture at the abortion clinics lead to their own depression and self-loathing, causing them to seek therapy for themselves.

273.    At times, C.M. worked in the recovery room at defendant PPMNS/PPNCS' St. Paul abortion facility. Half of the women in the recovery room were crying, some out loud. "The grief and emotional pain was palpable." In the recovery room, C.M. witnessed grief, humiliation, and the pain of losing a child. When C.M. checked women out of that St. Paul facility, the women were sad, crying and depressed. There was no procedure at PPMNS/PPNCS to address the women's emotional state and grief. The women were just left alone in their grief. "There was no joy or celebration about liberty or freedom at the PPMNS St. Paul abortion facility, only distress, depression, grief and zombie-like disassociation."[286]

---

[286]C.M. Decl., ¶¶16-21.

274.    C.M. testifies that the observations of the famous feminist author, Germaine Green, was "reminiscent" of what she witnessed in the recovery room at defendant PPMNS' St. Paul abortion facility. She quotes Greer:

> "It is typical of the contradictions that break women's hearts that when they avail themselves of their fragile right to aborion they often, *even usually*, went with *grief and humiliation* to carry out a *painful duty* that was presented to them as a privilege."

C.M. states:

> "That is precisely what I witnessed: that grief; that humiliation; and the pain of losing a child by an abortion."[287]

275.    That negative environment left workers, like C.M., angry and depressed. There was an overriding ideology and dogmatic atmosphere that permeated the entire culture at PPMNS in St. Paul. Abortion was treated as if it was a religious ritual.[288] The pain, grief, crying and even wailing, wore on the workers. "The PPMNS abortion clinic was a dark place, full of sadness, grief and pain."[289]

276.    Mayra Rodriguex testifies that, because of the horror she witnessed at Planned Parenthood, she could not sleep and was awake most of every night. When she did sleep, she had nightmares.[290] Because of the grief, suffering, sadness, horrors, and mistreatment of the

---

[287]*Id*. ¶¶16-17.

[288]*Id*. ¶¶22-24.

[289]*Id*. ¶27.

[290]Rodriguez 1 Decl., ¶9.

pregnant mothers and their interests that Mayra witnessed at Planned Parenthood, she had to undergo psychological therapy for a number of years.[291] Mayra engaged in self-loathing for being part of what they did at Planned Parenthood.[292]

277.    Mayra witnessed how the "horrors at Planned Parenthood caused other workers to become depressed," many needed therapy, and a number of the abortion clinic workers had nervous breakdowns. The self-loathing and depression abortion clinic workers experience results in their seeking therapy. About 700 abortion clinic workers have sought help, including psychological therapy after they leave the abortion industry from an organization called "*And Then There Were None*," which was created to provide necessary assistance to abortion clinic workers suffering psychological injury.[293]

278.    Myra Neyer testifies that the suffering she witnessed in the recovery room at the abortion facility where she worked "was depressing" The women were crying and totally lost. It was evident that most of the women wished they didn't have an abortion, and some of the women even came right out and said so. The suffering came from the loss of their child, not from physical pain. Witnessing the deep grieving was distressing and depressive

---

[291] *Id*. ¶7.

[292] *Id*. ¶36.

[293] *Id*., ¶8; *see also*, Declaration of Nichola Morrison; Declaration of Amanda Willie, DMin.

to Myra. Witnessing that grief of the women and the mistreatment of the pregnant mothers left Myra grieving.[294]

279.    A tragic experience Myra had involving the slaughter of baby quadruplets, which the pregnant mother wanted to keep, was too great an evil for Myra to remain at Planned Parenthood. The mother of the quadruplets begged her boyfriend not to force her to have an abortion, and despite the fact that Myra sent her home twice over the objection of her superiors, that pregnant mother was brought back to Planned Parenthood three times until she was subjected to an abortion she did not want. That experience with "the quads" resulted in Myra asking "how did our culture get to a point where we promote such evil as a positive good?".[295]

280.    After Myra quit working at Planned Parenthood following her experience with the mother of the quadruplets, she sought assistance from *And Then There Were None*, where she was able to get therapy she needed to heal from the horrors and evil of what she witnessed at the Planned Parenthood abortion business.[296]

281.    Nichola Morrison works at *And Then There Was None*, where she is a certified mental health coach with substantial experience with emergent response for medical injury.

---

[294]Neyer Decl., ¶¶15-16.

[295]*Id*. ¶¶28-49.

[296]*Id*. ¶¶50-52.

Nichola is the lead client advocate in charge of its client intake program. *And Then There Were None* (ATTWN), has bout 700 women who were former abortion clinic workers that have sought help and therapy at ATTWN because of the depression and self-loathing they suffer as a result of their their participation in the destruction of the rights of pregnant mothers.[297]

282.    Prior to working at ATTWN, Nichola often worked as an emergency medical technician, and mental health technician. Nichola was the first person at ATTWN who came in contact with a new abortion clinic worker seeking help. While ATTWN has helped about 700 former abortion clinic workers, Nichola handled the initial interviews of about 200 of these women. Many of those abortion workers express deep distress and their mental states are very similar: they took a job at the abortion clinic because they originally believed that those clinics advanced the rights of women; they all came to realize that they were involved in the unjust destruction of the rights and interest of pregnant mothers, and found themselves in a state of depression, self-loathing, and even suicidal thoughts. ATTWN provides therapy for these women. The therapy program operates under the direction and supervision of Dr. Amanda Willie, DMin.[298]

---

[297]Morrison Decl.

[298]*Id.*

154

283.    Nichola relates further common experiences among the former abortion clinic workers: they were horrified at what they witnessed, and realized they were involved in a great injustice; that they are escaping a "dark world," and the workers state that they literally hated themselves for being a part of that world. The workers all told of the horrors of the recovery rooms and the "parts room." The women, they all repeat, are swept through a clinic as if on an assembly line. Many of the ex-abortion clinic workers suffered from suicide ideation as a result of their self-loathing. Shockingly, it has been determined that while only 0.6% of the general public attempts suicide, 18% of former abortion workers have attempted suicide, while 37.6% report having suicide ideation, 10 times greater that the general population.[299] That mental health crisis is directly due to the injury to pregnant mothers that the workers witnessed and in which they participated.[300]

### (c)    The Testimony of the Mothers Subjected to Abortions They Did Not Want

284.    The nature and degree of the coercion and pressure to which pregnant mothers are subjected to compel them to submit to an abortion, takes many forms; as does the deception to which they are subjected.

---

[299]*Id*.

[300]Declaration of Amanda Willie, DMin.

**(i)      Pregnant Mother Plaintiffs**

285.    Plaintiff Alexandra Johnson was subjected to forceful and coercive demands resulting in the father of her child taking her to defendant Red River's abortion business and his making sure she submitted to an abortion she repeatedly stated she did not want. Alexandra's boyfriend was aggressive and intimidating in his demands for an abortion. That intimidation was constant. Alexandra went to Relate Care Pregnancy Help Center to try to convince her boyfriend not to force the abortion. He was overpowering during the period when Alexandra went to Relate Care, as well as when he took her to Red River and insisted on the abortion. Red River deviated from abortion businesses' normal practice and made her take both abortion drugs ensuring that she could not get the progesterone treatment she thought she could obtain.[301]

286.    Plaintiff K.P.S. was placed under enormous pressure to submit to an abortion she clearly did not want. The father of her child wanted the abortion, as did her family. The negative demands made upon her, and the fact that the baby's father would abandon her and her child wore on her. K.P.S. had no desire for an abortion and wanted her baby. The level of stress placed upon her resulted in her going to Planned Parenthood in St. Paul, where she fled from that clinic because she didn't want an abortion. K.P.S. was seen at Planned Parenthood multiple times, and she left multiple times despite PPMNS pushing an abortion.

---

[301]Alexandra Johnson Decl.

PPMNS/PPNCS knew she didn't want an abortion, and no one helped protect her rights, no one at PPMNS/PPNCS gave her the counseling and assistance for her to keep the baby she wanted. K.P.S. has suffered psychologically ever since the abortion.[302]

287.    The pressure placed upon plaintiff Clara Munger was more subtle, yet a form of pressure that is very common. Clara would never have even thought of having an abortion, but her boyfriend, father of her baby, wanted the abortion, which she felt was wrong and not consistent with her feelings and beliefs. When she was at the PPMNS/PPNCS facility in Rochester, Minnesota with her boyfriend, there was no counseling, and no discussion about where she could obtain help. No one discussed the actual nature of the abortion. Clara has lived with deep pain over losing her child, and she lives with the isolation of her guilt in feeling she did not protect her child and that she was the one person in the world most responsible for her baby. She lives with anger toward her baby's father because it was he who wanted the abortion. She needed advice and assistance, but there was no true informed consent procedure or any effort to determine her true desires, or whether she was being pressured. In addition to all of that, Clara testifies that if anyone at Planned Parenthood, or the State of Minnesota, ever told her that the abortion was a murder punishable by life imprisonment, and that her signature operated to grant immunity from prosecution for such a murder, she never would have submitted to the abortion. The continuation of the pressure

---

[302]K.P.S. Decl.

from her boyfriend, and the deception allowed by Minnesota law that authorized PPMNS/PPNCS to murder her child with impunity, resulted in her suffering from an abortion she did not want. She wanted her child.[303]

### (ii)     Other PPMNS/PPNCS and Minnesota Mothers

288.    L.M., Brittany Weston, B.H., Alyssa Carlson, and S.C., all had abortions at PPMNS/PPNCS facilities, and all were subjected to coercion and pressure to submit to an abortion they did not want. Their testimonies are discussed above under "Factual Allegations," II B(2)(a) to (e). In the cases of L.M., Brittany Weston, B.H., and Alyssa Carlson, those mothers were coerced by extreme measures. S.C. was signifiantly pressured by the doctor and nurses at the PPMNS facility.[304]

289.    Megan Bartz had an abortion in Minnesota that she did not want, resulting in her becoming suicidal. Her live-in boyfriend rejected her and her baby which led to an abortion she did not want. She testifies to the deep suffering she had endured because Minnesota law did not protect her, her rights, or her child.[305]

---

[303]Munger Decl.

[304]Declarations of L.M., Brittany Weston, B.H., Alyssa Carlson, and S.C.

[305]Bartz Decl.

290.    Tanya Humphreys was pressured into an abortion by her mother and boyfriend who scheduled an abortion in St. Paul Minnesota. The abortion clinic scheduled surgery over the phone without them ever speaking with Tanya. A "consent" for an abortion was signed in a waiting area, and the procedure was paid for by Tanya's boyfriend. All of that happened before she ever saw or spoke with a "counselor" or doctor. There was no counseling and she was never given an opportunity to have any discussion about what she really wanted.[306]

291.    K.H. was pressured by the father of her child to submit to an abortion in Robinsdale, Minnesota. K.H. cried all the while she was at the abortion clinic, but they performed the abortion anyway. After the abortion, she became depressed. For 15 years after the abortion she cried every day in the shower. When she cried she needed to be alone. She finally obtained help and entered a six-week therapy program.[307]

292.    K.H. states: "The doctor killing my baby is not medical care.[308]

293.    Jace Hanish and his girlfriend, Jane, wanted to get married and keep their baby. Jace's parents supported their wishes. Jane's father, however, demanded an abortion. Jace's parents met with Jane's parents hoping to help Jace and Jane keep their child. Jane's father insisted on an abortion and repeatedly demanded one. Jane's parents scheduled an abortion

---

[306]Humphreys Decl., ¶¶20-39.

[307]Declaration of K.H., ¶¶16-31.

[308]*Id*. ¶27.

over the phone to take place in Minneapolis, Minnesota. Jane never spoke with the abortion clinic. Jane's mother drove her to the abortion facility, but Jane insisted that she did not want the abortion, so she was allowed to leave the facility without the abortion. Furious, Jane's father drove her to the abortion facility the very next day and forced her to have the abortion. Throughout the ordeal, Jane suffered deep distress.[309] PPMNS has known these facts for a number of years.

### (iii)    Other Mothers Subjected to an Abortion They Did Not Want

294.    The coercion of pregnant mothers, as noted, includes acts of violence and assault. After beating Margie Ayers to force her to submit to an abortion, Margie's mother dragged her to a Planned Parenthood abortion clinic where Margie cried the entire time she was there. While Margie was crying in the procedure room, her mother was just outside the room screaming that she wanted to be sure Margie had the abortion, and wanted to see it "with her own eyes." The Planned Parenthood doctor performed the abortion anyway. After being forced to submit to the abortion, Margie was so distraught she could only think about her baby. A few days after the abortion, Margie attempted to commit suicide. She was found unconscious and rushed to a local hospital emergency room. Margie woke up in the hospital where she had to stay for three days.[310]

---

[309]Cassidy 4, Ex. 5 (Declaration of Jace Hanisch), Ex.6 (Declaration of Patrick Hanisch).

[310]Ayers Decl., ¶¶3-35.

295.    After her suicide attempt, Margie continued to dwell on her dead baby that she always envisioned as a baby girl. All she could think about was the abortion and her baby. Margie started having nightmares after the abortion. She would wake up and scream for her baby daughter, and shouted in her sleep, "Mommy's coming, it's O.K." Those frequent nightmares lasted for over four years. She finds she must avoid seeing her mother. She still wonders about her daughter, what she would be like. Margie has still not completely healed from the abortion at Planned Parenthood. She received therapy and continues to do so now.[311]

296.    Suicides and suicide attempts are far too common among pregnant mothers who were subjected to an abortion they did not want. Stacey Zallie was a beautiful, vibrant, 21 year old college student when her college boyfriend's father forced her to submit to an abortion. Stacey's parents were totally unaware of her pregnancy and her abortion until her father, George, found her dead, hanging from the ceiling fan in her bedroom. Stacey left a suicide note that said, in part, "Now I can be with my unborn child." Stacey's funeral mass took place on the same day and in the same church where here brother's wedding had been scheduled to be performed. The wedding was cancelled for the funeral.[312]

297.    Carol Ball, MD PPMNS' Medical Director, and Planned Parenthood abortion doctor Nichola Moore, MD, both admitted that if a pregnant mother is pressured into an

---

[311]*Id*. ¶¶36-45.

[312]Zallie Decl.

abortion she doesn't want, that mother is at increased risk for psychological injury, including the increased risk of suicide ideation and suicide. In 2012, PPMNS lost a §1983 action it brought concerning South Dakota's "Suicide Disclosure," when an *en banc* panel of the Eighth Circuit of the U.S. Court of Appeals held that "An abortion placed a woman at increased risk for suicide ideation and suicide." *Planned Parenthood v. Rounds*, 686 F.3d 889 (8th Cir. 2012)(*en banc*).

298.    Amanda Adams was forced to have an abortion she did not want. Amanda had been raped. She testifies that the abortion was more traumatizing than the rape. She testifies: "The forced abortion meant my 'boyfriend' had his way with me twice – first by raping me, and then forcing me to have an abortion I didn't want.[313]

299.    Julia Holcomb Misley was coerced into an abortion she did not want by her then boyfriend Steven Tyler, who was the lead singer of the rock band "*Aerosmith*." Julia was living with Tyler and was completely dependent on him. Tyler continually demanded she have an abortion and coerced her into one.[314]

300.    Julia was taken on a Gurney at a hospital lying completely naked and in total despair. An abortion doctor injected saline into her abdomen, which was extraordinarily painful. However, once injected, Julia felt the horrific sensation of her baby "jerking and

_____

[313]Declaration of Amanda McAdams, ¶14.

[314]Declaration of Julia Holcomb Misley, ¶¶2-17.

wiggling." Julia was completely devastated while all of this was going on. Julia was then administered a drug and she became unconscious. Later Tyler told her she delivered a baby boy who was born alive, and the baby was deliberately killed by the nurse.[315]

301.    Julia testifies that part of her died that day at the hospital, and she was never the same. Julia started having nightmares every night for a year and a half. In her nightmares, she would relive the moment the "needle was thrust" into her abdomen. She would wake up "fearful with a sense of dread." She realized that Tyler had rejected both her and their baby, and she could never again look at him without remembering how he forced her to have an abortion. After a couple of years she attended a Christian retreat and felt she could rebuild her life. She doubts, after all these years, that she will ever recover from the forced abortion. The abortion was the worst thing that ever happened in her entire life.[316]

302.    Theresa Bonopartis was an 18-year-old high school graduate when she found out she was pregnant. She wanted to keep her baby and initially her boyfriend supported her having the baby and even suggested that they should get married. When she was three to four months pregnant, her father discovered she was pregnant and demanded an abortion. When Theresa refused his demands he became furious and screamed at her. When he kicked her out of his house he yelled "you forget that I'm your father and I'll forget that you're my

---

[315] *Id*. ¶¶18-22.

[316] *Id*. ¶¶22-25.

daughter." Theresa was totally dependant upon her parents and had no money, no car, and nowhere to live. A friend of hers arranged to have her stay at her house on a temporary basis. It was extremely stressful. Then her sisters started calling her demanding and begging her to get an abortion. They called every day. Theresa steadfastly refused. After three weeks at her friend's, she knew she couldn't stay there much longer. The stress and pressure placed upon her by her father, her other family members, and the fact she had no money, no car, and no place to live became unbearable. Her boyfriend broke off with her and left her alone in isolation. She was now alone with no support from anyone. Finally her father scheduled an abortion at a local hospital. She never spoke to the hospital personnel and after she was taken to the hospital, no one spoke to her about the procedure and she can't remember signing a consent. She was put in the maternity ward filled with happy mothers. A doctor came to her and injected a large needle into her abdomen. She did not know what was actually being done and "had no idea what was going on." Then she felt the sensation of thrashing around inside of her, which she "later learned was my baby struggling to stay alive" after she had been injected with saline.[317]

303.    Theresa was in labor for several hours and then gave birth to a dead baby who was fully formed at four months old. She was shocked to see the baby. She sat alone in the hospital room with her dead son lying between her legs. Theresa testifies that at that moment

---

[317]Declaration of Theresa Bonopartis, ¶¶2-10.

she was forced to ask herself: "Oh my God, how is this possible? How could this barbarity be allowed?" The experience was so traumatic that she had significant psychological problems. She became "incredibly depressed," and had recurring nightmares and panic attacks. She had to go to a hospital emergency room a number of times because of the panic attacks. Theresa did not go back to her parents' house for about three years. She left New York and stayed in California, then Florida. She experienced the pain from the forced abortion for years, and engaged in self-hatred for not being able to stop the abortion. She ruminated about her son. As she tried to heal from her abortion, she was saddened and frustrated because she found there were really no resources for women like her to heal.[318]

304.   As a result, Theresa co-founded an organization in New York called "Entering Canaan," which conducts post-abortion healing programs, and has since worked with numerous organizations that provide women with post-abortion healing. She has personally counseled or helped counsel over 1,000 post-abortive women.[319]

305.   Lisa Hartman was deceived into submitting to two abortions. The first pregnancy was the result of a rape. A woman she looked up to told her to get an abortion. She was told by that woman that all that she had was "a blob of tissue." At the abortion clinic she asked the nurse "what is there?" She was told "there was nothing but some tissue." Lisa

---

[318] *Id*. ¶¶11-23.

[319] *Id*. ¶¶24-27.

trusted them and believed them. No one told her the truth during the second abortion either. Had she been told that a human being was already in existence, that the abortion killed a whole, separate, living human being, she would never have consented to an abortion. Shortly after that second abortion Lisa started sobbing uncontrollably, and didn't understand her great sense of loss. She tried to convince herself that there was nothing morally wrong with the abortion because it was the removal of just a "blob of tissue." Lisa started to have suicidal thoughts, and when, while in junior college, she learned, unequivocally that the abortions kill a whole, separate, living human being, she "felt lied to." She "felt manipulated." She never would have agreed to an abortion if she was told the truth. Her suicidal thoughts and preoccupation with death and dying lasted almost ten years. She developed a sense of self-hatred and low self-esteem. She felt responsible for the deaths of her babies. Lisa testifies that the trauma and self-hatred made the abortion far worse than the rape. In the rape she was powerless. In the abortion – although totally misled – she felt an enormous guilt because she felt she somehow participated in the killing of her baby. She felt she deserved to be treated poorly.[320]

306.    Lisa testifies that she has met and spoken with many post-abortive women and is convinced that no abortion should be permitted without full disclosure that the abortion

---

[320]Declaration of Lisa Hartman, ¶¶2-15.

kills a human being, and without a determination that the mother has a full understanding of that fact, that reality, and the possible suffering she could endure.[321]

307.    Allyson Bowlin was forced into an abortion by her boyfriend who was the father of her child. He pressured her, and despite Allyson's resistance, he continued to demand an abortion. At one point, her boyfriend told her that he was in chemotherapy and was dying of cancer. Allyson was confused because he seemed healthy, but her boyfriend told her he could be dead before the baby was born. Allyson never wanted an abortion, but her boyfriend drove her to an abortion clinic. He had scheduled the appointment over the phone. He had continually told her it would be unfair to the baby to have no father. There was no counseling at the abortion clinic. Shortly after the abortion, Allyson learned that her boyfriend never had cancer. Allyson felt manipulated and started having nightmares, flashbacks and would start crying uncontrollably. She was so depressed over the abortion she couldn't even look at another woman with a baby or a pregnant woman. She describes her mental suffering as lasting for years. Even therapy didn't help her. Allyson urges that pregnant mothers must be protected against involuntary or uniformed abortion, for their own mental health, their happiness and for the welfare of their children.[322]

---

[321]*Id.* ¶¶15-25.

[322]Declaration of Allyson Bowlin, ¶¶2-33.

308.    Linda Huffstetler was deceived by an abortion nurse and was pressured into an abortion she did not want. She told the abortion worker that she wanted to keep her baby and did not want an abortion. She told the abortion worker "I could not kill a baby." Then the abortion clinic worker lied to her and told her that because she was only nine weeks pregnant that there was no baby "yet." She was told there was just some tissue there until she was 12 weeks pregnant. Following the abortion Linda suffered for many years with severe depression, anxiety, and nightmares. Later, after she received counseling, she started counseling other post-abortive women who benefitted from speaking with a woman who understood, first-hand, the horror of their experience. Linda testifies that no state should delegate such terminations to a private entity. The protection of the mothers' rights requires their protection by a court of law. Linda questions the entire practice of subjecting the mother to the termination of her relationship with her child by killing the mother's child.[323]

309.    Janet Hurguy was forced into an abortion by her mother. Janet explains the psychological pain she experienced and emphasized that no woman should be lied to about the true nature of an abortion, and that, based upon her experience, subjecting a pregnant mother to the termination of her relationship with her child by killing her child is inherently immoral.[324]

---

[323]Declaration of Linda Huffstetler, ¶¶2-16.

[324]Declaration of Janet Hurguy, ¶¶1-21.

310.    The post-abortive women describe their deep psychological suffering and suicidal ideation and even suicide attempts. The father of one woman forced into an abortion testifies about his daughter's suffering and suicide death.[325]

311.    Many of the pregnant mothers who were subjected to an abortion suffer from recurring nightmares over their abortion.[326]

312.    Numerous other women testify about how they were coerced or pressured into an abortion they did not want.[327]

---

[325]*See*, Declarations of Brittany Weston, ¶¶42, 44, 45; B.H., ¶¶20, 23, 25-27; Margie Ayers, ¶¶34-36, 39, 40, 41; George Zallie (father of Stacey Zallie), ¶¶2-30; Clara Munger, ¶¶3, 19-25, 32; Alexandra Johnson, ¶¶31, 36; Tanya Humphreys, ¶¶33, 34, 36, 37; Megan Bartz, ¶¶14-16, 19, 20; L.M., ¶¶26, 27; Julia Holcomb Misley, ¶22; Lisa Hartman, ¶¶2, 7, 9, 12; Alyssa Carlson, ¶¶2, 10, 12, 14; Amrutha Bindu Mekala, ¶¶3, 38, 43, 44; S.C., ¶22; Janet Hurguy, ¶¶9, 13; Theresa Bonopartis, ¶¶14-16; K.P.S., ¶¶20, 27, 35, 36; K.H., ¶¶27-29; Linda Huffstetler, ¶12; Jean Corbett, ¶¶11, 13-15; Amanda McAdams, ¶¶11-13; Allyson Bowlin, ¶¶21, 22, 24, 26; Bonnie Steen, ¶¶7, 9; Megan Watson, ¶¶17, 19; Kay Keifer, ¶6; Ruth Ruch, ¶13; Joy Schwartz, ¶¶9, 10.

[326]*See*, Declarations of B.H., ¶¶2, 3, 24, 27; Megan Bartz, ¶18; Alyssa Carlson, ¶13; K.P.S., ¶36; Margie Ayers, ¶38; Lisa Hartman, ¶¶2, 7; Theresa Bonopartis, ¶19; Julia Holcomb Misley ¶22; Jean Corbett, ¶12; Linda Huffstetler, ¶12; Allyson Bowlin, ¶¶22, 24.

[327]*See*, Cassidy 4, Ex.4 (Declaration of Amrutha Bindu Mekala); Declaration of Jean Corbett (Jean later provided post-abortion counseling for other women); Declaration of Bonnie Steen; Declaration of Ruth Ruch; Declaration of Vixie Miller (the pregnant mother whose husband forced her into a car and drove her to an abortion clinic while brandishing a 44 magnum gun and a 12-inch knife to threaten her); Declaration of Joy Schwartz; Declaration of Kay L. Kiefer; Declaration of Denise Cota.

### (d)    Testimony of the Pregnancy Help Centers

313.    There are approximately 3,000 pregnancy help centers across the United States that are run and staffed by approximately 54,000 women nation-wide, who get up in the morning to help other women. It is one of the largest women's movements in the history of the nation – devoted to helping preserve a pregnant mother's cherished relationship with her child and helping women in need of post-abortion counseling. Many of the founders of pregnancy help centers, many of the directors who help operate them, and many of the counselors and volunteers are women who had been subjected to abortions themselves. These women are able to provide empathetic pre-abortion and post-abortion counseling, in large measure, because from their own experiences they fully understand the pressure, coercion, and violence to which pregnant mothers may be subjected. A large percentage of pregnant mothers are subjected to abortions they do not want. The pregnancy help centers, and their army of dedicated women across the country who work with them, are often able to stop an unwanted abortion before it occurs, and help the healing process for women who were subjected to an abortion they did not want. Many of the women working at pregnancy help centers know and understand the magnitude of the loss a mother incurs by an abortion, and the resulting suffering. Pregnancy help centers and their workers have vast knowledge of the suffering and loss of those mothers.[328]

---

[328]Wallis Decl., ¶¶15, 18-20.

314.    Dorothy Wallis founded *Care Pregnancy Clinic* (CPC) in 1980 and *Caring to Love Ministries* (CTLM), and has been the CEO of both 501(c)(3) entities going back to the mid-1980's. *Care Pregnancy Clinic* is located in Baton Rouge, Louisiana and is nationally known. CPC has provided services to 134,247 women, or about 3,100 per year on average from 1980 to August 2023. As a result of the assistance that CPC has provided during those years, the pregnant mothers it served gave birth to 86,740 babies, or more than 2,000 per year on average. The central mission of *Care Pregnancy Center* and CTLM is to help pregnant mothers to keep and raise their children if that is what the pregnant mothers truly desire. The experience at CPC and CTLM is that the "vast majority of pregnant mothers want to maintain their relationship with their children, but many are coerced or pressured into submitting to abortions, and many others feel that they must submit to an abortion because of a perceived lack of financial and material resources."[329]

315.    Dorothy Wallis, who has helped found numerous pregnancy help centers, was a founding member of the Board of Directors of plaintiff National Institute of Family and Life Advocates (NIFLA), which has helped pregnancy help centers convert to medical facilities. In that capacity, and as part of that effort, she was consulted by approximately 2,500 pregnancy help centers. Ms. Wallis testifies: "Through these efforts, I became familiar with many pregnancy help centers across the country, their missions, counseling, their

---

[329]*Id*. ¶¶4-7.

procedures, and the experiences they had with pregnant mothers they helped. I also became familiar with their experience providing post-abortion counseling, and what was learned through that counseling about the mothers' suffering and the bad practices at abortion clinics."[330]

316.    Dorothy also operated an organization called *House of Hope* for 15 years, where pregnant mothers could stay if they had no place to live, and which also provided a path for education and employment during their pregnancy and up to a year after giving birth. She created a program enlisting families to take pregnant mothers into their homes, and Dorothy has taken pregnant mothers into her own home on a regular basis. "*Some pregnant mothers served by House of Hope needed a place to live to escape the violence they were subjected to as a result of their refusal to submit to the demands of others to have an abortion.*"[331]

317.    For the past 44 years, Dorothy Wallis has worked with many thousands of pregnant mothers and post-abortive women, as well as those 2,500 pregnancy help centers. Few know more about how pregnant mothers are coerced and pressured into abortions they don't want, and how pregnant mothers lose children they want because they do not know where to obtain the help they need, because they are misled by abortion businesses, and how

---

[330]*Id*. ¶¶12, 13.

[331]*Id*. ¶14.

they suffer from uninformed consents. The scandal of pregnant mothers losing their children in those manners must be exposed, addressed, and prevented. The women's movement represented by the pregnancy help centers have witnessed the pain of the mothers, the injustices inflicted on them, and has saved nearly 1,000,000 pregnant mothers each year from losing children they would have lost without the help of pregnancy help centers. The PHCs provide post-abortive counseling and healing to approximately 75,000 to 150,000 post-abortive women each year. The law must protect these mothers.[332]

318.    Of the approximate 3,000 pregnancy help centers across the nation, 1,765 are affiliate members of the plaintiff National Institute of Family and Life Advocates, which operates in all 50 states. NIFLA provides legal counsel, education and training for pregnancy help centers across the nation. NIFLA is the national leader in helping PHCs to convert to licensed medical clinics, assisting about 1,500 PHCs to make that transition. Approximately 1,500 of NIFLA affiliate member PHCs operate as medical clinics. There are 38 NIFLA-affiliated PHCs operating in the State of Minnesota, which has a total of 49 different locations throughout the state. Each of the 38 NIFLA member main sites pays annual dues to maintain their affiliation/membership for their principle site and satellite locations. NIFLA provides valuable services to its member affiliates and the annual dues help offset NIFLA's costs in providing those services to those PHCs. Thirty-five of the 38 NIFLA

---

[332]*Id*. ¶¶22-36.

member PHCs in Minnesota are medically licensed and operate a total of 43 medically licensed locations. All of those medically licensed affiliate member PHCs operate under the directions and supervision of their Medical Directors. NIFLA provides the counseling and assistance for pregnant mothers through its affiliate members. NIFLA also is able to help protect pregnant mothers from unwanted, pressured and uniformed terminations of their relationships with their children through the affiliates, and through them provides post-abortion healing counseling.[333]

319.    All NIFLA member centers provide pregnancy counseling and assistance, and many of its members also provide post-abortion support for women traumatized by their prior abortions. The pregnancy help center plaintiffs in this case are NIFLA member affiliates, as are the non-plaintiff PHCs whose executive Directors and counselors submitted declarations in support of the plaintiffs' motion for a preliminary injunction.[334]

320.    Directors and counselors of NIFLA affiliated member PHCs, whose patients are subjected to abortions in Minnesota which are the result of coercion, pressure, or deception leading to an uniformed or involuntary waiver of their rights and the termination of their parental relationships with their children, have provided testimony concerning those

---

[333]Declaration of Thomas Glessner, JD, ¶¶2-12.

[334]Glessner, JD Decl., ¶¶8, 17-18; Second Declaration of Jacinta Lagasse (*Women's Life Care Center*), dated Jul. 19, 2024 ("Lagasse 2"), ¶2; Declaration of Jill Chandler (*Relate Care Clinic*), ¶6.

patients. As a result of their work with pregnant mother and post-abortive women they have the best understanding and perspective of the experiences of pregnant mothers who are abortion vulnerable. While the function of terminating a mother's relationship with her child and the mother's parental rights are traditionally a state function, the State of Minnesota has delegated those terminations to private entities who profit from such terminations, and who have interests in direct conflict with the constitutionally protected interests of the pregnant mothers. The State of Minnesota not only delegates the termination of one of the greatest rights a mother has to a private entity, Minnesota and the defendant state officials make no provisions or procedures to ensure that the mother's waiving of her rights – a waiver that is irreversible, fatal, and unappealable – is truly voluntary and informed. An involuntary killing of the mother's child in utero is a murder under Minnesota law that goes unpunished if the actor labels it "an abortion." The state defendants encourage and support that injustice. It is in the context of the environment created by Minnesota's law that the PHCs must act to protect the mothers, their rights and interests, and in which they understand the experiences of the pregnant mothers and the post-abortive women.[335]

---

[335]Declaration of Jacinta Lagasse, ¶¶20-26; Declaration of Jill Chandler, ¶¶2-5, 10, 11; Declaration of Jacqueline O'Neil, ¶¶2-20; Declaration of Nadia Smetana, ¶¶2, 3, 5, 9-15, 28-41, 45; Declaration of Jennifer Meyer, ¶¶9-15, 26-31; Declaration of Sydney March, ¶¶4-21; Declaration of Tanya Humphreys, ¶¶2-19; Declaration of K.H., ¶¶3-9, 11-12; Lagasse 2 Decl., ¶¶4, 10-21; Declaration of Kristi Fannik, RN; Declaration of Margaret Ganje; Declaration of Yvonne Florczek-Seeman, ¶¶15, 18, 19-21; Declaration of Mary Schott, ¶¶3-5, 7, 8; Declaration of Denise A. Cota, R.N., ¶¶2, 23-28; Declaration of Theresa Bonopartis, ¶¶28, 29; Cassidy 4, Ex.7 (Declaration of Cynthia Collins, ¶20).

321.    Pregnant mothers who are coerced and pressured to have an abortion are taken or steered to an abortion facility. There, many, if not most, never have the benefit of obtaining the counseling and assistance available at a PHC. Nonetheless, most pregnant mothers who are able to find their way to a pregnancy help center – despite PPMNS/PPNCS' and the state defendants' efforts to dissuade the mother from going to a PHC – are being pressured, or coerced to have an abortion, or are ambivalent, or in need of assistance, and for these reasons, they are considering an abortion.[336]

**B.    The Overwhelming Majority of the Waivers of the Fundamental Constitutional Rights of Pregnant Mothers Subjected to an Abortion and the Termination of Their Relationships with Their Children are Uninformed.**

322.    The injustice to a pregnant mother and the violation of her intrinsic rights are obvious to all when she is forced, coerced, or pressured into the termination of her relationship with her child by the killing of her child in an abortion. However, the result and the magnitude of the loss and injustice to the pregnant mother who is induced into an uninformed waiver of her rights and uninformed consent to the termination of her relationship with her child by an abortion is just as great and just as traumatic. The overwhelming majority of abortions are uninformed with the same devastating injury to the mother.

---

[336]Lagasse Decl., ¶¶6-10; Chandler Decl., ¶¶3-5, 7-12; Smetana Decl., ¶¶9-15; Meyer Decl., ¶¶10-15; K.H. Decl., ¶¶6-8; Humphreys Decl., ¶¶4, 5, 8-13; Fannik, RN Decl.; March Decl., ¶¶8-18; Lagasse 2 Decl., ¶¶15, 16, 27, 28; O'Neil Decl., ¶¶4-15, 17-20; Dr. Giebink Decl., ¶34.

323.    There are two main groups of facts and disclosures critical to the mother's decision to waive her rights to be truly informed which are withheld by the abortion businesses seeking to maximize their sales of abortions.

324.    The first of these concerns the very nature of the procedure and the result of that procedure which the abortion businesses propose to perform. In that regard, the mother must understand that she has an existing intimate relationship with an existing human being, and that she has a constitutional right to keep and maintain that relationship protected by the 14th Amendment of the U.S. Constitution, and even by state law like Minnesota's murder statute. She must understand that she is waiving one of the most important constitutional rights she will ever have. The mother must be told, and she must understand, for the consent to be informed, that abortion is a medical procedure to achieve a non-medical objective. That objective is to terminate her relationship with her child. Thus, those rights that she will be giving up must be discussed with her to determine whether she actually wants to waive them.

325.    In that context, the mother must understand that the abortion terminates the life of a whole, separate, unique, living human being. That is an established scientific fact that is withheld from the pregnant mother.[337] To fully understand the nature of her consent, she

---

[337]*See*, *Planned Parenthood v. Rounds*, 530 F.3d 724 (8th Cir. 2008)(*en banc*); *Planned Parenthood v. Rounds*, 650 F.Supp. 2d 972, 976-977 (S.D. S. Div. 2009); *Planned Parenthood v. Rounds*, 653 F.3d 662, 667 (8th Cir. 2011) (pointing out the 2008 *en banc* decision of the Eighth Circuit Court of Appeals had already decided the matter, citing the *en banc* opinion at 530 F.3d at 735. *See also,* Declarations of leading world experts: Declaration of David Fu-Chi Mark, PhD (Molecular Biologist); Declaration of

must fully understand the effect of her waiver of her rights by consenting to the termination of the life of her child. She must be told, and she must understand, that the killing of her unborn child, at any age after conception, is a murder punishable by mandatory life imprisonment, and that her signed consent acts to immunize the abortion workers and abortion doctors from prosecution for that murder. That is the startling reality to which the mother is asked to consent.

326.    The abortion businesses fail to make any disclosures of those facts. In fact, when the State of South Dakota passed its 2005 Informed Consent Statute, the defendant PPMNS and its medical director, Dr. Carol Ball, instituted suit claiming that the required statutory disclosures violated their own right to free speech. Three of the disclosures which PPMNS attacked as violative of its own rights are relevant here. SDCL §34-23A-10.1(1)(b)(c) &(d) required PPMNS to disclose:

> "(b) That the abortion will terminate the life of a whole, separate, unique, living human being; (the term "human being" was defined in the biological sense under §34-23A-1(4));
>
> (c) That the pregnant mother has an existing relationship with that unborn human being and that the relationship enjoys

---

Bruce Carlson, MD, PhD (Human Embryologist); Declaration of Ola Saugstad, MD, PhD (Neonatologist) (who also testifies that the human being in utero feels pain as early as 12 weeks post-conception and possibly as early as the 7th week post-conception, ¶¶15-20).

protection under the United States Constitution and under the laws of South Dakota;[338]

(d) That by having an abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated."

327.    In complete disregard of the interests and rights of the pregnant mothers, defendant PPMNS brought suit to defeat the mothers' interests, claiming that PPMNS and its abortion doctors did not want to disclose those facts. PPMNS claimed that the state could not force them to say or relate something they themselves did not to want to disclose. They claimed that their right "not to speak" trumped the mothers' interests. Because those three disclosures (as well as others) were true statements of fact, were not misleading, and relevant to the mother's decision of whether to submit to an abortion, PPMNS was ordered to make those disclosures.[339] To this day, PPMNS and other abortion businesses in Minnesota do not, and will not, make those disclosures to help protect the interests of the pregnant mothers and their children.

328.    In fact, at Planned Parenthood abortion facilities the abortion workers are trained and instructed to lie to the pregnant mothers. If a pregnant mother asks a question,

---

[338]In South Dakota, like Minnesota, it is a homicide to kill an unborn child any time after conception punishable by life in prison; also, in South Dakota the death of an unborn child any time after conception due to negligence is redressable with a Wrongful Death cause of action.

[339]*See*, *Planned Parenthood v. Rounds*, 530 F.3d 724 (8th Cir. 2008)(*en banc*); *Planned Parenthood v. Rounds*, 650 F.Supp. 2d 972 (S.D. S. Div. 2009); *Planned Parenthood v. Rounds*, 653 F.3d 662 (8th Cir. 2011).

such as "What's there," or "is there a baby," the abortion workers must tell them that "it is nothing but tissue," or sometimes it is nothing but "products of conception"[340]

329.    PPMNS abortion doctor Miriam McCreary bragged that she would only tell the mothers that there was nothing there except some "contents of the uterus," and liked to use those words precisely because they were "nonspecific."[341]

330.    In fact, no information is provided at PPMNS or any other abortion clinic about the nature or status of the human being in utero.[342]

331.    The complete denial of any meaningful disclosures to the pregnant mothers is particularly derelict in the context of the pregnant mother losing her rights and her child's life because, in addition to the magnitude of the mother's loss, her decision-making is badly compromised by stress, ambivalence, and despair. One of the "patient educators" at PPMNS testified that 25% of the pregnant mothers they see are "teary-eyed" during the sessions, some of the mothers have tears running down their cheeks, and some even openly weep.[343] That PPMNS "patient educator" testified that the tears and crying is because the mother is

---

[340]*See, e.g.* paragraphs 246-249, *supra*, and accompanying footnotes 239-245.

[341]Cassidy 1, Ex.71 (McCreary, 76:11 - 77:17, 185:16-25).

[342]*See*, Cassidy 1, ¶26 (and Exhibits 24-31 and Exhibits 70 & 72, cited therein).

[343]Cassidy 1, Ex.53 (Jaime, 161:14-18); Ex. 54 (Jaime, 163:22 - 164:5).

under stress because she is facing what she admits is "probably the toughest decision a woman will ever make."[344]

332.    According to PPMNS "patient educators" the difficulty of the decision the pregnant mothers face manifests itself in the "patient educator" sessions, even to the point the mothers are, in the PPMNS worker's words, even "sick to their stomach."[345] Even PPMNS' workers admit that the tears demonstrate the mother's "decision might not be firm."[346] No assessment of pressure or coercion is ever performed. Despite the stress, ambivalence, crying, and despair, 99 out of 100 pregnant mothers who went to PPMNS left with an abortion and without their child, and 24 out of every 25 pregnant mothers who were ¶¶25 teary-eyed or weeping were subjected to an abortion anyway.[347] PPMNS worker C.M. testified that about half of the women at the PPMNS/PPNCS Saint Paul facility were crying, some out loud, and the mother's grief from losing her child was "palpable."[348] Brittany Weston testified that she was "bawling" when she was at the PPMNS facility.[349] Plaintiff

---

[344]Cassidy 1, Ex.55 (Jaime, 166:23 - 167:2; 167:21 - 168:20; 170:11-14).

[345]Cassidy 1, Ex.57 (Jaime, 171:15 - 172:1).

[346]Cassidy 1, Ex.56 (Jaime, 169:17-19).

[347]Cassidy 1, Ex.59 (Jaime, 144:12 - 145:8); Ex.58 (Jaime, 140:15 - 142:6).

[348]C.M. Decl., ¶16.

[349]Weston Decl., ¶¶27, 28.

K.P.S. testified that she was "crying throughout the ordeal" at PPMNS/PPNCS' St. Paul abortion facility.[350]

333.    It is clear from those who studied the mothers' experiences that being teary-eyed, crying, or weeping, indicates that the mother is at best ambivalent and uncertain about her decision, or she is being coerced or pressured into a procedure she does not want.[351] Despite the magnitude of the mother's rights and the magnitude of her loss, PPMNS and other abortion businesses do not perform counseling and fail to make the necessary disclosures about the mother's rights or the nature and effect of the procedure to which they subject the mothers.

334.    Experts who have studied the psychology of abortion decision-making have testified that, even if the mother is not being pressured or coerced, the stress of the pregnant mother's circumstances impair good and healthy decision-making.[352]

335.    In 2008, following the 2008 *en banc* decision of the 8th Circuit in the *Rounds* case upholding South Dakota's Human Being Disclosure, the State of North Dakota passed its own statute requiring the identical Human Being Disclosure contained in the South

---

[350]K.P.S. Decl., ¶27.

[351]Casey, MD, PhD Decl., ¶¶40-41.

[352]Flanagan, PhD Decl., ¶¶22-30; Coleman, PhD Decl. (and authorities cited at ¶¶40-56); Casey, MD, PhD Decl., ¶¶25, 26, 28; *see also,* Coleman, PhD Decl., Table under "Ambivalence or Decision Difficulty," p. 47-48 (demonstrating the stress and difficulty of the mothers' decision-making).

Dakota Statute with the same identical definition of "human being." Ten years after the decision of the *en banc* court of the 8ᵗʰ Circuit, and ten years after the passage of North Dakota's own Human Being Disclosure Statute, the defendant Red River sued the state officials in North Dakota claiming, once again, that the Human Being Disclosure requirement violated their right to free speech because they did not want to make that disclosure. Again, the abortion businesses attempted to put their personal interest in maximizing profits and maximizing the sale of abortions over the protection of the interests of the mothers they exploit.[353]

336.     The second main group of facts Planned Parenthood and other abortion clinics refuse to provide the pregnant mothers concerns where they can obtain help they need to keep the children they want. That information is critical to those mothers. In a survey of 987 post-abortive women, 84.6% stated that "if just one person had helped me I would have kept my child."[354]

337.     The pregnant mothers are never told where they can obtain help to keep their babies. Former workers at PPMNS in Minnesota and from other Planned Parenthood abortion

---

[353] *Access Independent Health Services, Inc., d/b/a Red River Women's Clinic, et al. v. Wayne Stenehjein*, Case No.: 1-19-cv-00125 (D.N.D. 2019).

[354] Coleman, PhD Decl., ¶25 (and Table 2, Item No. 5, "Pressures From Others Generally").

facilities testified that it is PPMNS' and the other facilities' policies not to permit their workers to tell a pregnant mother where she can get help to keep her child.[355]

338.    Pregnant mothers were never given any counseling about what help was available to them to keep their children, and no meaningful counseling about the nature of the abortion procedure at PPMNS facilities or other abortion clinics. Brittany Weston testifies, speaking about the coerced abortion to which she was subjected at a facility operated by defendant PPMNS:

> "There was no discussion about the reason for an abortion. The 'counselor' just had to check a box. In fact, there was no counseling at all. No discussion of the risks. There was no information about how I could keep my baby, or what organizations were available to give me assistance. There was no mention of what was already inside me, whether it was a human being, what it looked like, or the kind of development that had already taken place. *Nothing.* There wasn't a single question about my baby's father *or whether anyone was pressuring me*. I became overwhelmed. I wanted to have the baby. I felt completely helpless. *No one was helping me. I was being pressured to have an abortion, and all Planned Parenthood was doing was making that abortion happen. I wanted to be rescued from Joe's demands and from the abortion*."[356]

---

[355]Declaration of former PPMNS/PPNCS abortion clinic workers, C.M., ¶28, and Chastity Fyksen Ladoucer, ¶¶1-14 ; *see*, Complaint, at Facts II A(2)(c) and citations, *supra*, ¶¶114-127; *see also*, Neyer Decl., ¶¶9, 17-21.

[356]Weston Decl., ¶¶26, 27, 29.

339.    The pregnant mothers who lost their children in an abortion provide a common testimony that they received no counseling, no information, and there was no informed consent process at the abortion facilities.[357] The need to ensure that a decision of a pregnant mother who submits to a termination of her relationship is totally voluntary exists regardless of whether that termination is in an adoption or an abortion.[358]

340.    The factual record in this case demonstrates:

- That the pregnancy help centers come to the aid of pregnant mothers in their time of need; the abortion businesses and the state officials tell them don't bother us, "just dispose of your child;"

- That subjecting a pregnant mother to an abortion is not protecting her rights, it is the destruction of some of the greatest rights she has in life.;

- That the state devotes large sums of money to assist the abortion businesses to kill the mother's child and calls it "medical care;"

- That the state defendants and the abortion businesses subject pregnant mothers to involuntary and unwanted terminations of their rights and then call it "the right to choose;"

---

[357]Humphreys Decl., ¶¶30, 31; Declaration of S.C., ¶¶8, 12 (an abortion was started on S.C. and she hadn't even decided to have one); Bartz Decl., ¶¶10, 11; Munger Decl., ¶¶16-18; K.P.S. Decl., ¶¶21-26; Alexandra Johnson Decl., ¶26; K.H. Decl., ¶16; B.H. Decl., ¶16; L.M. Decl., ¶¶18-21; Ayers Decl., ¶¶14, 21, 25, 30; Declaration of Janet K. Hurguy, at ¶¶6, 7; Bonapartis Decl., ¶¶7-10; Corbett Decl., ¶¶8, 9; Declaration of Denise A. Cota, R.N., ¶¶10, 11; McAdams Decl., ¶¶9, 10; Declaration of Vixie Miller, ¶¶11, 12; Bowlin Decl., ¶¶15-18; Bindu Mekala Decl., ¶¶23-29, 35-37; Declaration of Bonnie Steen, ¶6; Declaration of Megan Watson, ¶¶10-15; Huffstetler Decl., ¶¶5-10; Declaration of Joy A. Schwartz, ¶¶6-8; Declaration of Margaret Ganje.

[358]Declaration of Deborah Myers, ¶¶2, 8; Declaration of Renee Gelin, ¶18.

- That the abortion businesses call the destruction of the mothers' rights "enlightened" when little in life could be a greater denigration of a mother and a mother's rights;

- That the defendants call it "compassion" to destroy the mothers' rights but attack the very people and entities which help protect the mothers in their time of need.

## IV. The Unworkablity of Delegating the Taking of a Waiver and Termination of the Fundamental Intrinsic Rights of Pregnant Mothers Without a Court Proceeding to Ensure that Such Waivers and Terminations are Completely Voluntary and Completely Informed

341. A mother's intrinsic right to keep her relationship with her child is one of the greatest rights she will have in all of life, and that relationship brings great joy, happiness, and fulfillment to her. A mother's unique relationship with her child during pregnancy is the most intimate, most important, and one most worthy of protection.[359] For that reason, to protect that relationship, Minnesota makes it a murder to terminate the mother's relationship by killing her child, punishable by mandatory life in prison.

342. Observing the importance of a mother's relationship with her chid, the joint chambers of the South Dakota legislature published a 23-page Concurrent Resolution addressed to the courts, which read in pertinent part:

> "If there are any self-evident and universal truths that can act for the human race as a guide or light in which social and human justice can be grounded, they are these: that life has intrinsic

---

[359]Flanagan, PhD Decl., ¶¶13-17; Casey, MD, PhD Decl., ¶54; Coleman, PhD Decl., ¶¶6, 8, 10, 15; Hartmann, MD, PhD Decl., ¶¶24, 34; Wallis Decl., ¶¶24, 25.

value; that each individual human being is unique and irreplaceable; that the cherished role of a mother and her relationship with her child, at every moment of life, has intrinsic worth and beauty; that the intrinsic beauty of motherhood is inseparable from the beauty of womanhood; and that relationship, its unselfish nature and its role in the survival of the race is the touchstone and core of all civilized society. Its denigration is the denigration of the human race."

343.    The function of terminating parental rights has traditionally been an exclusive state function, in the context of both "involuntary" terminations of a mother's relationship with her child as well as in the context of "voluntary" terminations. Traditionally, only a court of law can terminate that fundamental right of the mother, and only following a court hearing meeting 14th Amendment due process requirements. However, the State of Minnesota, under the guise that such terminations are "voluntary," delegates the state function of terminating a pregnant mother's relationship with her child to private entities with financial, ideological and political interests in conflict with the interests and rights of the pregnant mothers, without any due process protections of the mother's rights. As a result, a majority of terminations at abortion businesses are actually involuntary, the result of coercion, pressure, or deception, or the result of uninformed and unknowing waivers.

344.    The United States Supreme Court has observed that "few forms of state action are both *so severe* and *so irreversible*" as state authorization of the termination of a mother's parental rights. The Court made that observation in the context of a court order which

allowed for an appeal of a judgment of termination resulting from a court error.[360] Here, the act of the delegated abortion businesses state actors, – termination by an abortion doctor – is totally irreversible, and not subject to appeal. No termination is so severe or so brutal as one imposed by the killing of the mother's child. *Santosky v. Kramer* also observed that the mother's right to her relationship with her child is "far more precious than any property right," and the process of termination of her relationship "seeks not merely to infringe that fundamental liberty interest, but to end it."[361]

345.   The state and its courts are duty bound to "indulge in every reasonable presumption against waivers of fundamental rights," and the courts "do not presume acquiescence in the loss of fundamental rights."[362] Here, however, the state delegates the taking of such waiver to abortion businesses who presume the opposite. They presume the mother decided to waive her rights before she arrived at their facility and, therefore, there is no need for any true counseling or any protection of her rights.

346.   At a minimum, if the state proposes to engage in what it deems a "voluntary" termination of a mother's rights by an abortion, there must be a court procedure that: (1)

---

[360]*Santosky v. Kramer*, 455 U.S. 745, 759 (1982) (emphasis added).

[361]*Santosky v. Kramer*, at 758-759 (quoting *Lassiter v. Dept of Social Services*, 452 U.S. 18, 27 (1981)).

[362]*Johnson v. Zerbst*, 304 U.S. 458 (1938) (quoting *Aetna Ins. v. Kennedy*, 301 U.S. 389, 393, and *Ohio Bell v. Public Utilities Comm.*, 301 U.S. 292).

guarantees, to the fullest extent possible, that a decision of a pregnant mother to give up her rights and her child is not the product of coercion, pressure, threats, or deception, and that it is completely voluntary; (2) ensures that the mother fully understands the nature of the rights she is waiving, which are some of her greatest rights, including: (a) her intrinsic fundamental 14th Amendment parental right to keep and maintain her existing relationship with her child; (b) her right to procreate, which includes her right to give birth; (c) her protected 14th Amendment interest in her child's welfare and her child's life; and (d) her right to the equal protection of the laws, which includes the protection of her relationship with her child by Minnesota's Murder Statute, and Minnesota's statutes that protect the mother's interests in a "voluntary" termination in an adoption proceeding.

347.    Various disclosures must be made to the pregnant mothers about the nature and purpose of an abortion, which must be confirmed to have been fully understood by her, including:

(1)    a full disclosure about all four of her 14th Amendment rights, and that a "consent" to an abortion operates as a legal waiver of all four of them;

(2)    that an abortion is the employment of a medical procedure to achieve a non-medical objective: the termination of the mother's constitutionally protected existing relationship with her child;

(3)    that the abortion terminates the life of a whole, separate, unique, living human being;

(4)     that the physician proposing to perform an abortion has two separate patients, the mother and her child in utero;[363]

(5)     that the physician who proposes an abortion is proposing to terminate the life of one of his patients;

(6)     that the act of the doctor killing the child in utero is a murder in Minnesota any time after conception, punishable by mandatory life imprisonment; and

(7)     that if the pregnant mother signs a consent for the abortion, her signature operates to immunize the physician from prosecution for that murder.

348.    The necessity of those disclosures is supported by the critical admissions made

by defendant PPMNS' medical director, Dr. Carol Ball, who testified:

(1)     "The relationship that a mother has with her child can give great joy and benefit to the mother over her lifetime";[364]

(2)     the decision of a pregnant mother whether to keep her relationship with her child or give it up – regardless of the context – is one of the greatest decisions for a mother to face, is a very difficult decision, and is one that has significant consequences to the mother;[365]

(3)     the decision of a mother determining whether she should or should not keep her relationship with her child is not a medical question;[366]

---

[363]The unborn child as patient is understood in the context of a caesarean section necessary to save the child's life, but it is most clearly understood in the context of fetal surgery. *See,* Hartmann, MD, PhD Decl., ¶25; Declaration of Ola Saugstad, MD, PhD, ¶15; *see also* Saugstad MD, PhD Decl., ¶¶15-20 (fetal pain).

[364]Cassidy 2, Ex.1 (Ball, 49:11-17).

[365]Cassidy 2, Ex.2 (Ball, 49:23 - 50:17).

[366]Cassidy 2, Ex.3 (Ball, 52:8-13).

(4)  when a physician has a pregnant mother as a patient, the physician *always* has two separate patients, the mother and the child she carries in utero;[367]

(5)  with respect to any treatment or medical procedure, the pregnant mother makes the decision for both patients, the mother and her unborn child;[368]

(6)  she knew it is a criminal homicide in South Dakota for any person to intentionally kill an unborn child at any age after conception;[369]

(7)  the *only* thing that immunizes a physician from being charged with homicide for her intentional killing of an unborn child at any age of gestation, is the *paper that is called the "consent"*;[370] and

(8)  despite those facts, Dr. Ball, testified that she does *not think it is more important that the consent for an abortion – which immunizes her from prosecution for murder – be truly voluntary any more than a consent to suture a cut finger.*[371]

349.  Prior to the court hearing designed to ensure that any decision of the mother is not the result of pressure, coercion, or deception, and is truly informed, the mother must receive counseling by an entity that could provide her assistance both financial and non-financial, if she really wants to keep her relationship with her child. She must know where she can obtain any help that she may need before she can make a truly informed decision.

---

[367]Cassidy 2, Ex.5 (Ball, 63:15 - 64:20).

[368]*Id*.; *see also*, Cassidy 2, Ex.6 (Ball, 59:8-17; 60:21 - 61:5; 62:24 - 63:10).

[369]Cassidy 2, Ex.7 (Ball, 63:13-17).

[370]*Id*., (Ball, 65:18 - 66:1).

[371]Cassidy 2, Ex.8 (Ball, 67:19 - 68:23).

350.    Delegating any or all of those requirements to an abortion business is completely untenable and totally unworkable. In 2005, after studying the policies and procedures at abortion businesses, particularly the practices of defendant PPMNS, the South Dakota Legislature created a task force to study abortion. After many hearings held over a number of months, live testimony from fifty-five witnesses, including thirty-two experts, review of approximately 3,500 pages of written materials, studies, reports and written testimony, and review of the testimonies of about 2,000 post-abortive women, the task force published its report and delivered it to the state legislature.[372]

351.    That South Dakota task force report finds that an abortion, as practiced, is a completely unworkable method for a pregnant mother "to waive" her fundamental "right to her relationship with her child." The task force listed seven reasons why it is unworkable for a state to delegate to an abortion facility the acceptance of the mother's waiver and termination of her relationship:

First, the abortion businesses do not even tell the mother that her child already exists;

Second, the method of waiver by abortion is completely fatal, irreversible, and not subject to an appeal if the mother's rights and interests are violated;

Third, the abortion businesses have interests in conflict with those of the pregnant mother. They only provide terminations, and nothing else. Their sole purpose and function is to terminate the mother's constitutionally protected relationship by killing her child;

---

[372]Cassidy 1, Ex.51 (Report of *The South Dakota Task Force to Study Abortion*, December, 2005, at p.4-7).

Fourth, the procedure, without state court intervention, is inherently coercive;

Fifth, an abortion implicates the mother in the killing of her child which is so far outside the normal protective instincts of the mother, that the abortion businesses resort to deceiving her, and induce her into believing that her child is not yet in existence, to manipulate her to act against her protective instincts;

Sixth, most abortions are uninformed or involuntary, and, thereby, unnecessarily subjects a woman to physical and psychological injury; and

Seventh, in the abortion process, unlike "voluntary" termination in an adoption, and "involuntary" terminations in a state initiated proceeding, the state does not supervise the process to ensure that the mother is not exploited and that her rights are adequately protected.[373]

352.    The waiver of a pregnant mother's intrinsic constitutional rights, and the termination of her relationship with her child cannot be delegated to abortion businesses consistent with the mother's 14th Amendment rights. To the extent a pregnant mother's rights can be terminated at all by the act of terminating the life of the mother's child consistent with due process, there must be a court procedure designed to ensure that any waiver of the pregnant mother's rights is completely knowing, and her acquiescence to the termination of her rights is totally voluntary and completely informed. To the extent the state insists on making abortions a legal method of terminating the mother's relationship, it would require an order of the court following a full hearing. No other process would be adequate and an abortion facility is the last place such a waiver should be taken.

353.    Such a court proceeding would require the court to enter an order making express findings that the pregnant mother's waiver of her constitutional rights is completely

---

[373]*Id*., at p.55-56.

knowing, and her acquiescence to the termination of her rights is totally voluntary and completely informed. That order would have to expressly authorize the termination of the mother's relationship with her child by an abortion terminating the life of her child, and expressly immunize the abortion doctor, the abortion clinic, and its workers, from prosecution for murder under Minnesota's murder statute.

354.    The paramount obligation of the state is to protect the pregnant mother's fundamental constitutional rights guaranteed by the 14th Amendment. If the state insists on making some kinds of abortion legal, the state must first and foremost ensure that the pregnant mother's 14th Amendment rights are adequately protected. In that event, the state would have to face and resolve the question of whether a court order terminating a pregnant mother's relationship, by the termination of the life of her child, is consistent with the principles and requirements of due process. While the plaintiffs do not seek an order enjoining all abortions in this case, the question of whether it is possible for the state to legalize abortions in a manner consistent with due process and equal protection must be resolved by the state.

355.    Defendant PPMNS has pregnant mothers sent to their Minnesota facility where they perform unwanted, involuntary and uninformed terminations. Defendant Red River previously operated in North Dakota, but after North Dakota stopped delegating the terminations to Red River, Red River moved across the border to Minnesota where

involuntary abortions are legal, and Red River then performed an involuntary abortion on plaintiff Alexandra Johnson in Minnesota exploiting Minnesota's destructive laws.

356.   The complete unworkable nature of such delegations is made prominently manifest because the potential methods to completely and properly protect all of the pregnant mother's actual fundamental intrinsic 14th Amendment rights conflict with Minnesota's efforts to make such delegated terminations legal. While plaintiffs do not seek an injunction enjoining all abortion laws, the South Dakota legislature observed in its 2015 South Dakota Concurrent Resolution, that efforts to both protect the pregnant mother's 14th Amendment rights while still legalizing abortions, is an unattainable venture. That legislature stated:

> The right and duty to preserve life cannot co-exist with a right or duty to destroy it. The right and duty to preserve and protect the cherished relationship between mother and child cannot co-exist with a right and duty to destroy it. It is the law, as it represents the collective interests of the individuals for whom it exists, that must choose which set of interests it must protect, and long ago our law was required to choose life over death; the mother's beautiful interest in her child's life over its destruction; the protection of innocent children over the misguided philosophies and trends in social thought which come and go.[374]

---

[374]Cassidy 2, Ex.28 (State of South Dakota Concurrent Resolution No. 1004 (2015), at p.6).

## THE INJURY AND HARM TO THE PLAINTIFFS

### I.  The Injury to the Pregnant Mother Plaintiffs

357.    As a result of the unconstitutional deprivation of the 14th Amendment rights of the pregnant mother plaintiffs, by the Minnesota abortion laws and their implementation by the state officials and state actor abortion businesses, all acting under the color of state law, the plaintiffs Clara Munger, Alexandra Johnson, and K.P.S., each lost their child to an abortion they did not want. As a result, they each lost their lifelong relationship with their child. The children of Clara Munger and K.P.S. were killed at the Minnesota abortion businesses operated by defendants PPMNS/PPNCS. The child of Alexandra Johnson was killed at the Minnesota abortion business operated by defendant Red River Women's Clinic. In addition to their children being killed and losing their relationship with them, Clara Munger, Alexandra Johnson, and K.P.S., have each suffered psychological and emotional injury, including depression, anxiety, and severe trauma. Each of them live, and will continue to live, with the deep psychological pain of having lost their child to an intentional killing. The pain inflicted upon them will last their entire lifetime. K.P.S. has had frequent flashbacks in which she relives the horror of her child's death at PPMNS, which at times disabled her to the point where she couldn't get out of bed. Since her child's death, Alexandra Johnson has suffered deep depression and has had to see a therapist on a regular basis, and she continues to receive other additional counseling. Clara Munger was deeply traumatized by

the abortion PPMNS inflicted upon her and her baby. Clara ruminates about the loss of her child, experiencing "an emptiness and hollowness" with deep sadness, depression and anger.[375] She finds it one of the greatest painful experiences in her life. She has always seen her baby as a little boy. As a result of the psychological and emotional injuries due to the abortion inflicted at PPMNS, Clara received therapy from two different therapists.

358.    Alexandra Johnson mustered the strength to explain the horror, devastation, and pain of giving birth to her dying baby which lasted several hours. She testifies: "The pain and bleeding lasted for three hours. The physical pain continued for days after. The mental pain continues."[376] She explains the horror of seeing her dying baby, and how she cried hysterically. Alexandra testifies:

> "No one else was in that bathroom with me that day. No one else had to face, first hand, the killing of my child, and the grief, pain and self-loathing it produced .. I have been isolated in my psychological pain and distress. I continue to attend therapy, but I am the only one forced to live with that isolation in that pain and guilt. It is a form of psychological imprisonment. While I'm imprisoned, those who killed my baby go free."

---

[375]Munger Decl., ¶21.

[376]Alexandra Johnson Decl., ¶7.

Alexandra explains that she is forced to relive the hours she spent seeing her dying baby, and those images of that day frequently return. When they do, she "cannot stop weeping."[377] The experience and her pain compelled her to state:

> "The courts and people of our nation must stop hailing and celebrating abortion as if it is some kind of 'right' and positive good. My real rights, and those of other pregnant mothers like me are destroyed in that process. Abortion is an accommodation of the exploitation of women, and must be recognized as such."[378]

359.    Nadia Smetana, Director of plaintiff Dakota Hope, explains how the experience of Alexandra Johnson (who she refers to as "A.J.") illustrates the unworkable nature of delegating to an abortion business the function of terminating the mother's right and relationship with her child.[379]

## II.  Injury and Harm to the Pregnancy Help Center Plaintiffs

360.    The two individual pregnancy help centers which are plaintiffs in this case, Women's Life Care Center (WLCC) and Dakota Hope, have as their central mission the protection and advancement of the rights and interests of the pregnant mothers to keep and raise their children they want. Many of the pregnant mothers who are their patients are being pressured by others into an abortion they do not want. Many of the pregnant mother patients

---

[377]Second Declaration of Alexandra Johnson, at ¶13.

[378]*Id*., ¶14.

[379]Smetana Decl., ¶¶48-56.

consider submitting to an abortion they don't want because they don't know what help is available for them. The PHC plaintiffs help these mothers to exercise their rights and help them keep their children. Plaintiffs Dawn Schreifels, MD, and plaintiff David Billings, MD are the medical directors of WLCC and Dakota Hope respectively. The respective PHCs operate under their medical orders and supervision. Their interests are inextricably interwoven with those of the pregnancy help centers they supervise, and all of the patients at those PHCs are patients of Dr. Schreifels and Dr. Billings, respectively. Both plaintiffs WLCC and Dakota Hope are affiliate members of the plaintiff National Institute of Family and Life Advocates (NIFLA).

361.    While WLCC and Dakota Hope work daily to protect the rights of pregnant mothers, the mothers' rights are attacked and destroyed by the implementation of Minnesota's abortion laws which delegate to the abortion businesses the taking of waivers of the mothers' rights, and the termination of the mothers' parental relationships with their children. The complete lack of any protection of the mothers' rights under Minnesota law presents extremely difficult challenges for the pregnant mothers who want to keep their children, and for the PHCs trying to assist and help them do so. The implementation of those laws directly frustrates the efforts of the PHCs to help the mothers keep their children they want. In fact, the abortion businesses, aided by, and in partnership with, the state officials, aggressively try to defeat the work of the PHCs to maximize their number of abortion sales. NIFLA affiliate PHCs whose patients lose their children to abortions in Minnesota testify to

the destruction of the mothers' rights by the implementation of Minnesota's laws, by the state officials, and abortion businesses.[380]

362.    The core mission of the PHC plaintiffs and other NIFLA affiliate PHCs is to protect the rights of pregnant mothers to keep their children and give the mothers the help they need to do so. Plaintiffs WLCC and Dakota Hope, and other NIFLA affiliate PHCs, have had significant success in helping pregnant mothers to exercise their rights to keep their children. However, because of Minnesota's law and its implementation, many, many pregnant mothers lose the children they want. WLCC and Dakota Hope, despite their success and their efforts, do not have the legal power and authority to stop third-parties from forcing or pressuring mothers to submit to an unwanted abortion, and many of their pregnant patients lose the child they want. Once the mothers are taken to an abortion facility many of the mothers are subjected to forced, pressured, unwanted, and uninformed abortions that destroy the mothers' wishes and the efforts of the PHCs to help them. The abortion facilities, especially defendants PPMNS/PPNCS, do nothing to prevent the forced, pressured, or uninformed terminations. Only the courts have the power to stop those unknowing and involuntary or uninformed waivers and terminations of the mothers' rights. In order to fulfill their mission, WLCC, Dakota Hope, and other PHCs, through NIFLA, are compelled to seek

---

[380]Lagasse 2 Decl. (WLCC Director), ¶4; Smetana Decl. (Dakota Hope Director), ¶3; Chandler Decl. (Relate Care Director), ¶¶3-5; Meyer Decl. (Options for Women East Director), ¶¶4-15, 26-27; O'Neil Decl., ¶¶2-8, 12-20; Declaration of Dawn Schriefels, MD.

the intervention of the courts to protect the rights and interests of their patients. As a result of the actions of the abortion businesses and the Minnesota officials' implementation of Minnesota's abortion laws, many of the PHC plaintiffs' patients lose their children they want, and the PHCs' second patient, the unborn child in utero, is killed in the procedure. As part of their work, PHC plaintiffs are obligated to bring this lawsuit as part of their job to protect the rights of their current patients, the rights of their future patients, and the rights of pregnant mothers who would like their services but who are prevented from obtaining them.[381]

363.    The PHCs cannot completely fulfill their mission to help the mothers without protecting their rights through this lawsuit, and there are no other entities with the job of protecting the rights of the mothers and the lives of their children, or standing to obtain prospective injunctive relief in furtherance of that effort. Thus, the interests of the pregnancy help center plaintiffs are inextricably connected with the interests of the pregnant mothers, such that they have interests in common.

364.    WLCC, Dakota Hope, and other NIFLA affiliates, have direct interests in the outcome of this lawsuit. Minnesota's abortion laws, and their implementation by defendants, negatively impact them, their interests, and their work, and directly injure five separate interests of those plaintiff PHCs and other NIFLA affiliate PHCs:

---

[381]Lagasse 1 Decl., ¶¶6-7.

1.    Their interest in successfully completing their mission;

2.    Their interest in protecting the rights and interests of the pregnant mothers and their children (whose interests are interconnected with those of the PHCs), which the PHCs are obligated to protect as part of their physician-patient relationship;

3.    The PHCs' interest in preserving their good reputations;

4.    The PHCs' financial interests; and

5.    The PHCs' interest in not diverting and depleting their resources, but preserving those resources to advance their core mission.

Each of those interests are directly and negatively impacted by Minnesota law implemented by the defendants.[382]

### III.    The Injury and Harm to National Institute of Family and Life Advocates

365.    National Institute of Family and Life Advocates (NIFLA) was founded in 1993 and currently has a national network of approximately 1,765 affiliate-member PHCs, over 1,500 of which operate as medical clinics. Each NIFLA member medical center, and its satellite locations, operate under the direction and supervision of that center's medical director. NIFLA provides legal counsel, education, and training to its pregnancy help center affiliates across the country. NIFLA is the national leader in helping pregnancy help centers

---

[382]Lagasse 2 Decl., ¶¶25-37 (and Exhibits A & B); Lagasse 1 Decl., ¶¶6-32 (and Exhibit 1); Chandler Decl., ¶¶2-30 (and Exhibits A & B); Smetana Decl., ¶¶2-47; Meyer Decl., ¶¶4-33; Schriefels, MD Decl.; Billings, MD Decl., ¶¶3-22.

best serve their patients by helping the PHCs convert to medical clinics. Board member Dorothy Wallis worked with and was consulted by approximately 2,500 pregnancy help centers nationwide. NIFLA's comprehensive medical conversion program helps PHCs recruit and train qualified medical professionals, advises centers about physical layout and necessary medical equipment, and provides model policies and procedures, which address (among other things), staff safety, personnel practices, quality assurance, medical record privacy and security, and appropriate provision of clinical services such as pregnancy testing and ultrasounds. NIFLA has, to date, assisted approximately 1,500 PHCs to convert into medical clinics with expanded services.[383]

366.    NIFLA assists its member PHCs in training and supervising staff who assist pregnant mothers considering an abortion, and provides a volunteer manual for use by its affiliates. All NIFLA member pregnancy centers must pledge to adhere to NIFLA's "Commitment of Care and Competence" which affirms that clients and patients are served in accordance with the highest legal and ethical standards, and that all advertising and communications are honest and truthful.

367.    One of NIFLA's critical roles in furthering its mission is giving legal guidance to member centers, particularly its medical clinics. NIFLA offers a three-day course to help its PHC affiliate members to comply with legal requirements in connection with limited

---

[383]Glessner, JD, Decl., founder and president of NIFLA, ¶¶2-3.

diagnostic ultrasounds, as well as in-person training for member centers providing ultrasounds. NIFLA's monthly newsletter sent to each affiliate member contains "Legal Tips" and "Clinic Tips." Every day, on average, NIFLA receives about 20 inquires from member centers to ask about legal and regulatory issues they are facing. The legal advice NIFLA provides covers a broad spectrum of issues. NIFLA provides many other services to its affiliate members to help them best serve their pregnant mother patients, including "legal audits."[384]

368.    The core mission of NIFLA is to serve the pregnant mothers who seek services at its affiliate centers, which requires NIFLA to protect their most precious constitutional rights. NIFLA exists to protect those rights.[385]

369.    Every year more than an estimated 250,000 pregnant mothers receive pregnancy counseling at NIFLA affiliated pregnancy help centers. Numerous services are provided to help the mothers properly exercise their rights to keep their babies they want. NIFLA's mission and interests are inextricably connected with those of its affiliate PHCs.[386]

370.    It has become common for states with aggressive pro-abortion policies to take action or threaten action against an affiliate member PHC – instead of protecting the pregnant

---

[384] *Id*. ¶5.

[385] *Id*. ¶¶6, 9.

[386] *Id*. ¶7-8.

mothers' critical intrinsic constitutional rights – to the point where NIFLA is compelled to litigate in federal and state courts across the country to protect the interests of its affiliate members. Among those cases, NIFLA obtained a favorable decision in the U.S. Supreme Court case, *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755 (2018).[387] Other court cases in which NIFLA was recognized as having standing to litigate on behalf of its affiliate member centers include: *NIFLA v. Schneider*, 434 F.Supp. 3d 596 (D.N. Ill. 2020); *NIFLA v. Raoul*, 685 F.Supp. 3d 688 (D.N. Ill. 2023); *NIFLA v. Cuomo*, 594 F.Supp. 3d 515 (D.N.Y. 2022); and *Calvary Chapel Pearl Harbor, NIFLA v. Suzuki*, No. cv-17-00326-DKW-KSC, WL 11457412 (D. Haw. Sept. 20, 2018).

371.    Minnesota's abortion laws, their implementation by the defendants in this matter, and the actions taken by those state officials and abortion businesses who partner to increase the number of abortions performed on women in Minnesota and to prevent pregnant mothers from obtaining services at NIFLA member centers, cause direct harm to NIFLA itself.[388] NIFLA's central mission is to help pregnant mothers keep and raise their children, which includes protecting those mothers' rights and interests in preserving and maintaining their relationships with their children.[389] To achieve its mission, NIFLA provides training,

---

[387]*Id*. ¶¶10-11.

[388]*Id*. ¶¶30-37, 40-43.

[389]*Id*. ¶¶6, 9.

resources, and legal expertise to its member centers who then provide direct assistance and services to the pregnant mothers.[390]

372.   The Minnesota abortion laws and defendants' actions damage NIFLA's reputation and cause financial harm to NIFLA itself. Minnesota state officials and abortion businesses smear the reputations of NIFLA and its member centers. Defendant Attorney General Ellison issued a "Consumer Alert" which discourages women from seeking services at pregnancy help centers and suggests that NIFLA member PHCs provide false and misleading information to their patients and clients.[391] Publications by abortion businesses and abortion advocacy groups falsely label NIFLA centers as "fake clinics" and impugn NIFLA's motives for pursuing its mission to help pregnant mothers.[392] Such defamatory and libelous statements directly harm NIFLA's reputation.[393] Moreover, false statements about the integrity and quality of the counseling and services provided at NIFLA member centers not only damages the reputations of those members, it also damages NIFLA's reputation.[394] Such reputational damage necessarily damages the financial interests of NIFLA and its members, as their ability to fulfill their missions and to attract and retain donors depends

---

[390]*Id.*

[391]*Id.* ¶¶34-37.

[392]*Id.* ¶37.

[393]*Id.*.

[394]*Id.* ¶40.

upon their reputations for professional competence, honesty, integrity, and care and concern for their patients.[395]

373.    NIFLA is further harmed by the diversion and depletion of its limited resources. To assist pregnant mothers in keeping and raising their children, it is essential that NIFLA devote resources to protect pregnant mothers against the unknowing waiver of their rights and the involuntary or uninformed termination of their parental relationship.[396] As a result of the Minnesota abortion laws and the actions of the defendants which promote terminations by abortion and denigrate the work of PHCs, NIFLA must expend additional significant resources to protect against such unknowing waivers and involuntary or uninformed terminations. In particular, NIFLA must expend resources to help its members provide adequate pre-termination counseling to counter the defendants' efforts to maximize the number of terminations by abortion.[397] NIFLA must also spend precious resources participating in litigation to protect the rights and interests of its member centers and their patients.[398] The defendants' actions deplete NIFLA's resources, causing additional financial harm. To the extent that NIFLA's resources are diverted from its primary purpose of helping

---

[395] *Id*. ¶¶41-43.

[396] *Id*. ¶9.

[397] *Id*. ¶¶20-24

[398] *Id*. ¶11.

pregnant mothers keep and raise their children, NIFLA's ability to secure donor funding is also hampered. As NIFLA's President observes:

> "Those who donate to NIFLA … understand that to achieve our purpose, we need to expend time and energy to protect the mothers' rights to their relationship with their children. They also understand that protecting those rights sometimes includes participating in litigation. But those efforts are in service to our primary mission. It would be far better if we could dedicate all our time and resources to helping pregnant mothers keep and raise their children rather than protecting them against the abuses of the abortion businesses and hostile government actors."[399]

374. The Minnesota abortion laws and defendants' actions also frustrate NIFLA's ability to achieve its mission, which is yet another injury inflicted upon NIFLA. All of NIFLA's assistance to pregnant mothers in furtherance of its mission is accomplished solely and completely through the work of its member pregnancy help centers. Therefore, any interference with the work of NIFLA member centers necessarily interferes with NIFLA's ability to accomplish its mission. As NIFLA's President testifies:

> "NIFLA's work is accomplished through our member PHCs who provide services directly to pregnant mothers. When pregnant mothers' rights are violated, NIFLA's interests, and those of its member centers, are impaired. When our member PHCs are required to divert limited resources… [they] are impeded in accomplishing their primary mission, and NIFLA's mission is also hampered. When the work of our member

---

[399]*Id*. ¶43.

medical centers is stymied, NIFLA's mission is hindered or destroyed."[400]

375.    NIFLA member PHCs, both in Minnesota and those in surrounding states which serve pregnant mothers whose rights are violated in Minnesota, have direct interests in the outcome of this lawsuit. WLCC and Dakota Hope, the two pregnancy help center plaintiffs in this case, are both NIFLA members. The Executive Directors of two other NIFLA member PHCs, Options for Women East and Relate Care, have submitted declarations in support of plaintiffs' motion for a preliminary injunction. All four NIFLA members have sustained, and continue to sustain, injuries caused by the defendants' actions and implementation of Minnesota's abortion laws. The declarations concerning those NIFLA member PHCs identify five distinct interests which cause direct injury to them and to all other NIFLA member PHCs who serve pregnant mothers whose rights are violated in Minnesota: (1) their interests in achieving their missions; (2) their interest in protecting the rights and interests of pregnant mothers and their children which they are required to protect as a part of their patient-physician relationship; (3) their interest in preserving their good reputation; (4) their financial interests; and (5) their interest in preserving their resources for the advancement of their central mission and in not having those resources diverted and depleted.[401]

---

[400]*Id*. ¶38.

[401]Lagasse 2 Decl., ¶¶25-37 (and Exhibits A & B); Lagasse 1 Decl., ¶¶6-32 (and Exhibit 1); Chandler Decl., ¶¶2-30 (and Exhibits A & B); Smetana Decl., ¶¶2-47; Meyer

376. The harm to NIFLA, its member centers, and those centers' pregnant mother patients and potential patients continues unabated.[402] Accordingly, success in this lawsuit is necessary to protect NIFLA's rights and interests.[403] NIFLA's President urges:

> "The work of NIFLA and our member centers will continue to be significantly impaired unless we succeed in this lawsuit. We need a court procedure to protect the mothers' rights by standing between our patients and prospective patients (both the pregnant mothers and their unborn children) and the abortion clinics which subject those pregnant mothers to involuntary and uninformed abortions."[404]

377. There are 38 NIFLA affiliated PHCs operating in Minnesota, with several having satellite locations. Thus, there are 49 NIFLA member PHC locations in Minnesota. Each of the 38 NIFLA member main sites pays annual dues to maintain their affiliation and membership. Those dues are used to offset NIFLA's costs in providing services to the PHC members. Of the 38 NIFLA member PHCs in Minnesota, 35 centers are medical facilities, each operating under the direction, supervision, and orders of their medical directors, who are licensed physicians. Including the satellite locations, the 35 NIFLA member medical centers operate a total of 43 medical centers in Minnesota. In addition, there are 26 NIFLA affiliated PHCs (including satellite locations), in states contiguous to Minnesota, with seven

---

Decl., ¶¶4-33.

[402]Glessner, JD, Decl., ¶46.

[403]*Id*. ¶42.

[404]*Id*. ¶46.

centers located in North Dakota and South Dakota, both of which have outlawed delegation of the termination of the rights and parental relationships of pregnant mothers to abortion facilities. Among those are plaintiff PHC Dakota Hope and Relate Care. Relate Care is located just over the Minnesota border.[405] Many pregnant mothers living in North Dakota and South Dakota are taken into Minnesota where they are subjected to involuntary abortions and where there are no protections of the mothers' rights.[406] The interests of the pregnant mothers and NIFLA-affiliated PHCs in all three states are directly attacked by the implementation of Minnesota laws that violate the rights of pregnant mothers. The interests of the pregnant mothers and NIFLA-affiliated PHCs in all three states are directly attacked by the implementation of Minnesota laws that violate the rights of pregnant mothers.

378.    NIFLA has the requisite standing to bring this lawsuit on behalf of its member PHCs, in Minnesota, North Dakota, and South Dakota, and on behalf of its member centers with patients whose rights are violated in Minnesota. That standing is supported by four factors:

> 1.    NIFLA members have standing in their own right to litigate the case, and they each are suffering immediate and threatened injury as a result of implementation of Minnesota's abortion laws;

---

[405] *See*, Chandler Decl.; Smetana Decl.

[406] Glessner, JD, Decl., ¶¶12-13.

2.    The interests NIFLA seeks to protect in this case are not only germane to its purpose, but go to the core of NIFLA's mission;

3.    The case does not require the participation of its members and, in fact, all of its members cannot – while directly being negatively affected by implementation of Minnesota's abortion laws – litigate the issues by themselves;

4.    It is not only impractical for the individual PHCs to litigate on their own, but they need to preserve their limited resources to achieve their primary mission; they need the assistance of NIFLA to protect their interests by litigating on their behalf.

379.    That last fact is illustrated by NIFLA being compelled to take on the job of litigating this case on behalf of its affiliate members. One of NIFLA's roles, in order to advance the interests and effectiveness of the mission of its affiliate members, is to litigate legal issues on their behalf.[407] NIFLA not only has standing to litigate this case on behalf of its member PHCs, it is required to do so as part of the services it must provide its member pregnancy help centers.[408]

---

[407] *Id.* ¶¶10-11.

[408] *Id.* ¶¶30-47.

## CLAIMS FOR RELIEF

## FIRST CLAIM

**Violation of the Pregnant Mother's Right to Keep and Maintain Her Parental Relationship with Her Child Guaranteed by the 14th Amendment**

380.  Plaintiffs re-allege and incorporate by reference, as if set forth at length herein, the facts and allegations set forth in paragraphs 1 to 379.

381.  The Minnesota abortion laws,[409] as implemented by the state defendants and the defendant state actors PPMNS/PPNCS and Red River, all acting under the color of state law,

---

[409]The Minnesota laws which are the subject of this suit are the "pre-repeal Minnesota Abortion Laws" which were in force between 2020 and July 11, 2022, and the "post-repeal Minnesota Abortion Laws" which became law on July 11, 2022, and are currently in force. The "pre-repeal" laws were created by statute. Those statutes included M.S.A. §145.411 (definitions); M.S.A. §145.412 (defining permissible abortion); M.S.A. §145.413 (reporting requirements); M.S.A. §145.4131 (reporting requirements); M.S.A. §145.4132 (reporting); M.S.A. §145.4133 (reporting); M.S.A. §145.415 (saving live baby after abortion); M.S.A. §145.416 (requiring Commissioner of Health to license and regulate abortion clinics); M.S.A. §145.4242 (required disclosures for informed consent); M.S.A. §145.4243 (requiring printed material about the unborn child). Plaintiffs Clara Munger and K.P.S. challenge the constitutionality of those statutes.

The "prost-repeal laws" went into effect on July 11, 2022, when the Minnesota State District Court issued a decision holding that virtually all of those statutes violated the Minnesota State Constitution, including the statute that made it unlawful to perform an involuntary abortion, the 24-hour wait period, the informed consent statute, and held that only physicians can perform surgical abortions, but nurses with certain licenses can perform medical abortions. Subsequently, the state legislature and Governor passed statutes repealing all of those statutes that provided minor and inadequate protections. Plaintiffs Alexandra Johnson, WLCC, Dakota Hope, NIFLA, Billings, and Schreifels challenge the constitutionality of those laws.

delegate to abortion businesses, abortion doctors, their employees and agents, the traditional state function of terminating the pregnant mother's constitutionally protected parental relationship with her child. In that process, the abortion businesses solicit a pregnant mother's waiver of her intrinsic right to keep and maintain her relationship with her child, and the irrevocable termination of her constitutionally protected relationship. The abortion is the employment of a "medical" procedure to achieve a non-medical objective: the termination of the mother's parental relationship with her child. That termination is achieved by the abortion businesses killing the mother's child in utero. The termination of the child's life is the sole objective of the procedure.[410] Those abortion laws make that delegation without providing a court proceeding, Superintended by the state, which ensures that the pregnant mother's waiver of her rights is completely knowing, and the mother's consent to terminate her relationship is completely voluntary and completely informed. The Minnesota abortion laws violate the pregnant mother's intrinsic right to keep and maintain her relationship with her child guaranteed by the 14th Amendment.

382.    The State of Minnesota has no legitimate state interest in terminating a pregnant mother's relationship with her child when the child's best interests do not require it, the mother

---

[410]In situations where a pregnant mother has an ectopic pregnancy, or any other condition that places her life at risk, or places her at risk for the loss of a major bodily function, a medical procedure to treat her condition that has the unintended or unavoidable consequence of her child's death is NOT an abortion. That is true medical treatment. Such medical treatment is never performed at an abortion clinic. The abortion clinics only perform abortions to terminate the child's life.

wants to keep her child, or when the pregnant mother's consent to an abortion is not completely voluntary and completely informed. The State cannot, consistent with the 14th Amendment, legalize the termination of the mother's rights without protecting the pregnant mother against involuntary, pressured, uniformed, or otherwise unwanted termination of the mother's relationship.

## SECOND CLAIM

### Violation of the Pregnant Mother's Right to Procreate Guaranteed by the 14th Amendment

383.    Plaintiffs re-allege and incorporate by reference, as if set forth at length herein, the facts and allegations set forth in paragraphs 1 to 382.

384.    A pregnant mother possesses a fundamental 14th Amendment right to procreate, which includes her right to give birth. The Minnesota Abortion Laws are implemented by the state defendants and state actors PPMNS/PPNCS and Red River, all acting under the color of Minnesota state law. The Minnesota abortion laws delegate to abortion businesses, abortion doctors, their employees and agents, the function of effectuating the taking of a pregnant mother's waiver of her right to procreate, and irrevocably terminating that right by the termination of her child's life. That delegation, and the manner in which it is implemented, destroys the pregnant mother's right to procreate. Minnesota's abortion laws make that delegation without a proceeding in a court of law, superintended by the State, which ensures that the mother's waiver of her right to procreate is completely knowing, and that her

acquiescence and consent to the destruction of her right to her parental relationship is completely voluntary and informed. The Minnesota laws violate the pregnant mother's right to procreate guaranteed by the 14th Amendment.

385.    The State of Minnesota has no legitimate interest in denying the mother from exercising her right to procreate, and the State has a duty to protect that right of the mother. To effectuate a "voluntary waiver" of a pregnant mother's right to procreate, consistent with the 14th Amendment, the State must conduct a court proceeding, superintended by the State, which ensures that the mother's waiver of her rights is completely knowing and her acquiescence to the destruction of her rights is completely voluntary and completely informed. It is a violation of the mother's substantive and procedural due process rights for the State to fail to provide such a court procedure. Instead, the State of Minnesota, by contrast, acts to destroy the mothers' rights and interests without any effective protection of them.

**THIRD CLAIM**

**Violation of the Pregnant Mother's Constitutionally Protected Interest in Her Child's Life and Welfare**

386.    Plaintiffs re-allege and incorporate by reference, as if set forth at length herein, the facts and allegations set forth in paragraphs 1 to 385.

387.    Pregnant mothers possess an interest in their child's welfare protected by the 14th Amendment. That interest includes the mother's interest in her child's life and her interest in protecting her child's life. The Minnesota Abortion Laws are implemented by the state

216

defendants and defendant state actors PPMNS/PPNCS and Red River, all acting under the color

of state law. The Minnesota Abortion Laws delegate to abortion businesses, abortion doctors,

and their employees and agents, the function of effectuating the taking of the waiver of those

constitutionally protected interests, and the destruction of the mother's constitutionally

protected interests by the killing of her child. Such delegation is made by Minnesota law,

without providing a procedure in court, superintended by the State, that ensures that such

waiver and termination of the mother's protected interests are completely voluntary and

completely informed. Minnesota's laws violate the pregnant mother's interests in her child's

welfare and her child's life guaranteed by the 14th Amendment of the U.S. Constitution.

388.    The State of Minnesota has no legitimate state interests in destroying the welfare

of the mother's child, and no interest in killing a pregnant mother's child when the mother

wants her child, or when the mother's consent to an abortion is not completely voluntary and

completely informed. The State has an affirmative duty to protect the mother's interest in her

child's welfare and her child's life, but instead, the State acts to destroy those interests.

## FOURTH CLAIM

### Violation of the Pregnant Mother's 14th Amendment Right to the Equal Protection of the Law – Minnesota Murder Statute

389.    Plaintiffs re-allege and incorporate by reference, as if set forth at length herein,

the facts and allegations set forth in paragraphs 1 to 388.

390.   Pregnant mothers possess a right under the 14th Amendment to the equal protection of the law. The Minnesota Abortion Laws, implemented by the defendant state officials, and the defendant state actors PPMNS/PPNCS and Red River, all acting under the color of Minnesota's state law, violate the pregnant mother's right to the equal protection of the laws.

391.   Under Minnesota's murder statute, it is a murder to intentionally kill an unborn child in utero at any age after conception punishable by *mandatory* life imprisonment. M.S.A. §609.2661 and M.S.A. §609.266. That murder statute has as its intended purpose to protect, by deterrence, the pregnant mother's right to keep and maintain her relationship with her child. It is also intended to protect the life of the mother's child. *State v. Merrill*, 450 N.W. 2d 318, 322 (Minn. 1990). Minnesota law, implemented by defendants, denies the protection of that murder statute to pregnant mothers who appear at an abortion facility, even when a mother's waiver of her rights is not knowing, or when the consent to the killing of her child is not voluntary or informed. The abortion businesses take no action to ensure that the mother's consent to the abortion – which results in the killing of her child – is completely voluntary and completely informed. The abortion businesses kill the child even when they know, or should know, that the pregnant mother wants to keep her child. That fact is known, or should be known, by the defendant state officials. The abortion businesses accommodate the involuntary killing of mothers' children, and even mislead pregnant mothers to convince them to submit to an unknowing and uninformed waiver of their rights.

392.    The Minnesota Abortion Laws implemented by the defendant state officials and the defendant state actor abortion businesses they support, immunize the abortion businesses, abortion doctors, and their employees and agents from prosecution under the Minnesota murder statute. Such immunity is granted solely based upon the labeling of that killing as "an abortion," even when the killing is involuntary or completely uninformed.

393.    By granting such immunity, the state defendants encourage the abortion businesses to maximize the number of the pregnant mothers whose children are killed in an involuntary or uninformed abortion. Maximizing the number of abortions sold is a primary goal of abortion businesses, and the implementation of Minnesota's abortion laws not only accommodates such killing, but actually encourages it.

394.    The Minnesota Abortion Laws, implemented by the defendants in this case, deny the pregnant mothers (both residents of Minnesota, as well as mothers taken from other states into Minnesota, like Alexandra Johnson) the equal protection of the Minnesota murder statute, M.S.A. §609.2661 and M.S.A. §609.266.

### FIFTH CLAIM

**Violation of the Pregnant Mother's 14th Amendment Right to the Equal Protection of the Law – Minnesota's Statutory Procedures for the Involuntary Termination of a Mother's Parental Rights**

395.    Plaintiffs re-allege and incorporate by reference, as if set forth at length herein, the facts and allegations set forth in paragraphs 1 to 394.

396.    Pregnant mothers possess the right to the equal protection of the law guaranteed by the 14th Amendment. The Minnesota Abortion Laws implemented by the defendant state officials and the defendant state actors PPMNS/PPNCS and Red River, all acting under the color of Minnesota state law, deny the pregnant mothers the equal protection of Minnesota laws governing the involuntary termination of the mother's parental relationship and parental rights in violation of the 14th Amendment.

397.    Minnesota law governing the involuntary termination of a mother's relationship with her child is codified in and governed by M.S.A. §260C.163, M.S.A. §260C.301, and M.S.A. §260C.307.

398.    M.S.A. §260C.301(1)(b) sets forth the particular grounds needed to be proven for an involuntary termination of a mother's parental relationship and parental rights. The enumerated grounds for involuntary termination of her parental rights are intended to promote the paramount need to protect the best interests of the mother's child – never authorizing the destruction of the child's interests. The necessary grounds for involuntary termination is proof of the mother's unfitness.

399.    Under M.S.A. §260C.307, it is mandatory for the State to conduct a court hearing to establish the grounds for an involuntary termination of the mother's rights, and such hearing must conform to the procedural requirements set forth in M.S.A. §260C.163.

400.    M.S.A. §260C.163 dictates the procedure for a full hearing in a court of law before the court can enter an order involuntarily terminating the parental relationship between any mother and her child. The State must prove the grounds for termination by clear and convincing evidence, and the mother must be provided with full due process of law, including legal representation, the right of cross-examination of witnesses, and the calling of witnesses on her own behalf.

401.    By contrast, the Minnesota Abortion Laws delegate involuntary terminations, by involuntary abortions, to abortion businesses, abortion doctors, and their employees and agents.

402.    The Minnesota Abortion Laws deny pregnant mothers any hearing or due process before the abortion businesses subject a pregnant mother to an involuntary termination of her parental rights by the killing of her child.

403.    The Minnesota Abortion Laws, implemented by the defendants in this case, deny the pregnant mothers (both residents of Minnesota, as well as mothers taken from other states into Minnesota, like Alexandra Johnson) the equal protection of Minnesota laws which require a full hearing under M.S.A. §260C.163, before the involuntary termination of her parental relationship.

## SIXTH CLAIM

**Violation of the Pregnant Mother's 14th Amendment Right to the Equal Protection of the Law – Minnesota's Statutory Procedures for the "Voluntary" Termination of a Mother's Parental Rights**

404.    Plaintiffs re-allege and incorporate by reference, as if set forth at length herein, the facts and allegations set forth in paragraphs 1 to 403.

405.    Pregnant mothers possess the right to the equal protection of the law guaranteed by the 14th Amendment. The Minnesota Abortion Laws, as implemented by the defendant state officials and the defendant state actors PPMNS/PPNCS and Red River, all acting under the color of Minnesota state law, violate the pregnant mother's right to the equal protection of Minnesota laws governing the voluntary termination of a mother's parental relationship and her parental rights.

406.    Minnesota law governing the voluntary waiver and termination of a mother's right to her parental relationship with her child is codified in and governed by M.S.A. §260C.301, Subd. 1(a) (written consent for voluntary termination of parental rights). Under Minnesota law, such a voluntary termination requires a court hearing in the same manner and to the same extent as involuntary terminations under M.S.A. §260C.301, Subd. 1(b). The basis for termination must be established by clear and convincing evidence, the same as required for involuntary terminations. M.S.A. §260C.307, Subd. 2. All terminations under M.S.A. §260C.301 require a court hearing in the manner required by M.S.A. §260C.163. M.S.A.

§260C.163, Subd. 1(a) requires the basis for termination to be established by clear and convincing evidence. Under M.S.A. §260C.163, even in the context of a voluntary termination, the mother has a right: (1) to attend and participate in the hearing; (2) to be heard: (3) to effective legal counsel, including the right to have an attorney appointed when appropriate; and (4) to testify, present evidence, and to cross-examine witnesses. M.S.A. §260C.163, Subdivisions 1, 2, 3, 4, 8.

407.    Thus, under Minnesota law, even when a mother consents to a voluntary termination, only a court of law can terminate the mother's parental relationship and parental rights. She must be given a court hearing in which she clearly confirms that her decision is voluntary, and she admits to conduct which justifies the termination of her rights. The court's determinations must be made by clear and convincing evidence. *In re Welfare of Children of D.F.*, 752 N.W. 2d 88, 92 (Minn. App. Div. 2008). Even when the court enters an order terminating the mother's parental rights, that order can be stayed to give the mother a chance to correct her conduct and revoke her consent. *Id.*

408.    The Minnesota Abortion Laws deny the mother any hearing and due process procedures to determine whether an abortion is truly "voluntary" and informed, before the abortion businesses subject a pregnant mother to an alleged "voluntary" termination of her parental relationship with her child by the irreparable killing of her child in utero. In fact, the

abortion businesses assume the mother resolved to waive her rights before she arrived at the abortion facility.

409. The Minnesota Abortion Laws implemented by the state official defendants and the state actor defendants, all acting under the color of state law, deny the pregnant mothers (both residents of Minnesota, as well as mothers taken from other states into Minnesota, like Alexandra Johnson) the equal protection of the Minnesota laws which require a full hearing, pursuant to M.S.A. §260C.163, before a court can terminate the mother's parental rights in a voluntary termination proceeding.

## SEVENTH CLAIM

**Violation of the Pregnant Mother's 14th Amendment Right to the Equal Protection of the Law – Minnesota's Statutory Procedures and Protections Specific to a Pregnant Mother's "Voluntary" Termination of Her Rights and Relationship with Her Child in a Non-Abortion Termination**

410. Plaintiffs re-allege and incorporate by reference, as if set forth at length herein, the facts and allegations set forth in paragraphs 1 to 409.

411. Pregnant mothers possess the right to the equal protection of the law guaranteed by the 14th Amendment. The Minnesota Abortion Laws implemented by the defendant state officials and the defendant state actors PPMNS/PPNCS and Red River, all acting under the color of Minnesota state law, violate the pregnant mother's right to the equal protection of

Minnesota's law governing the termination of a pregnant mother's rights and parental relationship with her child.

412.   The Minnesota law that specifically governs the termination of a pregnant mother's constitutionally protected relationship with her child against involuntary or uninformed terminations is governed by M.S.A. Chapter 259. That law recognizes that: (1) persons other than the pregnant mother with interests in conflict with those of the pregnant mother may pressure her to terminate her relationship; (2) the pregnant mother's circumstances often place stress upon her and compromise her decision-making; and (3) it is often difficult for the mother to fully appreciate the nature and magnitude of what she would be giving up by a termination of her rights before the birth of her child.

413.   Minnesota law, like that of other states, provides protections of the pregnant mother's right to make a fully voluntary and a fully informed decision about a waiver of such important constitutional rights:

> (1)   It does not permit, recognize, or enforce a document signed by the mother purporting to give up, waive, and surrender her parental rights at any time during the pregnancy; such waivers can only be executed *after* her child is born, and she has the opportunity to see and hold her child. This provision is in recognition of the widely understood fact that a pregnant mother's waiver and termination of her right to her relationship with

her child made before the birth of her child is uninformed;[411]

(2)   The pregnant mother is entitled to free pre-termination counseling to properly explore her feelings, desires, and what help is available to her if she prefers to keep her child;

(3)   The pregnant mother is entitled to free legal counsel;

(4)   After signing a waiver and relinquishment of her rights, the mother is given the opportunity to revoke her waiver for any reason;

(5)   Only a court of law can terminate the mother's parental rights, and only after conducting a hearing in court that determines that the mother's consent to the termination of her rights and relationship is voluntary, knowing, and informed;

(6)   No private entity can terminate the mother's relationship; and

(7)   The mother has the right to appeal the termination of her rights if they were violated by deviation from the requirements of the law.

414.   The Minnesota Abortion Laws implemented by the defendant state officials and the defendant state actors PPMNS/PPNCS and Red River, all acting under the color of Minnesota state law, deny each and every one of those protections of the pregnant mother's intrinsic 14th Amendment rights.

---

[411] The pregnant mother "never makes a totally voluntary, informed decision for *quite clearly* any decision *prior to the baby's birth* is, in the most important sense, uninformed..." *In the Matter of Baby M*, 109 N.J. 396, 437 (N.J. 1988) (emphasis added).

415. The Minnesota Abortion Laws implemented by the state official defendants and the state actor defendants in this case, all operating under the color of state law, deny the pregnant mothers (both residents of Minnesota, as well as mothers taken from other states into Minnesota, like Alexandra Johnson) the equal protection of the Minnesota law that prohibits the taking of waivers of the mothers' rights and the termination of their parental relationship and parental rights prior to birth and without the required opportunity for counseling, legal representation, and a hearing in a court of law.

## EIGHTH CLAIM

**Violation of the Pregnant Mother's 14th Amendment Right to the Equal Protection of the Law – Minnesota's Statutory Procedure for a Court Proceeding to Approve the Performance of an Abortion**

416. Plaintiffs re-allege and incorporate by reference, as if set forth at length herein, the facts and allegations set forth in paragraphs 1 to 415.

417. Pregnant mothers possess the right to the equal protection of the law guaranteed by the 14th Amendment. The Minnesota Abortion Laws implemented by the defendant state officials and the defendant state actors PPMNS/PPNCS and Red River, all acting under the color of Minnesota state law, violate the pregnant mother's right to the equal protection of Minnesota's law that requires a court's approval, following a court hearing, for the

performance of an abortion. That court proceeding is provided to some pregnant mothers, but most pregnant mothers are denied any court proceeding.

418.    That Minnesota law provides a court hearing only in those circumstances where the abortion businesses want to avoid notifying the parents of a pregnant mother under the age of majority in order to terminate the mother's rights and protected relationship by performing an abortion on the mother. The abortion businesses seek the court's approval for the performance of an abortion only in those cases where the law requires them to do so, and only for the purpose of selling an abortion. M.S.A. §144.343(c)(1), Subd. 6.

419.    The Minnesota law, however, does not require the abortion businesses to refer a minor pregnant mother (or any other pregnant mother), for a court proceeding when the mother is ambivalent, indicates she wants to keep her child, or is brought to the abortion facility against her will. Those mothers are denied a court hearing to protect their intrinsic rights.

420.    Pregnant mothers under the age of majority who clearly want their child – and don't want their child killed in an abortion being forced upon them by others, including their parents (such as in the cases of B.H., "Jane," Jace Hanisch's girlfriend, and many of the patients of the PHC plaintiffs) – are denied a court hearing. In Minnesota, court procedures are only available to those who apparently want to terminate their relationship, but there is no hearing for mothers who want their children.

421.    The Minnesota Abortion Laws, implemented by the state official defendants and the state actor defendants PPMNS/PPNCS and Red River, all operating under the color of Minnesota state law, deny the pregnant mothers (both residents of Minnesota, as well as mothers taken from other states into Minnesota, like Alexandra Johnson) the equal protection of the Minnesota law that requires court approval for an abortion for some pregnant mothers. The law's requirement of court approval is denied other pregnant mothers, including the pregnant mother plaintiffs in this case, and the patients of the PHC plaintiffs.

### NINTH CLAIM

### Violation of the Pregnant Mother's 14th Amendment Right to Procedural Due Process of Law

422.    Plaintiffs re-allege and incorporate by reference, as if set forth at length herein, the facts and allegations set forth in paragraphs 1 to 421.

423.    Pregnant mothers possess the right to the procedural due process of law guaranteed by the 14th Amendment. The Minnesota Abortion Laws implemented by the defendant state officials and the defendant state actors PPMNS/PPNCS and Red River, all acting under the color of Minnesota state law, violate the pregnant mother's 14th Amendment right to procedural due process of law.

424.    The Minnesota Abortion Laws terminate a pregnant mother's intrinsic 14th Amendment rights to keep and maintain her relationship with her child, her right to procreate,

229

and her protected interest in her child's welfare and child's life, under the guise that the mother's waiver of those fundamental rights and interests is knowing and that her consent to their termination is informed and voluntary, without any court proceeding to determine whether the mother's "waiver" of her rights is truly and completely voluntary and informed, or any other meaningful legal protection of her rights and interests.

425. The State of Minnesota cannot circumvent the requirements imposed upon it by the 14th Amendment and evade the Constitution's guarantee of procedural due process of law by delegating to private entities the traditional state function of terminating the parental rights of pregnant mothers. Only the State can properly perform that function to ensure that such waivers and terminations are voluntary and informed through its courts. The violation of the mothers' rights is made more egregious by the fact that Minnesota law delegates terminations to private entities without any provisions to protect against a mother's unknowing waiver or involuntary or uninformed consent to the termination of her parental rights and interests, when the State makes that delegation to entities:

> (1)  that have financial and ideological interests, which conflict with the mothers' interests;
>
> (2)  that provide no pre-abortion counseling;
>
> (3)  that provide no post-abortion counseling;
>
> (4)  only provide the "service" of killing the mothers' child;

(5)     where the abortion doctors typically spend no more
than 5 to 10 minutes with a pregnant mother, only
the time it takes to kill the mother's child; and

(6)     where there is no true medical care and no "patient-
physician relationship."

426.    All of this delegation and process is done without any necessary court

supervision.

## TENTH CLAIM

### Violation of the Pregnant Mother and Her Child's Mutual Right to the Equal Protection of the Law – Minnesota Murder Statute

427.    Plaintiffs re-allege and incorporate by reference, as if set forth at length herein,

the facts and allegations set forth in paragraphs 1 to 426.

428.    Under Minnesota's Murder Statute, it is a murder to intentionally kill an unborn

child in utero at any age after conception, punishable by *mandatory* life imprisonment. M.S.A.

§609.2661 and M.S.A. §609.266. The intended purpose of that murder statute is to protect the

pregnant mother's right to keep and maintain her relationship with her child, and to protect her

child's life, through the deterrent effect of the severe criminal punishment. *State v. Merrill*, 450

N.W. 2d 318, 322 (Minn. 1990).

429.    During pregnancy, the interests of the pregnant mother who wants her child and

the interests of her child are inextricably connected and innately compatable like in no other

human relationship in all of life. At no time are they more directly aligned.

430.   For the pregnant mother who wants her child and who wants to keep her relationship, her interests and those of her child never conflict.

431.   When a pregnant mother wants to keep her child, her child has a protectable right to the equal protection of the Minnesota murder statute intended to protect the child's life. The mother has her personal interest in her own rights, but she has an interest in, and the legal standing to assert her child's rights and interests, as do the PHC plaintiffs who serve those pregnant mothers who want to keep their relationship with their child.

432.   When the rights of a human being in utero are not in conflict with the rights of his pregnant mother, the unborn child enjoys the equal protection of the law as guaranteed by the 14th Amendment. That Equal Protection Clause forbids the State to discriminate against any class of human beings, and that clause cannot, itself, discriminate against any class of human beings by excluding any particular class from its protection. The denial of the protection of Minnesota's murder statute to a pregnant mother who wants her child violates the mutual interests and mutual rights of the mother and her child.

## ELEVENTH CLAIM

### Violation of the PHC Plaintiffs and NIFLA's Liberties Guaranteed by the 14th Amendment

433.   Plaintiffs re-allege and incorporate by reference, as if set forth at length herein, the facts and allegations set forth in paragraphs 1 to 432.

434.    The pregnancy help center plaintiffs, Women's Life Care Center, Dakota Hope, Dr. David Billings, and Dr. Dawn Schreifels, as well as NIFLA, all work to promote and protect the rights of pregnant mothers to keep their relationship with their children, and to help protect the mothers' interests in the life and welfare of their children. The two pregnancy help centers, WLCC and Dakota Hope, along with NIFLA, are part of one of the largest women's movements in the history of the nation. They are among approximately 3,000 PHCs across the country run and operated by about 54,000 women, all working to protect and preserve the parental and other rights of pregnant mothers. As such, they are devoted to their mission to help pregnant mothers keep the children they want.

435.    In fulfilling their mission and providing the pregnant mothers with the counseling and help that they need, the PHC plaintiffs must communicate with the mothers and speak about the mothers' rights and interests. They must have discussion with, and counsel pregnant mothers about how to successfully resist pressure from others to waive their rights, and about what help is available to the mothers who want their children. The PHC plaintiffs and NIFLA must also communicate with the public to help pregnant mothers learn of the availability of their services.

436.    In fulfilling that mission, the PHC plaintiffs and NIFLA have a right to the freedom of speech guaranteed by the 14th Amendment without the unwarranted and unjust

interference by state officials and the abortion businesses which aggressively seek to defame them and their mission.

437.    The PHC plaintiffs and NIFLA have a protected 14th Amendment liberty interest to carry out their mission to protect and preserve the intrinsic constitutional rights of pregnant mothers without unwarranted and unjust interference from the state officials and their partners in the abortion industry.

438.    The State's abdication of its constitutional duty to protect pregnant mothers against the unwanted killing of their children, renders the mission of the PHCs and NIFLA extremely critical for the mothers. Instead of discharging the State's obligation to protect the mothers' rights, the state officials and the state actors PPMNS/PPNCS and Red River, all acting under the color of state law, act to destroy the mothers' rights. The defendants oppose the mission of the PHCs and NIFLA and attempt to impede and even defeat their ability to achieve their mission of protecting the mothers' rights. The defendants publicly attack the PHC plaintiffs and NIFLA and act in concert to make it harder for pregnant mothers to obtain the PHCs' services.

439.    The state defendants, through defendant Attorney General Keith Ellison, issued a "consumer alert" to tell pregnant mothers *not* to go to pregnancy help centers, and the State has set up a "hotline" asking for people to lodge complaints against the PHCs. In their partnership with the abortion businesses, particularly PPMNS/PPNCS, the state officials take

no complaints about abortion businesses, abortion doctors, or their agents, despite their documented abuses and violations of the mothers' rights which result in the killing of the children the mothers want, and the permanent and irrevocable destruction of the mothers' rights and interests. In fact, Governor Walz issued an executive order requiring all state agencies to protect the abortion industry, and forbidding the agencies from investigating abortion businesses, doctors, and nurses. The derelictions of PPMNS/PPNCS and other abortion facilities have been known, or should have been known, by the state officials, but rather than taking action against the wrongdoing of the abortion industry, the state officials join with the abortion businesses to interfere with the work and mission of the PHCs .

440.    The defendant state officials and the defendant state actor abortion businesses, all acting under the color of state law, directly interfere with the mission and the patient-physician relationship of the PHC plaintiffs by aggressively terminating the intrinsic rights of the PHCs' pregnant mother patients, and by killing the PHCs' unborn patients. By killing one of the PHCs' patients and taking the pregnant mother from the care of the PHCs in order to deprive the mothers of their services, which protect their 14th Amendment rights, the defendants prevent the PHCs and NIFLA from carrying out their mission, and, thereby, destroy the PHC plaintiffs' liberty interests guaranteed by the 14th Amendment.

441.    The laws of Minnesota, implemented by the defendant state officials and the defendant state actors PPMNS/PPNCS and Red River, violate the PHC plaintiffs' and NIFLA's

right to liberties guaranteed by the 14th Amendment, including the right to the freedom of speech and their interests in successfully discharging and completing their mission to protect and preserve the intrinsic rights of pregnant mothers to keep and maintain their relationship with their children, their right to procreate, their constitutionally protected interest in their children's welfare and children's lives, and their right to the equal protection of the law.

## INJUNCTIVE RELIEF

442.    The post-repeal Minnesota Abortion Laws, as implemented, cause irreparable harm to the pregnant mothers in Minnesota on a daily basis. The mothers lose their children permanently, and the unconstitutional termination of the mothers' rights by an abortion is irreparable without any opportunity to correct the harm. The mothers' children are killed. The mothers lose their children forever. Every human being is completely unique, and, therefore, irreplaceable. The PHC plaintiffs and NIFLA seek a preliminary injunction and a permanent injunction to protect the rights and interests of the pregnant mothers, and their own 14th Amendment rights, respectively. They seek such preliminary and permanent injunctions to protect the rights and lives of their current patients, their future patients, and for those pregnant mothers who would want to obtain their services now or in the future.

443.    The preliminary injunctions are immediately necessary to prevent the totally irreparable injury to the constitutional rights of the mothers, their children, the PHCs, and NIFLA set forth herein in the eleven claims for relief.

## PRAYERS FOR RELIEF

For the reasons set forth in this Complaint, and to protect the 14th Amendment rights of the pregnant mothers in Minnesota (whether Minnesota residents or mothers brought into Minnesota from another state, like plaintiff Alexandra Johnson), and those rights of the PHC plaintiffs and NIFLA, the plaintiffs respectfully request that the court enter orders and judgments directed against the defendant state officials, their employees, agents and their successors, and the defendant state actors PPMNS/PPNCS and Red River, acting under to color of state law, as well as all of their employees and agents, to provide for the following relief:

A.     As to Alexandra Johnson, the PHC plaintiffs, and NIFLA, a declaratory judgment declaring that Minnesota's "post-repeal" abortion laws, as implemented, violate the 14th Amendment of the United States Constitution; on their face and as applied to each of those individual plaintiffs. As to plaintiffs Clara Munger and K.P.S., a declaratory judgment declaring that Minnesota's "pre-repeal" abortion laws, as implemented, violate the 14th Amendment of the United States Constitution;

B.     A declaratory judgment that Minnesota's delegation to private entities that perform abortions the traditional state function of effectuating a pregnant mother's waiver of her intrinsic right to keep and maintain her relationship with her child, and performance of irrevocably terminating her constitutionally protected relationship with her child without any court proceeding and other Due Process protections, violates the pregnant mother plaintiffs'

14th Amendment rights, and the rights of the PHCs' pregnant mother patients, and future patients, to keep and maintain their relationship with their children, their right to procreate, their constitutionally protected interest in their children's lives and welfare, and their right to the equal protection of the law;

C.      A declaratory judgment declaring that the Minnesota's "post-repeal" abortion laws violate the 14th Amendment rights of the PHC plaintiffs and NIFLA;

D.      A declaratory judgment that Minnesota's "pre-repeal" and "post-repeal" abortion laws violate the Equal Protection rights of pregnant mothers who want their children and the joint interests of both those mothers and their children.

E.      A preliminary and a permanent injunction ordering the defendant state officials:

1.      To stop implementing Minnesota's post-repeal abortion laws;

2.      To stop delegating to abortion facilities, abortion doctors and nurses, the taking of the waivers of pregnant mothers' constitutional rights set forth herein, to PPMNS/PPNCS, Red River, and all other abortion facilities in the State of Minnesota;

3.      To stop delegating to abortion facilities, abortion doctors and nurses the termination of a pregnant mother's relationship with her child, by the killing of the child by an abortion procedure whether surgical or medical; and

4.      To stop the termination of the pregnant mother's relationship with her child by an abortion, both surgical abortions and medical abortions, without first conducting a full court hearing to determine whether the pregnant mother's waiver of her constitutional rights is knowing, and that her consent to the termination of those rights is completely voluntary, and completely informed, after the mother receives full and adequate pre-

termination counseling that informs her of her rights, and the help available to her, and provides the mother with a safe, protective setting that permits her to disclose whether she is being pressured to waive her rights against her will;

F.    Issue a preliminary and permanent injunction ordering defendants PPMNS/PPNCS and Red River:

1.    To stop performing all surgical and medical abortions under the current post-repeal Minnesota Abortion Laws;

2.    To stop performing all surgical and medical abortions without an order from a court of competent jurisdiction specifically directing and authorizing an abortion on a specifically named pregnant mother; and

3.    To stop performing all surgical and medical abortions without or until there are state laws in place that meet all requirements of the 14th Amendment and which truly ensure that a pregnant mother's waiver of her rights is completely knowing and that her submission to the termination of her relationship is completely voluntary and completely informed, and it is determined that the law, consistent with the principles of due process, can permit performance of such abortions.

G.    Awarding money damages to plaintiffs Alexandra Johnson, Clara Munger, and K.P.S.;

H.    Awarding the plaintiffs Johnson, Munger, and K.P.S. punitive damages;

I.    Awarding plaintiffs their attorneys' fees and cost of suit pursuant to 42 U.S.C. §1988; and

J.    Granting such other and further legal and equitable relief that the court deems just.

239

## <u>PREGNANT MOTHER PLAINTIFFS REQUEST A JURY TRIAL ON DAMAGES ONLY</u>

Plaintiffs Alexandra Johnson, Clara Munger, and K.P.S. waive a jury trial on the liability portion of their claims. They request a jury trial as to money damages only.

Dated: November 22, 2024

<div style="margin-left:40%">

*s/* Harold C. Knecht, III
Bar Number: 0283666
Attorney for Plaintiffs
20 Doral Road
Dellwood, MN 55110
Tel: (651) 303-9309
mallorygrp@comcast.net

THE CASSIDY LAW FIRM, LLC
Attorneys for Plaintiffs
Harold J. Cassidy*
Bar Number: 011831975
Joseph R. Zakhary*
Bar Number: 010302003
Derek M. Cassidy*
Bar Number: 041562007
Thomas J. Viggiano, III*
Bar Number: 044611997
750 Broad Street, Suite 3
Shrewsbury, NJ 07702
Tel: (732)747-3999
hjc@haroldcassidy.com

</div>

Schaerr | Jaffe LLP
Gene Schaerr*
Bar Number: 416368
1717 K Street, NW, Suite 900
Washington, DC 20006
Tel: (202) 787-1060
gschaerr@schaerr-jaffe.com

Ronan, Tuzzio & Giannone
James Ronan*
Bar Number: 026211976
4000 Route 66
Tinton Falls, NJ 07753
Tel: (732) 922-3300
jronan@ronanlaw.com

*Motions for admission *pro hac vice* pending

241