# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

WOMEN'S LIFE CARE CENTER; NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES; DAKOTA HOPE CLINIC; DAVID BILLINGS, MD; and DAWN SCHREIFELS, MD,

                  Plaintiffs,

v.

KEITH ELLISON, Attorney General, in his official capacity; TIM WALZ, Governor, in his official capacity; SHIREEN GANDHI, Temporary Commissioner, Department of Human Services, in her official capacity; PLANNED PARENTHOOD MINNESOTA, NORTH DAKOTA, SOUTH DAKOTA (PPMNS); PLANNED PARENTHOOD NORTH CENTRAL STATES (PPNCS); SARAH A. TRAXLER, MD, in her capacity as Medical Director/Chief Medical Officer of PPMNS/PPNCS, and individually; TIKKI BROWN, Commissioner, Department of Children, Youth, and Families, in her official capacity; BROOKE CUNNINGHAM, Commissioner, Department of Health, in her official capacity; PAMELA GIGI CHAWLA, MD, MHA, President, Board of Medical Practice, in her official capacity; JESSICA MIEHE, DNP, RN, President, Board of Nursing, in her official capacity; RONDA MARIE CHAKOLIS-HASSAN, PharmD, MPH, President, Board of Pharmacy, in her official capacity; ACCESS INDEPENDENT HEALTH SERVICES, INC. d/b/a Red River Women's Clinic; and KATHRYN L. EGGLESTON, MD, in her capacity as Medical Director of Red River, and individually,

                  Defendants.

Case No. 24-CV-4250 (NEB/SGE)

ORDER ON
MOTIONS TO DISMISS

In 2022, the Supreme Court held "that the Constitution does not confer a right to abortion" and concluded that "the authority to regulate abortion must be returned to the people and their elected representatives." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 292 (2022). In the years since, elected representatives in Minnesota passed laws intending to protect access to abortion.

Plaintiffs' argument challenges these laws and proceeds as follows: A pregnant mother has a constitutionally protected right to continue her relationship with her unborn child. An abortion terminates that relationship. Yet only courts can terminate parental rights (e.g., adoption proceedings, involuntary terminations). Thus, Plaintiffs contend that before a woman receives an abortion, the Fourteenth Amendment "requires an order of the court following a full hearing" to ensure that the woman's decision is knowing and voluntary. (ECF No. 161 ("Am. Compl.") ¶ 246.)

In other words, Plaintiffs are asking the Court to institute procedures whereby an abortion decision receives the same court review and involvement as a termination of parental rights under Minnesota's child protection statutes.

Under this theory, Plaintiffs bring ten constitutional claims against thirteen Defendants. The Defendants fall into two groups—the State Defendants and the Provider Defendants. Both groups move to dismiss, (ECF Nos. 163, 176, 213), and for the reasons below, the motions are granted.

# BACKGROUND

## I.     Abortion Laws in Minnesota

The evolution of Minnesota's abortion laws is central to Plaintiffs' amended complaint.[1]

In 1978, the Minnesota Legislature enacted several laws restricting medical-assistance program coverage for abortions. *Women of State of Minn. by Doe v. Gomez* ("*Gomez*"), 542 N.W.2d 17, 23 (Minn. 1995). In 1993, a group of plaintiffs filed a class action lawsuit against a group of state defendants and argued that restriction of public medical-assistance funds for abortions violated the Minnesota Constitution. *Id.* at 20. The litigation made its way to the Minnesota Supreme Court; the question presented was "whether the right of privacy under the Minnesota Constitution encompasse[d] a woman's decision to terminate her pregnancy." *Id.* at 26–27. Relying on Sections 2, 7, and 10 of Article I of the Minnesota Constitution, the Minnesota Supreme Court answered yes: "the right of privacy under the Minnesota Constitution encompasses a woman's right to decide to terminate her pregnancy." *Id.* at 27; *see id.* at 26. *Gomez* was "one of those limited circumstances in which" a state supreme court interprets its "constitution to provide more protection than that afforded under the federal constitution." *Id.* at 30.

---

[1] The amended complaint spends dozens of paragraphs detailing the litigation history of abortion access in South Dakota and North Dakota. (*See* Am. Compl. ¶¶ 78–86, 125–50, 154, 158–61, 220, 236, 244–45.) The Court has considered that history but will not recount those facts in this Order.

On June 24, 2022, the Supreme Court overruled *Roe v. Wade*, 410 U.S. 113 (1973), and held that the United States Constitution does not provide a right to abortion. *Dobbs*, 597 U.S. at 231. The next day, Minnesota Governor Tim Walz issued an executive order that directed state agencies "to protect people or entities" that provide abortions. (Am. Compl. ¶ 68; ECF No. 52-1 at 1–3[2] ("Executive Order") at 2[3].) The Executive Order prevented state agencies from imposing civil, criminal, or professional consequences on abortion providers. (Executive Order at 2.) And it required the Minnesota Department of Health to issue a report about the "importance of reproductive health care services in Minnesota." (*Id.*)

Around that same time, Minnesota Attorney General Keith Ellison issued a "Consumer Alert." (Am. Compl. ¶ 75.) As relevant here, the Alert communicated three messages. First, it warned Minnesotans about "Crisis Pregnancy Centers":

> Many so-called Crisis Pregnancy Centers (CPCs) may pose as reproductive healthcare clinics despite not providing comprehensive reproductive healthcare to consumers. Indeed, some CPCs do not provide any healthcare services at all. CPCs are private organizations that attempt to prevent or

---

[2] Page citations to the parties' exhibits and memoranda reference ECF page numbers unless otherwise noted.

[3] When deciding a motion to dismiss, the Court "generally may not consider materials outside the pleadings." *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008). "It may, however, consider some public records, materials that do not contradict the complaint, or materials that are 'necessarily embraced by the pleadings.'" *Id.* (citation omitted). The Court considers these materials embraced by the pleadings: (1) Governor Walz's Executive Order; (2) the Attorney General's 2022 "Consumer Alert," (ECF No. 122-2); and (3) the 2022 *Doe v. State* state court decision.

dissuade pregnant people from accessing their constitutionally protected right under the Minnesota Constitution to a safe and legal abortion.

(ECF No. 122-2 at 2.)

Second, the Alert casted doubt on "abortion pill reversal": "29% of CPCs promote an 'abortion pill reversal' practice that the American College of Obstetricians and Gynecologists has called 'unethical' and 'not based on science.'" (*Id.*)

Third, the Alert promoted a "hotline": "If you have information or concerns about any CPC that may be providing deceptive or inaccurate information, you should contact the Minnesota Attorney General."[4] (*Id.* at 3; *see* Am. Compl. ¶¶ 75, 323.) The Alert named none of the Plaintiffs, and no particular CPC.

On July 11, 2022, a state court decision invalidated eight of Minnesota's then-existing abortion laws. *Doe v. State*, No. 62-CV-19-3868, 2022 WL 2662998 (Minn. Dist. Ct. July 11, 2022). *Doe* held that eight Minnesota laws governing abortion access were unconstitutional under the Minnesota Constitution. *Id.* at *1. "[R]espect[ing] the precedent set by the Minnesota Supreme Court in *Gomez*," the *Doe* court found that each

---

[4] Plaintiffs contend that the Consumer Alert "promotes abortion and forcefully discourages pregnant mothers from seeking" help at pregnancy help centers. (Am. Compl ¶ 75.) They also allege that the Alert's description of "abortion pill reversal" is inaccurate because "[p]rogesterone treatment . . . has proven highly successful, and is now widely practiced." (*Id.* ¶ 76.) For their part, the State Defendants characterize Plaintiffs' description of the Consumer Alert as "wholly inaccurate." (ECF No. 166 at 15 n.5.)

of the eight laws burdened the right to privacy under the Minnesota constitution, and none survived strict scrutiny. *Id.* at *23. *Doe* was not appealed.

In 2023, the Minnesota Legislature formally repealed the eight laws found to be unconstitutional in *Doe*. (Am. Compl. ¶¶ 17, 65, 67.) That same session, the Legislature enacted the Protect Reproduction Options Act ("PRO Act"). The Act declared that "[e]very individual has a fundamental right to make autonomous decisions about the individual's own reproductive health, including the fundamental right to use or refuse reproductive health care" and "[e]very individual who becomes pregnant has a fundamental right to continue the pregnancy and give birth, or obtain an abortion, and to make autonomous decisions about how to exercise this fundamental right. Minn. Stat. § 145.409, subdiv. 3.

## II.    The Parties

### A.    *Plaintiffs: Pregnancy Help Centers, Doctors, and NIFLA*

Women's Life Care Center ("WLCC") is a pregnancy help center in Little Canada, Minnesota.[5] (Am. Compl. ¶ 23.) Its mission is to "protect the pregnant mother's

---

[5] According to the amended complaint, there are 3,000 pregnancy help centers or PHCs around the country. (Am. Compl. ¶ 233.) "Between 1 million and 1.5 million women receive pre-abortion counseling at a pregnancy help center in the United States each year, the vast majority of whom are vulnerable to an abortion." (*Id.* ¶ 232.) Provider Defendants argue the phrase "pregnancy help centers" is misleading. (*See* ECF No. 179 at 10 n.4.) Because the amended complaint uses that term, the Court will use the term in this Order. (*See id.* ("Provider Defendants use the term 'pregnancy help center' and 'PHC' herein because those terms are used in the Amended Complaint, but they disagree that those terms are accurate characterizations of these Plaintiffs.").) The Consumer Alert issued by

constitutionally protected right to keep and maintain her relationship with her child." (*Id.*) To fulfill that mission, "WLCC provides accurate and essential counseling and education, emotional support, material assistance, and information about available resources to pregnant mothers who want to keep their children." (*Id.*) Dr. Dawn Schreifels is WLCC's medical director. (*Id.* ¶ 27.) "As such, all of the pregnant mothers provided assistance at WLCC are patients of Dr. Schreifels, and she has a legal and professional duty to both the pregnant mothers and to their children in utero." (*Id.*)

Dakota Hope Clinic is a pregnancy help center in Minot, North Dakota. (*Id.* ¶ 25.) Like WLCC, "Dakota Hope's primary mission is to protect the pregnant mother's constitutionally protected right to keep and maintain her relationship with her child." (*Id.*) Dakota Hope provides "advice, education, and other assistance necessary to prevent pregnant mothers from losing their children by involuntary or uninformed terminations." (*Id.*)

According to the amended complaint, the "overwhelming majority" of women in North Dakota who receive an abortion "are subjected to those abortions" in Minnesota. (*Id.*) "Some of Dakota Hope's patients are taken into Minnesota to abortion facilities where they lose their child they want." (*Id.*)

---

the Minnesota Attorney General's Office—discussed above—uses the term "Crisis Pregnancy Centers" or "CPCs." To maintain consistency, the remainder of this Order uses the phrase "pregnancy help center."

Dr. David Billings is Dakota Hope's medical director. (*Id.* ¶ 26.) Like Dr. Schreifels, he has "a legal and professional duty to both the pregnant mothers and to their children in utero." (*Id.*) Dr. Billings provides "progesterone treatment to pregnant mothers who were administered Mifepristone." (*Id.*) Mifepristone is a prescription drug used to perform a medical abortion. (*See id.* ¶¶ 24, 190.)

Collectively, this Order will refer to Dr. Schreifels and Dr. Billings as the Doctors, and to WLCC and Dakota Hope as the Pregnancy Help Centers.

The National Institute of Family and Life Advocates, or NIFLA, is a network of 1,756 affiliated pregnancy help centers. (*Id.* ¶ 257.) Most of those centers operate as medical clinics. (*Id.*) There are 49 NIFLA members in Minnesota. (*Id.* ¶ 269.) NIFLA's "central mission" is to protect "pregnant mothers' constitutionally protected relationship with their children." (*Id.* ¶ 24.)

NIFLA is "the national leader in helping pregnancy centers convert to licensed medical clinics." (*Id.*) As part of its "medical conversion program" NIFLA "helps pregnancy help centers recruit and train medical professionals, advises centers about physical plant layout and necessary medical equipment, and provides model policies and procedures consistent with best practices." (*Id.*)

## B.   *State Defendants*

Plaintiffs sue seven defendants associated with the state of Minnesota.

1.    *Executive Officers*

Keith Ellison is the Attorney General of Minnesota. (*Id.* ¶ 28.) Plaintiffs allege that he is "is responsible for the enforcement and legal defense of the State's abortion laws which are used to deprive pregnant mothers of their 14th Amendment rights." (*Id.*) He is sued in his official capacity. (*Id.*)

Tim Walz is the Governor of Minnesota. (*Id.* ¶ 29.) In light of the 2022 *Dobbs* and *Doe* decisions, Governor Walz "signed and promoted legislation that repealed every previously existing protection of the pregnant mothers' 14th Amendment right to keep her child." (*Id.*) At a January 2024 press conference, Governor Walz described Planned Parenthood Minnesota, North Dakota, South Dakota as "partners" and pledged his "ongoing commitment" to advance Planned Parenthood's work. (*Id.* ¶¶ 69–70.) At that event, Governor Walz "boasted" that "he and the Minnesota Legislature repealed all of the modest protections for the rights of the pregnant mothers." (*Id.* ¶ 70.) He is sued in his official capacity. (*Id.* ¶ 29.)

2.    *State Licensing Boards*

Dr. Pamela Gigi Chawla is the President of the Minnesota Board of Medical Practice. (*Id.* ¶ 35.) Jessica Miehe is the President of the Minnesota Board of Nursing. (*Id.* ¶ 36.) Ronda Marie Chakolis-Hassan is the President of the Minnesota Board of Pharmacy. (*Id.* ¶ 37.) In their roles, each is tasked with licensing, regulating, and overseeing doctors, nurses, and pharmacists, respectively. (*Id.* ¶¶ 35–37.) Each is sued in

their official capacity. (*Id.* ¶¶ 35–37.) Plaintiffs allege that through state-sanctioned licenses, doctors, nurses, and pharmacists "are delegated the power and authority to terminate the pregnant mothers' constitutionally protected parental rights without providing Due Process protections." (*Id.* ¶ 35; *see id.* ¶¶ 36–37.)

### 3.    State Commissioners

Shireen Gandhi is the Temporary Commissioner of the Minnesota Department of Human Services ("DHS"). (*Id.* ¶ 30.) DHS oversees "all legal processes and procedures which effectuate the involuntary termination of a mother's parental rights." (*Id.*) DHS also "administers the MinnesotaCare Program and other government funded programs under which government monies are used to pay the abortion business." (*Id.*) She is sued in her official capacity.

Brooke Cunningham is the Commissioner of the Minnesota Department of Health ("DH"). (*Id.* ¶ 34.) In her role, she "is responsible for the state policies to promote the health and well-being of Minnesota residents." (*Id.*) Plaintiffs allege that she "has helped make Minnesota the 'abortion capital' of the Upper Midwest." (*Id.*) She is sued in her official capacity. (*Id.*)

Tikki Brown is the Commissioner of the Department of Children, Youth, and Families and is named as a defendant. (Am. Compl. at 1.) The amended complaint, however, does not provide any further description of Brown.[6]

### C. Provider Defendants

#### 1. Planned Parenthood and Dr. Traxler

Planned Parenthood Minnesota, North Dakota, South Dakota ("PPMNS") operates multiple abortion clinics in Minnesota. (*Id.* ¶ 31.) PPMNS's parent corporation is Planned Parenthood North Central States ("PPNCS"). (*Id.*) Collectively, this Order will refer to PPMNS and PPNCS as Planned Parenthood. A "significant majority" of the abortions performed each year in Minnesota are done through Planned Parenthood. (*Id.*)

Plaintiffs allege that Planned Parenthood "has never instituted any procedures to ensure that a mother's submission to an abortion is truly voluntary and truly informed." (*Id.* ¶ 87.) They also allege that Planned Parenthood "while acting under the color of state law, has been completely aware that abortions terminate a pregnant mother's constitutional rights, including her protected interest in her relationship with her child, and interest in her child's life and welfare." (*Id.* ¶ 31.) Finally, they allege that Planned Parenthood clinic staff coerce and pressure pregnant women into receiving abortions. (*Id.*)

---

[6] Brown was served in July 2025. (*See* ECF No. 211.) The State Defendants then filed a separate motion to dismiss on behalf of Brown. (ECF No. 213.)

Dr. Sarah Traxler is the Chief Medical Officer of Planned Parenthood. (*Id.* ¶ 33.) Planned Parenthood's surgical and medical abortions are "performed by her or under her direction, supervision, and orders." (*Id.*) Dr. Traxler appeared at the January 2024 press conference with Governor Walz. (*Id.* ¶ 69.) Plaintiffs allege that Dr. Traxler "gushed" about Minnesota's "supportive political environment" for abortion. (*Id.* ¶ 71.)

 2.   *Red River Women's Clinic and Dr. Eggleston*

Access Independent Health Services, Inc. is an abortion clinic and does business as Red River Women's Clinic. (*Id.* ¶ 38.) Although originally incorporated in North Dakota, Red River Women's Clinic is now located in Moorhead, Minnesota. (*Id.*) Plaintiffs allege that Red River Women's Clinic "has been terminating a mother's intrinsic constitutional rights when they perform abortions, and . . . has performed abortions which were coerced." (*Id.*) Dr. Kathryn Eggleston is the medical director of Red River Women's Clinic. (*Id.* ¶ 39.)

## III.   This Litigation

Plaintiffs' amended complaint brings ten constitutional claims against the thirteen defendants. Counts 1, 2, and 3 bring Fourteenth Amendment substantive due process claims. Counts 4, 5, 6, 7, and 9 bring challenges under the Fourteenth Amendment's equal protection clause. Count 8 alleges that Minnesota "circumvent[s]" procedural due process requirements by not sufficiently ensuring a pregnant mother's knowing and voluntary waiver before she receives an abortion. (*Id.* ¶ 309.) And Count 10 argues that

Minnesota law violates Plaintiffs' "right to liberties guaranteed by the 14th Amendment, including their right to the freedom of speech, their good reputation, their financial interests, and their interests in successfully discharging and completing their mission." (*Id.* ¶ 325.)

As relief, Plaintiffs seek declaratory judgment announcing that Minnesota's abortion laws are unconstitutional. (Am. Compl. Prayers for Relief ¶¶ A–D.) They request a preliminary and permanent injunction ordering the State Defendants to establish a ten-part judicial review process for women seeking an abortion. (*Id.* at ¶ E.) In addition, they seek a preliminary and permanent injunction preventing the Provider Defendants from performing abortions. (*Id.* at ¶ F.)

## ANALYSIS

### I.    Overview

As the Order goes on to explain, Plaintiffs lack standing, the Provider Defendants are not state actors, and the State Defendants are protected by sovereign immunity. But before diving into its analysis, the Court pauses to name two challenges with Plaintiffs' legal arguments: (1) Plaintiffs have not clearly identified what state authority they challenge; and (2) Plaintiffs brush aside the fact that they are asking the Court to recognize a new substantive due process right. The Court takes a moment to explain both shortcomings.

A.      *What State Law Do Plaintiffs Challenge?*

Plaintiffs repeatedly invoke the phrase "Minnesota's abortion laws" as the focus of their lawsuit. But they get no more specific than that. Here is how Plaintiffs define the focus of their challenge:

> Collectively, the implementation of Minnesota law as created by the State Constitution and affirmed by the Legislature's repeal of the Minnesota pre-repeal laws, are referenced as the "post-repeal laws," and are the subject of the [] Plaintiffs' claims . . .

(Am. Compl. ¶ 66.)

One possible target could be the series of post-*Dobbs* laws passed by the Minnesota legislature, including the PRO Act. But Plaintiffs disclaim that they challenge those laws: "While those statutes expose an extreme devotion to abortion, they are not the subject of Plaintiffs' claims." (ECF No. 189 at 82 n.9.)

Another potential target could be the Minnesota Constitution. But when pressed, Plaintiffs' counsel could not identify a specific provision of the Minnesota Constitution in dispute. (ECF No. 216 ("Hrg. Trans.") at 10.) The Court asked whether Plaintiffs were challenging a judicial interpretation of the Minnesota Constitution, for example *Gomez*. But Plaintiffs' attorney also denied challenging *Gomez*. (*Id.* at 8.)

The best the Court can glean, Plaintiffs first seem to challenge Sections 2, 7, and 10 of Article 1 of the Minnesota Constitution. Those are the provisions that *Gomez* relied on to conclude that the Minnesota Constitution's right to privacy "encompasses a woman's right to decide to terminate her pregnancy." 542 N.W.2d at 27. The 2022 *Doe* decision, in

14

turn, relied on *Gomez* to overturn the eight then-existing abortion laws. *E.g.*, 2022 WL 2662998, at *28 ("Since the Physician-Only Law infringes on a fundamental right and does not withstand strict scrutiny, it must be invalidated." (citing *Gomez*, 542 N.W.2d at 32)). Plaintiffs also appear to challenge the Legislature's *repeal* of the eight laws found to be unconstitutional in *Doe*.

That said, there is still no statute, regulation, or case that Plaintiffs identify. The core of their challenge is to the legal regime of abortion in Minnesota, writ large.

### B.    *What Fundamental Right is at Issue?*

According to Plaintiffs, the central right at issue is a mother's fundamental right to maintain her parental relationship with her unborn child during pregnancy.[7] (Am. Compl. ¶¶ 40–45, 218; ECF No. 189 at 48.) As support, Plaintiffs contend that "no fewer than 16 Supreme Court cases discuss the sanctity and contours of a parent's right to maintain her parental relationship with her child." (ECF No. 189 at 46–47.)

The Court has carefully read those sixteen cases. True, each addresses, to some extent, familial relationships. *E.g.*, *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982) ("Before a State may sever completely and irrevocably the rights of parents in their natural child,

---

[7] As framed by Plaintiffs, Minnesota's abortion laws violate three fundamental rights: (1) a "mother's intrinsic right to keep and maintain her relationship with her child," (Am. Compl. ¶ 273); (2) "a mother's right to procreate," (*id.* ¶ 277); and (3) a "pregnant mother's interests in her child's welfare and her child's life," (*id.* ¶ 279). It is the Court's determination that the first right encompasses the second and third right. Thus, this section of the Order will try to delineate just the first articulated right.

due process requires that the State support its allegations by at least clear and convincing evidence."). And many celebrate the importance of family. *E.g.*, *Lehr v. Robertson*, 463 U.S. 248, 256 (1983) ("The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility."). But no case has recognized a constitutionally protected right between a pregnant mother and her unborn child.

The intellectually honest approach in this case would be for Plaintiffs to acknowledge that they are seeking to establish a new fundamental right under the Fourteenth Amendment's substantive due process clause. Plaintiffs are perfectly entitled to try and establish such a right. But they have continued to argue that such a right already exists in case law, which is simply not true.

When pressed at the hearing on which cases best support their purported fundamental right, Plaintiffs' counsel pointed to three: *Lehr v. Robertson*; *Tuan Anh Nguyen v. INS*, 533 U.S. 53 (2001); and *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds* ("*Rounds*"), 530 F.3d 724 (8th Cir. 2008) (en banc). These cases do not support the Plaintiffs.

In *Lehr*, Jessica M. was born to unmarried parents. 463 U.S. at 250. Her mother married a different man—not her biological father—several months after she was born. *Id.* When Jessica was two, her mother and her mother's husband adopted her. *Id.* Jessica's biological father "contend[ed] that the adoption order [wa]s invalid because he, Jessica's

16

putative father, was not given advance notice of the adoption proceeding." *Id.* Yet Jessica's father had not registered with New York's "putative father registry," a list maintained by the state that gave registrants notice of any relevant adoption proceedings. *Id.* at 251. Nor was he part of "several other classes of possible fathers of children born out of wedlock" that were also entitled to notice. *Id.* The Supreme Court held that New York's statutory scheme violated neither the Due Process nor Equal Protection Clauses of the Fourteenth Amendment. *Id.* at 263–64, 267–68.

In *Nguyen*, petitioner Tuan Anh Nguyen was born in Vietnam to a U.S. citizen father and a noncitizen mother, who were not married. 533 U.S. at 57. The relevant naturalization statute established "different rules for attainment of citizenship by children born abroad and out of wedlock depending upon whether the one parent with American citizenship is the mother or the father." *Id.* at 58. The Supreme Court held that the different rules were "consistent with the constitutional guarantee of equal protection." *Id.* at 58–59. Applying intermediate scrutiny, the Supreme Court concluded that the additional steps required of citizen fathers served two important governmental objectives: (1) "assuring that a biological parent-child relationship exists" and (2) "ensur[ing] that the child and the citizen parent have some demonstrated opportunity or potential to develop . . . a connection between child and citizen parent and, in turn, the United States." *Id.* at 62–64.

*Lehr* and *Nguyen* consider the rights a father has to a child born to unmarried parents. Neither addresses a pregnant mother's relationship with her unborn child. Both are clearly inapplicable.

*Rounds* fares no better. In 2005, South Dakota enacted House Bill 1166 ("the Act") that required doctors "to provide certain information to the patient as part of obtaining informed consent prior to an abortion." 530 F.3d at 726. The Act required doctors to give the woman a written statement including, in relevant part, "[t]hat the abortion will terminate the life of a whole, separate, unique, living human being." *Id*. The relevant statute defined "human being" as "an individual living member of the species of Homo sapiens, including the unborn human being during the entire embryonic and fetal ages from fertilization to full gestation." *Id.* at 727.

Planned Parenthood sued to prevent the Act from taking effect arguing, inter alia, that the disclosure requirements violated doctors' free speech rights. Planned Parenthood moved for—and ultimately received—a preliminary injunction preventing the Act from taking effect. *Id.* It argued that the law "would violate physicians' free speech rights by compelling them to deliver the State's ideological message, rather than truthful and non-misleading information relevant to informed consent." *Id.*

Sitting en banc, the Eighth Circuit concluded that the district court abused its discretion by finding that Planned Parenthood was likely to prevail on the merits. *Id.* at

18

732–33. Describing *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833

(1992), *overruled by Dobbs*, 597 U.S. at 231, the Eighth Circuit noted that

> [*Casey*] found no violation of the physician's right not to speak . . . where physicians merely were required to give "truthful, nonmisleading information" relevant to the patient's decision to have an abortion. Significantly, information deemed relevant in *Casey* was not limited to information about the medical risks of the procedure itself; the State also required the physician to inform the patient that the father of her child would be liable for child support and that other agencies and organizations offered alternatives to abortion. Such information was relevant because it "furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." Furthermore, the fact that the information "might cause the woman to choose childbirth over abortion" did not render the provisions unconstitutional.

*Id.* at 734 (citations omitted). Looking next to *Gonzales v. Carhart*, 550 U.S. 124 (2007), the

Eighth Circuit observed that, in the context of partial-birth abortions, a state had an

interest in "us[ing] its voice and its regulatory authority to show its profound respect for

the life within the woman." *Id.* (citation omitted). Synthesizing those two cases, the Eighth

Circuit concluded that states could "require a physician to provide truthful, non-

misleading information relevant to a patient's decision to have an abortion, even if that

information might also encourage the patient to choose childbirth over abortion." *Id.* at

735.

Looking to the slim record before the district court at the preliminary injunction

stage, *see id.* at 727–28, the Eighth Circuit noted that there was "little dispute" between

South Dakota's definition of "human being" and Planned Parenthood's supporting

19

affidavit, *id.* at 735. South Dakota defined "human being" as "an individual living member of the species of Homo sapiens during its embryonic or fetal age." *Id.* at 736 (cleaned up). Planned Parenthood described a living embryo or fetus in utero as "a developing organism of the species Homo Sapiens which may become a self-sustaining member of the species if no organic or environmental incident interrupts its gestation." *Id.* (citation omitted). Because Planned Parenthood's definition "appear[ed] to support" South Dakota's definition, Planned Parenthood was not likely to show that the disclosure requirements were "untruthful, misleading or not relevant to the decision to have an abortion." *Id.*

Plaintiffs contend that *Rounds* established, as a matter of constitutional law, that "[a]n abortion terminates the life of a whole, separate, unique, living human being." (ECF No. 189 at 24.) That vastly overstates *Rounds* holding. *Rounds* concluded that it was an abuse of discretion for the district court to grant Planned Parenthood's motion for a preliminary injunction when nothing in the record supported a conclusion that South Dakota's definition of "human being" was "either untruthful, misleading or not relevant to the patient's decision to have an abortion." 530 F.3d at 735.

Relying on these cases, Plaintiffs ask the Court to recognize a new substantive due process right: a mother's fundamental right to have a relationship with her unborn child. The Supreme Court has warned of its own reluctance to recognize new substantive due

20

process rights. *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). And before engaging in that analysis, at the very least Plaintiffs would need standing.

## II.    Standing

Defendants move under Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss the amended complaint for lack of standing. As in every case, the "threshold question" is whether Plaintiffs have Article III standing. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024).

To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Id.* at 380. Because causation and redressability "are often 'flip sides of the same coin,'" "the two key questions in most standing disputes are injury in fact and causation." *Id.* at 380–81 (citation omitted).

An injury in fact must be concrete and particularized; it must be "actual or imminent, not speculative." *Id.* at 381. "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.*

For causation, a plaintiff must show that their injury "likely was caused or likely will be caused by" a defendant's conduct. *Id.* at 382. When government action directly regulates a plaintiff "standing is usually easy to establish." *Id.* The path is harder when a

plaintiff challenges the government's regulation of someone else. *Id.* "That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *Id.*

A.     *Doctors*

The Doctors have not established standing.

To start, Minnesota "has not required the [Doctors] to do anything or to refrain from doing anything," meaning the Doctors have suffered no direct injury. *All. for Hippocratic Med.*, 602 U.S. at 385; *cf. Comprehensive Health of Planned Parenthood Great Plains v. Williams*, 322 F. Supp. 3d 921, 927 (W.D. Mo. 2018) (finding standing where state law required abortion clinics to either "(1) comply with regulations that are expensive, difficult, and allegedly unconstitutional, or (2) face criminal prosecution").

To be sure, the Doctors have genuine objections to how Minnesota regulates abortion. But citizens cannot sue "merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action." *All. for Hippocratic Med.*, 602 U.S. at 381.

Next, Plaintiffs raise a standing argument specific to Dr. Billings. According to the amended complaint, women who regret initiating a medication abortion in Minnesota come to Dr. Billings in North Dakota and request progesterone treatment to offset the

mifepristone. (Am. Compl. ¶¶ 25–26.) Thus, Minnesota's laws "make his efforts and expenditure of time and resources to assist these patients necessary." (*Id.* ¶ 26.)

The expenditure of time and resources is a common injury in fact. *E.g.*, *All. for Hippocratic Med.*, 602 U.S. at 390. But even if Dr. Billings' administration of progesterone is an injury, he has not sufficiently alleged causation. As the Court understands it, the causation chain is (1) Minnesota underregulates abortion providers; (2) because of this under-regulation, abortion providers in Minnesota prescribe mifepristone; (3) women who do not want an abortion visit an abortion provider in Minnesota and are coerced into taking mifepristone; (4) those same women then visit Dakota Hope in North Dakota; and (5) Dr. Billings is required to provide progesterone.

The Supreme Court rejected a similar causation theory in *Alliance for Hippocratic Medicine*. There, "the doctors cite[d] various monetary and related injuries that they allegedly [would] suffer as a result of FDA's actions," for example "diverting resources and time from other patients to treat patients with mifepristone complications." *All. for Hippocratic Med.*, 602 U.S. at 390. The Supreme Court noted that the causal link was speculative: "The doctors have not offered evidence tending to suggest that FDA's deregulatory actions have both caused an increase in the number of pregnant women seeking treatment from the plaintiff doctors *and* caused a resulting diversion of the doctors' time and resources from other patients." *Id.* at 390–91. In addition, the Supreme Court explicitly rejected a doctrine of "doctor standing":

23

> [T]he law has never permitted doctors to challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries. Stated otherwise, there is no Article III doctrine of "doctor standing" that allows doctors to challenge general government safety regulations. Nor will this Court now create such a novel standing doctrine out of whole cloth.

*Id.* at 391.

Even as accepting as true that Minnesota's under-regulation of abortions causes Dr. Billings to provide more progesterone treatment, the causal chain is simply too attenuated. Minnesota's action—not sufficiently regulating abortion providers—"is so far removed from its distant (even if predictable) ripple effects that the [Dr. Billings] cannot establish Article III standing." *Id.* at 383. Dr. Billings cannot challenge Minnesota's lack of regulation "simply because more individuals might then show up" at Dakota Hope seeking progesterone. *Id.* at 391.

## B.    *Pregnancy Help Centers and NIFLA*

Of course, "organizations may have standing 'to sue on their own behalf for injuries they have sustained.'" *Id.* at 393 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. at 363, 379 n.19 (1982)). But organizational standing still requires organizational plaintiffs to "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.* at 393–94. The Court concludes that neither the Pregnancy Help Centers nor NIFLA have organizational standing.

This section addresses five aspects of Plaintiffs' argument: (1) harm to mission; (2) resource diversion; (3) reputational harm; (4) associational standing; and (5) third-party standing.

1.    *Harm to Mission*

According to the amended complaint, Minnesota impairs the mission of the Centers and NIFLA. (Am. Compl. ¶¶ 19, 263, 266.) "That argument does not work to demonstrate standing." *All. for Hippocratic Med.*, 602 U.S. at 394.

In *Alliance for Hippocratic Medicine*, two pro-life medical associations challenged FDA's regulations of mifepristone. 602 U.S. at 376. Like Plaintiffs here, those medical associations claimed that "FDA ha[d] 'impaired' their 'ability to provide services and achieve their organizational missions.'" *Id.* at 394. But the Supreme Court rejected the medical associations' harm-to-mission theory of standing:

> Like an individual, an organization may not establish standing simply based on the "intensity of the litigant's interest" or because of strong opposition to the government's conduct, "no matter how longstanding the interest and no matter how qualified the organization." A plaintiff must show "far more than simply a setback to the organization's abstract social interests."

*Id.* (citations omitted).

On Plaintiffs' harm-to-mission theory, *Alliance for Hippocratic Medicine* is directly on point. The Pregnancy Help Centers' "primary mission" is to defend the "constitutionally protected" rights of pregnant women. (Am. Compl. ¶¶ 23, 25.) NIFLA's "central mission is to help pregnant mothers keep and raise their children." (*Id.* ¶ 263.)

25

But the Centers and NIFLA "cannot assert standing simply because they object to" Minnesota's abortion laws. *All. for Hippocratic Med.*, 602 U.S. at 394.

2.    *Resource Diversion*

According to the amended complaint, Minnesota's abortion laws have caused the Centers and NIFLA to divert resources away from the "advancement of their central mission." (Am. Compl. ¶ 267; *see id.* ¶ 264.) Again, *Alliance for Hippocratic Medicine* rejected a similar theory. In that case, the pro-life medical associations asserted several resource harms that derived from their opposition to FDA's actions: (1) "conduct[ing] their own studies on mifepristone so that the associations can better inform their members and the public about mifepristone's risks"; (2) "'expend[ing] considerable time, energy, and resources' drafting citizen petitions to FDA"; and (3) "engaging in public advocacy and public education." *All. for Hippocratic Med.*, 602 U.S. at 394. The Supreme Court concluded that an organization "cannot spend its way into standing simply by expending money" to oppose government action. *Id.*

The Centers' "central mission" is "the protection of their pregnant patients' constitutionally protected relationship with their children and their interests in the lives and well-being of their children." (Am. Compl. ¶ 13.) To fulfill that mission, the Centers provide services like counseling, education, material assistance, "pregnancy testing, diagnostic ultrasounds, [and] prenatal and parenting classes." (*Id.* ¶ 23.) And NIFLA supports that mission by "provid[ing] training, resources, and legal expertise to its

26

member centers who then provide direct assistance and services to pregnant mothers."
(*Id.* ¶ 263.)

Plaintiffs' resource diversion argument fails on two levels. First, the amended complaint does not sufficiently allege that any Defendant interferes with the Centers' mission or NIFLA's mission. For example, the amended complaint has pointed to no Minnesota law that regulates the Centers' ability to provide counseling, pregnancy testing, or ultrasounds. Second, the amended complaint has not sufficiently alleged what resources have been diverted. The medical associations in *Alliance for Hippocratic Medicine* enumerated specific diversions of resources—conducting studies, drafting petitions, and engaging in public advocacy—yet they still lacked standing. 602 U.S. at 394. Beyond a conclusory allegation, the amended complaint contains no specific factual allegations about what resources have been diverted.

### 3.    *Reputational Harm*

According to the amended complaint, Attorney General Ellison's 2022 Consumer Alert "denigrate[d] the reputations" of Pregnancy Help Centers. (Am. Compl. ¶ 75.) The Alert also "smear[ed]" NIFLA's reputation. (*Id.* ¶ 264.) To be sure, reputational harm can qualify as an injury in fact. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). But allegations of reputational harm supported by conclusory statements are not enough to establish standing. *See Sagehorn v. Indep. Sch. Dist. No. 728*, 122 F. Supp. 3d 842, 868 (D. Minn. 2015) (describing "federal courts' preference for specific pleading of defamation

claims because knowledge of the exact language used is necessary to form responsive pleadings" (cleaned up, citation omitted)).

The Second Circuit recently affirmed a case directly on point: *Miller v. James*, 751 F. Supp. 3d 21 (N.D.N.Y. 2024), *aff'd*, No. 24-2785, 2025 WL 1085815 (2d Cir. Apr. 9, 2025). In 2023, the Attorney General of New York held a press conference and announced the filing of a civil complaint against a pro-life organization called Red Rose Rescue. *Id.* at 28. Red Rose Rescue's activities including "praying, distributing literature, holding pro-life signs, and counselling women on public sidewalks outside of abortion centers." *Id.* at 27. In announcing the complaint, the Attorney General "labelled those who associate with Red Rose Rescue as 'terrorists,' and she labelled Red Rose Rescue a 'terrorist group.'" *Id.* at 28. That statement was published online and covered by the media. *Id.* Two individuals who participated in Red Rose Rescue activities brought a defamation claim. *Id.* But because neither plaintiff was mentioned by name at the press conference, they failed to "establish that any reputational harm actually materialized or was likely to materialize," and thus they lacked standing *Id.* at 32.

In this case, neither WLCC, Dakota Hope, nor NIFLA was mentioned in Attorney General Ellison's Consumer Alert. The Alert invited individuals to share "concerns about any [Pregnancy Help Center] that may be providing deceptive or inaccurate information." (ECF No. 122-2 at 3.) Yet there is no allegation that any complaint was lodged about WLCC or Dakota Hope. Attorney General Ellison did not describe the

Pregnancy Help Centers with charged language like "terrorist." Nor are there any allegations that "any reputational harm actually materialized or was likely to materialize." *Miller*, 751 F. Supp. 3d at 32. Thus, the Alert does not create standing for the Plaintiffs based on a reputational harm.

### 4.    *Associational Standing*

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

NIFLA cannot clear the first hurdle for associational standing. As explained above, neither of the Pregnancy Help Centers "have standing to sue in their own right." *Id.*

To support its associational standing argument, Plaintiffs counter that NIFLA has achieved standing in five other federal cases. (Am. Compl. ¶ 262; ECF No. 189 at 76; ECF No. 192 at 78.) Fair enough. But ironically, those five cases underscore NIFLA's lack of standing here. In each case, NIFLA challenged a state law that directly regulated the speech or actions of its members.[8] By contrast, no Minnesota law imposes an obligation on NIFLA's members' speech or actions.

---

[8] *NIFLA v. Becerra*, 585 U.S. 755, 761–764 (2018) (challenging California statute that required pregnancy-related service providers to give notice of California's public family-planning and contraceptive services or give notice of their status as an unlicensed medical

5.    *Third-Party Standing*

Plaintiffs seem to make a third-party standing argument. (*See* Am. Compl. ¶ 315.)

A plaintiff may assert third-party standing when "the plaintiff has a 'close relationship with the person who possesses the right' and 'there is a hindrance to the possessor's ability to protect his own interests.'" *Alliance for Hippocratic Med.*, 602 U.S. at 397 (Thomas, J., concurring) (citation omitted). Plaintiffs allege that they have a close relationship to pregnant women through various professional and moral obligations. For example, the Pregnancy Help Centers have an obligation to protect the rights and interests of the pregnant mothers who seek out the Centers' services. (Am. Compl. ¶ 256.) But for "litigants to assert the interests of others, the litigants themselves still must have suffered an injury in fact, thus giving them a sufficiently concrete interest in the outcome of the issue in dispute." *Alliance for Hippocratic Med.*, 602 U.S. at 393 n.5 (citing

provider); *NIFLA v. Schneider*, 484 F. Supp. 3d 596, 607–608 (D.N. Ill. 2020) (challenging an Illinois statute requiring healthcare providers with conscience objections to a patient's requested treatment to refer the patient to alternative providers upon the patient's request); *NIFLA v. Raoul*, 685 F. Supp. 3d 688, 697 (D.N. Ill. 2023) (challenging Illinois statute prohibiting providers of pregnancy-related services from engaging in "unfair or deceptive acts or practices" intended to prevent someone from accessing an abortion provider or emergency contraception); *CompassCare, NIFLA v. Cuomo*, 594 F. Supp. 3d 515, 518 (D.N.Y. 2022) (challenging New York statute requiring employers who provide employee handbooks to include notice of New York's prohibition on discrimination based on an employee's reproductive health decisions), *vacated in part sub nom., CompassCare v. Hochul*, 125 F.4th 49, 69 (2d Cir. 2025); *Calvary Chapel Pearl Harbor, NIFLA v. Suzuki*, No. 17-00326-DKW-KSC, 2018 WL 11457412, at *1 (D. Haw. Sept. 20, 2018) (challenging a Hawaii statute that required limited-service pregnancy centers to provide notice of Hawaii's publicly available family-planning services, which include FDA-approved methods of contraception).

*Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013)). The Supreme Court was clear in *Alliance for Hippocratic Medicine*: "The third-party standing doctrine does not allow doctors to shoehorn themselves into Article III standing simply by showing that their patients have suffered injuries or may suffer future injuries." *Id.* The same logic applies to the Pregnancy Help Centers and NIFLA; neither may assert standing based on a purported obligation to patients given that the Centers and NIFLA have not suffered their own injury.

\* \* \*

Plaintiffs' objections here are akin to the plaintiffs' objections in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). In *Lujan*, the plaintiffs desired a broader application of the Endangered Species Act. *Id.* at 558–59. As "organizations dedicated to wildlife conservation and other environmental causes," the plaintiffs believed that the Act should extend to federally funded projects abroad. *Id.* at 559. But absent Article III standing, plaintiffs could not bring their action in federal court. *Id.* at 578.

In this case, Plaintiffs wish that Minnesota required "an order of the court following a full hearing" to ensure that a woman's decision to have an abortion is knowing and voluntary. (Am. Compl. ¶ 246.) But absent Article III standing, Plaintiffs cannot bring their action in federal court.

### III.    State Action

Even assuming standing, Plaintiffs' Section 1983 claims against the Provider Defendants fail as a matter of law under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Sabri v. Whittier All.*, 122 F. Supp. 3d 829, 837 (D. Minn. 2015) ("Even if Plaintiffs had standing to challenge the by-law provision, their claims fail on the merits because [defendant] is not a state actor."), *aff'd*, 833 F.3d 995 (8th Cir. 2016).

To establish a Section 1983 claim, Plaintiffs must show "that they have been deprived of a constitutional right by a person acting under color of state law." *Sabri v. Whittier All.*, 833 F.3d 995, 999–1000 (8th Cir. 2016). Only state actors face Section 1983 liability. *Roberson v. Dakota Boys & Girls Ranch*, 42 F.4th 924, 928 (8th Cir. 2022). "However, 'in a few limited circumstances, a private entity can qualify as a state actor.'" *Id.* (citation omitted). To evaluate whether a private entity is a state actor, the Court answers two questions: "First, 'whether the claimed deprivation resulted from the exercise of a right or privilege having its source in state authority.' Second, 'whether the party engaging in the deprivation may be appropriately characterized as a state actor.'" *Id.* (citations omitted). In this case, only if the answer is "yes" to both questions will the Court classify the Provider Defendants as state actors.

### A.      State Authority

To start, the Court considers whether Plaintiffs' alleged deprivations were "caused by the exercise of some right or privilege created by the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *see Lindke v. Freed*, 601 U.S. 187, 198 (2024) ("An act is not attributable to a State unless it is traceable to the State's power or authority."). In other words, do the Provider Defendants exercise a right or privilege created by Minnesota law when they engage in the alleged unconstitutional acts?

To answer this question, there must be an identifiable state-created right or privilege before the Court. Examples of identifiable state authority include state statutes and contracts between states and private actors. *E.g.*, *Lugar*, 457 U.S. at 924–25 (state statute allowed creditor to secure prejudgment attachment of a debtor's property without judicial review); *Americans United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 422 (8th Cir. 2007) ("The [Iowa Department of Corrections] gave [religious nonprofits] access to facilities, control of prisoners, and substantial aid to effectuate the program. Thus, the privilege . . . was created by the state.").

As described above, Plaintiffs do not pinpoint what state authority is at issue, let alone what state authority the Provider Defendants are allegedly exercising. And even if Plaintiffs had identified a specific state statute, the alleged violations here cannot reasonably be traced back to state authority. The thrust of Plaintiffs' argument against the Provider Defendants is that they perform abortions without informed consent. (*See* Am.

Compl. ¶¶ 12, 107–08, 273–74.) But that harm "is attributable to private decisions and policies, not to the exercise of any state-created right or privilege." *Hoekman v. Educ. Minn.*, 41 F.4th 969, 978 (8th Cir. 2022).

## B.    *State Actor*

Even if Plaintiffs had sufficiently identified state authority, their state action argument would fail at the second step. The Supreme Court has delineated three "limited circumstances" when a private party qualifies as a state actor: (1) "when the private entity performs a traditional, exclusive public function"; (2) "when the government compels the private entity to take a particular action"; or (3) "when the government acts jointly with the private entity."[9] *Manhattan Comm. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019). Of these three circumstances, Plaintiffs focus on the first and third.

As to traditional and exclusive public function, the Supreme Court "has stressed that 'very few' functions fall into that category." *Id.* (citation omitted). Two recognized examples are running elections and operating a company town. *Id.* Nonexamples include "running sports associations and leagues, administering insurance payments, operating

---

[9] The Supreme Court also "recognized that a private entity may, under certain circumstances, be deemed a state actor when the government has outsourced one of its *constitutional obligations* to a private entity." *Manhattan Comm. Access*, 587 U.S. at 810 n.1 (emphasis added). That obligation is not implicated here. *Cf. Roberson*, 42 F.4th at 932 ("Where North Dakota 'outsourced one of its constitutional obligations'—the duty to provide adequate medical care—to the [private psychiatric residential treatment facility], that 'private entity may . . . be deemed a state actor.'" (citing *Manhattan Comm. Access*, 587 U.S. at 810 n.1)).

nursing homes, providing special education, representing indigent criminal defendants, resolving private disputes, and supplying electricity." *Id.* at 810.

Plaintiffs argue that the traditional and exclusive public function here is the termination of parental rights. (ECF No. 189 at 79.) As support, Plaintiffs point to Minnesota laws that govern involuntary terminations of parental rights and adoptions. (Am. Compl. ¶ 47 nn.7–10, ¶ 50 nn.13–19, ¶¶ 51–52 nn.20–22.) In both scenarios, Minnesota mandates robust judicial proceedings before a court can terminate an individual's parental rights. (*See id.* ¶¶ 47, 50, 52.) Plaintiffs reason that because abortions also terminate parental rights, the Provider Defendants exercise a power traditionally and exclusively reserved to the state. (*Id.* ¶ 2.)

But Plaintiffs have not alleged that *abortions specifically* are a traditional and exclusive state function. In fact, there is no allegation that Minnesota itself has ever performed abortions. The Court declines to find that abortion is one of the "very few" functions that fall into the "traditionally *and* exclusively" public function category. *Manhattan Comm. Access*, 587 U.S. at 809.

As to joint action, the Court notes the unique nature of Plaintiffs' argument. As framed by Plaintiffs, this is not a case where one discrete state actor is "knowingly and pervasively entangled" with a private actor. *Wickersham v. City of Columbia*, 481 F.3d 591, 599 (8th Cir. 2007). Rather, Plaintiffs contend that a host of state actors—licensing boards,

the Attorney General, the Governor, and various state agencies—each took one or two actions that, collectively, transformed the Provider Defendants into state actors.

There are two problems with Plaintiffs' approach. First, each instance of joint action, by itself, falls short. Second, even if the Court were to consider each instance collectively, there is no knowing and pervasive entanglement between Minnesota and the Provider Defendants that constitutes joint action.

*State Licensing Boards*. The Presidents of the Board of Medical Practice, Board of Nursing, and Board of Pharmacy license and regulate Minnesota physicians, nurses, and pharmacists, respectively. (Am. Compl. ¶¶ 35–37.) Plaintiffs allege that through "state-sanctioned" licenses, physicians and nurses "are authorized to terminate the pregnant mothers' protected rights, without any form of Due Process protections." (*Id.* ¶ 36; *see id.* ¶ 35.) Plaintiffs also claim that pharmacists "dispense drugs for medical abortions without any regulation, oversight, or Due Process protection to ensure that the mother's waiver of her rights is truly voluntary and fully informed." (ECF No. 189 at 83.) But the fact that the Boards license doctors, nurses, and pharmacists who may work at the Provider Defendants' clinics does not transform the Provider Defendants into state actors. *Manhattan Comm. Access*, 587 U.S. at 814 ("[T]he fact that the government licenses . . . a private entity does not convert the private entity into a state actor."); *Kerwin v. Banner Health*, No. CV-24-03244-PHX-KML, 2024 WL 4904399, at *1 (D. Ariz.

Nov. 27, 2024) ("Physicians do not qualify as state actors merely because they possess state-issued licenses." (citing *Manhattan Comm. Access*, 587 U.S. at 814)).

*Governor*. Governor Walz took two actions that allegedly constitute joint action. At a press conference, he "acknowledged and boasted that he and other state officials are 'partners' with" the Provider Defendants. (Am. Compl. ¶ 29; *see id.* ¶¶ 69–70.) But a joint press conference falls far short of the requisite entanglement to transform the Provider Defendants into state actors. *See Sw. Cmty. Res., Inc. v. Simon Prop. Grp., LP*, 108 F. Supp. 2d 1239, 1247 (D.N.M. 2000) (rejecting argument that joint press conference between mall and local police department transformed mall into state actor). Governor Walz also issued an Executive Order that "forbade any state agency to investigate or start a proceeding that seeks to enforce civil or criminal liabilities or professional sanctions upon an abortion provider." (Am. Compl. ¶ 29; *see* Executive Order.) But the Court notes that the Executive Order did not impose any obligations on the Provider Defendants. And even if it had, that alone falls short of state action. *See Jackson v. Methodist Health Servs. Corp.*, 121 F.4th 1122, 1125 (7th Cir. 2024) (affirming dismissal where district court "concluded that [plaintiff's] claim failed because Methodist [Health Services] was a private actor and it did not become a state actor simply by complying with state law (the governor's executive order), which mandated regular testing for unvaccinated individuals"), *petition for cert. filed*, No. 24-1169 (U.S. May 14, 2025).

*Attorney General*. Attorney General Ellison took two actions that allegedly constitute joint action. First, the Consumer Alert "discourage[d] pregnant mothers from obtaining help they need and want from pregnancy help centers." (Am. Compl. ¶ 28.) Second, his "greatest assistance" to the Provider Defendants is his defense of the State Defendants here. (ECF No. 189 at 82–83.) The Consumer Alert did not entangle the Attorney General's office in the Provider Defendants' operations. And it is unclear how the Attorney General's defense of the State Defendants could transform the Provider Defendants into state actors.

*State Agencies*. Plaintiffs argue that the Commissioners of the Department of Human Services and the Department of Children, Youth, and Families "delegate[]" the "traditional state function" of parental terminations to the Provider Defendants. (Am. Compl. ¶ 30; *see* ECF No. 189 at 84.) Plaintiffs contend that the Commissioner of the Department of Health "provides financial payments to the abortion businesses for abortions." (ECF No. 189 at 84; *see* Am. Compl. ¶¶ 30, 72.) But receiving public funds alone does not convert the actions of a private actor into state action. *Alexander v. Pathfinder*, Inc., 189 F.3d 735, 740 (8th Cir. 1999).

At bottom, there is no "pervasive entwinement'" or "entanglement" between the Provider Defendants and the state. *Wickersham*, 481 F.3d at 597, 598. There is no allegation that Minnesota provides active and critical assistance to the alleged violation—a lack of informed consent.

* * *

Plaintiffs have failed to sufficiently allege both prongs required to transform the Provider Defendants into state actors: (1) their claimed deprivation does not result from state authority and (2) the Provider Defendants may not be appropriately characterized as state actors. Put differently, Plaintiffs have failed to allege "a close nexus not merely between the state and the private party, but between the state and the alleged deprivation itself." *Roberson*, 42 F.4th at 929 (citation omitted). Thus, Plaintiffs' claims against the Provider Defendants are dismissed.

## IV.    Eleventh Amendment Immunity

The State Defendants also argue that they are protected by sovereign immunity.[10] Under the Eleventh Amendment, states are generally immune from suit. *Minnesota RFL Republican Farmer Lab. Caucus v. Freeman*, 33 F.4th 985, 989 (8th Cir. 2022) ("*Freeman*"). State officials sued in their official capacity qualify for that same general immunity. *Ass'n for Gov't Accountability v. Simon*, 128 F.4th 976, 978 (8th Cir. 2025), *petition for cert. filed*, No. 24-1198 (U.S. May 22, 2025). *Ex parte Young*[11] provides a "narrow exception" to Eleventh Amendment immunity. *Freeman*, 33 F.4th at 989–90. But "[t]he *Ex parte Young*

---

[10] Given the clear lack of standing, the Court addressed standing first, and Eleventh Amendment immunity second. *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1017 (6th Cir. 2022) ("[C]ourts have repeatedly noted that they may dismiss on immunity grounds before considering standing issues.").

[11] *Ex parte Young*, 209 U.S. 123 (1908).

exception only applies against officials '*who threaten and are about to commence proceedings*, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act.'" *Id.* at 990 (citation omitted) (emphasis added).

Here, the amended complaint does not allege that Minnesota officials have taken any past enforcement actions against Plaintiffs, are conducting any active investigations into Plaintiffs, or have made any threats to commence future enforcement actions. *See AbbVie, Inc. v. Ellison*, 777 F. Supp. 3d 971, 977 (D. Minn. 2025) (dismissing action based on Eleventh Amendment immunity because there was "no allegation that either [the Minnesota Attorney General or the Minnesota Board of Pharmacy] has enforced or threatened to enforce the statute"). Moreover, Plaintiffs do not clarify which state law, or which provision of the state constitution, might soon be enforced against them. Nor do Plaintiffs identify who is enforcing the unidentified law. And no enforcement mechanism is mentioned. A generalized allegation that an unspecified state law will be enforced by an unspecified state official does not qualify for the *Ex parte Young* exception. *See AbbVie*, 777 F. Supp. 3d at 976 (dismissing action based on Eleventh Amendment immunity because challenged state law "did not expressly empower the Attorney General to enforce" that law).

Thus, even assuming "[the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," there is no allegation that any Minnesota official is about to enforce any state law against Plaintiffs. *Freeman*, 33 F.4th at

990 (emphasis omitted). The Eleventh Amendment bars Plaintiffs' claims against the State

Defendants.

**V.    Merits of Plaintiffs' Claims**

Given its conclusions on standing, state action, and sovereign immunity, the Court

need not reach the merits of Plaintiffs' claims.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein,

Defendants' motions to dismiss (ECF Nos. 163, 176, 213) are GRANTED. And given the

Court's conclusions, Plaintiffs' motion for preliminary injunction (ECF No. 64) is

DENIED as MOOT.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: August 27, 2025                           BY THE COURT:

                                                 s/Nancy E. Brasel
                                                 Nancy E. Brasel
                                                 United States District Judge